# EXHIBIT "F"

# Transcript of the Testimony of **DR. WILLIAM GRAY**

**Date:** June 10, 2009
**Volume:** 1

**Case:** IN THE MATTER OF THE HAMMOCKS LLC d/b/a THE RICHMOND HILL INN

Printed On: 7/19/2009

ORIGINAL

Emert Reporting Service, Inc.
Phone:336-998-9551
Fax:336-998-9568
Email:EmertReport@aol.com
Internet:

Page 1

IN THE MATTER OF THE HAMMOCKS LLC d/b/a

THE RICHMOND HILL FIRE LOSS,


DATE OF LOSS:  March 19, 2009

HARLEYSVILLE INSURANCE CLAIM NO.:  SO-840619

---

Asheville, North Carolina

June 10, 2009

9:00 a.m.




- - - - - - -



EXAMINATION UNDER OATH


OF


DR. WILLIAM GRAY


VOLUME I


- - - - - - -

Page 2

```
 1    APPEARANCES:

 2         RONALD K. PAYNE, ESQ.

 3         LONG, PARKER, WARREN, ANDERSON & PAYNE, P.A.

 4         14 South Pack Square, Suite 600

 5         Asheville, NC 28801

 6         Appearing on behalf of the Deponent.

 7

 8

 9         MICHAEL R. NELSON, ESQ.

10         NELSON, LEVINE, de LUCA & HORST, LLC

11         518 Township Line Road, Suite 300

12         Blue Bell, PA 19422

13         Appearing on behalf of Harleysville Mutual

14         Insurance Company.

15

16

17

18    ALSO PRESENT:     Chris Logan, Larry Williams of Harleysville

19    Mutual Insurance Company; Douglas Y. Christian, Esquire

20

21

22

23                      - - - - - - - -

24

25
```

Page 3

```
 1
 2                        I N D E X
 3   WITNESS            DIRECT      CROSS      REDIRECT    RECROSS
 4
 5   DR. WILLIAM GRAY
 6
 7   By Mr. Nelson          7
 8
 9                    - - - - - - -
10
11                    E X H I B I T S
12
13   NUMBER              DESCRIPTION                    PAGE
14
15   1      Letter from Pinto Coates Kyre & Brown informing
16             Dr. William Gray of Examination Under Oath and
17             documents to be produced dated April 2, 2009...... 10
18   2      Proof of Loss Document............................ 14
19   3      Not marked yet***
20   4      Letter to Ronald K. Payne from Michael R. Nelson
21             dated May 13, 2009 requesting documents..........149
22   5      Application to White Insurance Agency, Inc. dated
23             October 15, 2008................................ 69
24   6      Not marked yet***
25   7      Not marked yet***
```

Page 4

```
 1     8      Letter from Chain Bridge Capital to Dr. William Gray

 2              dated September 8, 2005.........................164

 3     9      Appraisal of May 2005 by Foster Real Estate........166

 4    10      Letter from Virginia C. Love to Mr. Jim Sloggart

 5              dated March 16, 2009...........................149

 6    11      Not marked yet***

 7    12a     Photograph.....................................202

 8    12b     Photograph.....................................202

 9    13a     Photograph.....................................206

10    13b     Photograph.....................................206

11    14      Not marked yet***

12    15      Not marked yet***

13    16      Not marked yet***

14    17      Letters from Ronald K. Payne to Michael R. Nelson

15              dated 5/21, 5/22 and 5/28/2009.................. 15

16    18a     First floor plan of Richmond Hill Inn00............ 33

17    18b     Property Owned by The Hammocks LLC.................144

18    19      Aerial map of land................................ 40
```

19

20    ***These exhibits were not marked during this day of testimony.

21

22                    - - - - - - -

23

24              Quoted material is verbatim and

25            may/may not reflect a direct quote.

Page 5

1

2          The examination of DR. WILLIAM GRAY was taken by

3    Harleysville Mutual Insurance Company for use as evidence, IN THE

4    MATTER OF THE HAMMOCKS LLC d/b/a THE RICHMOND HILL INN FIRE LOSS,

5    OF APRIL 1, 2009, Asheville, North Carolina, pursuant to the policy

6    of insurance, before DEBORAH O. EMERT, CVR, Verbatim Court Reporter

7    and a Notary Public in and for the County of Davie, State of North

8    Carolina, on the 10 day of June, 2009, at the offices of Long, Parker,

9    Warren, Anderson & Payne, P.A., 14 South Pack Square, Suite 600,

10   Asheville, North Carolina 28801, commencing at 9:00 a.m.

11

12                         - - - - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1

2

3

4                    NO STIPULATIONS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1    Thereupon:

2                        DR. WILLIAM GRAY

3    was called as a witness pursuant to notice and agreement of

4    counsel in the above-entitled cause and, being duly sworn in the

5    manner provided by law, was examined and testified upon his oath

6    as follows:

7                        DIRECT EXAMINATION

8    BY MR. NELSON:

9        Q      My name is Mike Nelson, sir.  Do you prefer Dr. Gray

10   or Mr. Gray?

11       A      That or Bill is fine.

12       Q      Okay.  Well, we'll just go with Dr. Gray then, okay.

13   Dr. Gray, I'm an attorney and I represent the Harleysville

14   Mutual Insurance Company and they had a policy that was issued

15   to the The Hammocks, LLC and under that policy they've asked you

16   to submit to an examination under oath or more accurately stated

17   they've asked for a representative of The Hammocks to give sworn

18   testimony today under the EUO provision.  Do you understand

19   that's why you're here today?

20       A      Yes.

21       Q      And have you ever given sworn testimony before?

22       A      Yes.

23       Q      How many times?

24       A      I don't know.

25       Q      More than five?

Dr. William Gray, Vol. I

Page 8

1       A       I was a forensic psychiatrist for a while and so I

2   did a fair number of cases.

3       Q       Okay.  Let me give you some instructions.  Every

4   witness gets them in a situation like this.  The court reporter

5   is taking down everything that you and I say so it's important

6   that she have an opportunity to get the transcript right so you

7   have to wait for me to finish my question before you respond,

8   okay?

9       A       Okay.

10      Q       You're going to assume some times that you think you

11  know where I'm going with a question and so you might start to

12  think about how to answer it so wait till you hear the whole

13  question and make sure you understand it.  If you do answer I'm

14  going to assume you understood the question, is that fair?

15      A       Yes.

16      Q       The communications also have to be verbal so you

17  can't nod your head or shake your head, you have to say yes or

18  no, okay?

19      A       Yes.

20      Q       I also find that using pronouns makes it a little

21  bit hard to understand each other so if you could avoid using,

22  you know, the hims and their and that sort of thing and be very

23  specific in your answers that will help everybody understand

24  what we're talking about, okay?

25      A       Okay.

Page 9

1        Q      It's also important you not guess sworn testimony.

2   Now sometimes people approximate things so if you say about a

3   mile that's not a guess but if you just happen to guess

4   completely an answer that's going to be inappropriate, okay?

5        A      Okay.

6        Q      Are you under the influence of any medication or any

7   substance that's going to impair your ability to understand me

8   today?

9        A      No.

10       Q      You understand me just fine right now?

11       A      Yes.

12       Q      This examination under oath may well go past today.

13  It's going to be a fairly long process so you may need to take a

14  break from time to time.  You let me know if you need that,

15  okay?

16       A      Yes.

17       Q      At the end of the examination under oath, I'm going to

18  give your counsel an opportunity to ask you any questions or you

19  can certainly say anything you want.  This looks like a

20  deposition in some ways because there's a court reporter here

21  but this is an examination under oath and it's slightly

22  different, okay?

23       A      Yes.

24       Q      And again I just want to make sure we're on the same

25  page, are you authorized to testify on behalf of The Hammocks,

1    LLC?

2          A    As far as I know.

3          Q    Who would give you that permission?

4          A    Myself.

5          Q    Did you give yourself permission?

6          A    Yes.

7          Q    What is your position as concerns The Hammocks, LLC?

8          A    I'm the manager, partner.

9          Q    Is it okay if I stop using the LLC part of the name

10   and just call it The Hammocks?

11         A    That'll be fine.

12              MR. NELSON:  If you'll mark that as Exhibit 1.

13   Counsel, that's the letter noticing the EUO and asking for

14   documents.

15         Q    Dr. Gray, in front of you is Exhibit 1.  It's a

16   letter dated April 2nd; do you see that letter in front of you?

17              (Thereupon, Exhibit Number 1 is marked for

18   identification.)

19         A    Yes.

20         Q    Do you recall getting that letter once upon a time?

21         A    Yes.

22         Q    You got it around April 2nd?

23         A    I don't know when but I got it.

24         Q    And when you got it, do you remember thinking that's

25   the right date on the letter, it's not like it was dated a year

Page 11

1    before you got it?

2        A    No.  And it was '09 so.

3        Q    Okay.  And I'm going to ask you to look at a few

4    aspects of that letter as soon as I catch up with you.

5            (Discussion off the record.)

6        Q    When you got the letter, did you read the letter in

7    Exhibit 1?

8        A    I kind of skimmed it.

9        Q    Did you give it to anybody and ask them to explain

10   it to you?

11       A    I gave it to the bankruptcy lawyer for him to look

12   at.

13       Q    Who is that?

14       A    David Gray.

15       Q    And by the way is David Gray related to you in any

16   way?

17       A    No.

18       Q    On the front page of the letter, there's two

19   addresses there, an address for Asheville, that's the business

20   address, correct?

21       A    That is correct.

22       Q    And the address to the right of that Windy Run Lane,

23   is that your home address?

24       A    Yes, it is.

25       Q    I'd like you to turn to page two, you'll see three

Dr. William Gray, Vol. I

Page 12

1    paragraphs down under the words "Reservation of Rights" in the

2    middle there's a paragraph that says there, "You should be aware

3    that the cause of loss at issue has been under investigation.

4    Certain parties have come to the conclusion that the fire was

5    incendiary in nature."  Do you see those two sentences?

6         A    Yes.

7         Q    When you received this letter, did you know the

8    letter said those things?

9         A    Yes.

10        Q    Did you read the rest of that paragraph?  It says in

11   part, "Harleysville is also investigating whether material

12   misrepresentations have been made to Harleysville either before

13   or after the loss."  Do you see that sentence?

14        A    Yes.  Uh-huh.

15        Q    Did you know the letter said that when you received

16   it?

17        A    Yes.

18        Q    Now, if you turn to page 6 of that letter again

19   Exhibit 1, you'll see the words almost at the top "Other

20   Conditions."  Do you see that?

21        A    Yes.

22        Q    Do you see where it says number seven, can you read

23   that paragraph that has number seven beside it?

24        A    Yes.

25        Q    Can you read it to yourself?  I'm going to paraphrase

Page 13

1    that language.   The language generally is considered the

2    misrepresentation, concealment provision of the policy and that

3    language in the policy by courts has been held at times to say

4    that if you lie to the insurance company either before the loss

5    about the policy or about the loss that they will not owe you

6    coverage.   Are you aware that that's a provision in the policy?

7           A     No.   I wasn't aware of it until this came along.

8           Q     Okay.   When you got the letter?

9           A     Uh-huh.

10          Q     Is that a yes?

11          A     Yes.

12                MR. PAYNE:   Dr. Gray, answer yes or no.   Don't nod

13    your head.

14                THE WITNESS:   Okay.

15          Q     So you understand today that while you're under an

16    obligation to tell the truth cause you've sworn an oath, the

17    policy also says that if you lie at any point about something

18    material that they may be grounds for the insurance company not

19    to pay the claim?

20          A     Yes.

21          Q     Now, if you turn to page 9 of the letter, at the

22    bottom it says, "Demand for Proof of Loss," do you see that?

23          A     Yes.

24          Q     Dr. Gray, I'm handing you what's been marked as

25    Exhibit 2 here today.   And I received this from your attorney

Page 14

1    but since I received it I then had every page numbered on the

2    bottom, do you see where it says on the very first page RHI0001?

3              (Thereupon, Exhibit Number 2 is marked for

4    identification.)

5         A    Uh-huh.

6         Q    That's what we refer to as Bates stamping.

7         A    Right.

8         Q    And so each of the pages has been Bates stamped so

9    each page is a different number, okay?

10        A    Uh-huh.

11        Q    Is that a yes?

12        A    Yes.

13        Q    Can you tell me what Exhibit 2 is?

14        A    It's a sworn statement of Proof of Loss.

15        Q    Does it bear your signature on page one of Exhibit

16   2?

17        A    Yes.

18        Q    What is a Proof of Loss, sir?

19        A    Just saying this is what we think we lost.

20        Q    It states how much you lost? Is that yes?

21        A    Yes.

22        Q    Would you do me a favor and sign on the Proof of

23   Loss over your name, where it appears on that copy?

24        A    (Witness signs the document.)

25        Q    And was this document accurate when you first signed

Dr. William Gray, Vol. I

Page 15

1    it?

2          A      I believe so.

3          Q      Okay.  Now at page 10 of Exhibit 1 that letter that

4    we've been referring to.  In the middle of the page it refers to

5    the following documents must be produced.  Do you see that

6    sentence?

7          A      Yes.

8          Q      Then there's a number of paragraphs that follow that

9    that run on for several pages.  Paragraphs 1 through 40.  You

10   understood that the insurance company was asking you to give

11   them some documents?

12         A      Right.

13         MR. NELSON:  Let's go off the record.

14         (Discussion off the record.)

15         Q      What's marked as Exhibit 17 to the EUO, Dr. Gray, is

16   four letters from your attorney directed to my attention.

17         MR. NELSON:  And I don't care how we deal with this

18   but I just want to get some kind of affirmation on the statement

19   that the documents that were produced with these letters were in

20   response to the request for documents in Exhibit 1.  So I don't

21   know if he wants to testify or you want to say.

22         (Thereupon, Exhibit Number 17 is marked for

23   identification.)

24         MR. PAYNE:  If you want to stipulate, I will

25   stipulate that Exhibit 17 were sent to Michael R. Nelson either

Page 16

1    under my signature Ronald K. Payne or that of Philip S. Anderson

2    on behalf of The Hammocks and also enclosed with each of the

3    letters were the documents indicated in each letter some by

4    Bates stamped others not containing, I don't believe there's an

5    enclosure with the top letter if I recall correctly.

6         Q    Okay. And I would just like to get on the record

7    that the documents that are referred to in those letters---

8              MR. PAYNE:  And they were the documents that we were

9    provided in response to the request from the letter from Pinto

10   Coates.  That I believe was Exhibit 1.

11        Q    And Dr. Gray did you participate in getting the

12   documents together?

13        A    Yes.

14        Q    Did you omit, leave out, not put into these

15   documents any documents that would be responsive to these

16   requests?

17        A    None that I possessed or could obtain.

18        Q    Let me get to a little bit of your background, Dr.

19   Gray.  Where do you currently reside?

20        A    I reside in Mooresville and up here.

21        Q    Where is up here?

22        A    Currently, staying in a house that we own across

23   from the inn.

24        Q    That's on the inn property, right?

25        A    It's across the street.

Page 17

1        Q      What's the address for Mooresville?  Is it the

2  address in Exhibit 1?

3        A      Right.  It is.

4        Q      How long have you lived in Mooresville at that

5  address?

6        A      That address three years going on four, I think.

7        Q      Where did you reside before that?

8        A      In Mooresville.

9        Q      What was the street address there?

10       A      Wilton Street.

11       Q      How long did you live there for?

12       A      Six years.

13       Q      By the way have you ever gone by any other name?

14       A      No.

15       Q      What is your Social Security number?

16       A      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.

17       Q      Have you ever been sued civilly in a lawsuit?

18       A      With the Village of Lake Norman one of the partners

19  sued the other partner and I was included in that.

20       Q      Well, let's get some names to that.  Who is the

21  partner that sued you?

22       A      Well, he actually sued Roger Frost who was my

23  partner.  And he was supposed to develop the property there

24  along with his partner his name was Gene something or another.

25  I've forgotten.  And so Gene sued the Elderlin [phonetic]

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Dr. William Gray, Vol. I

Page 18

1    Services which was one part of the Village at Lake Norman and

2    included The Village of Lake Norman and I was involved with that

3    and so I was named in that.

4        Q    So Roger Frost was the plaintiff?

5        A    What do you mean by plaintiff?

6        Q    He's the person that started the lawsuit?

7        A    No.  That was Gene Vaughn was his name.

8        Q    Okay.  And Gene Vaughn sued Roger Frost?

9        A    Right.

10       Q    And also sued you?

11       A    Right.

12       Q    When did that lawsuit start approximately?

13       A    I have no idea.  Five years ago or something.

14       Q    Is it still going on?

15       A    No, no.  It got settled in arbitration and neither

16   one of those individuals were left in the partnership then.

17       Q    Okay.  Any other civil litigation you've been a

18   party to?

19       A    I had one malpractice lawsuit that was threatened to

20   be filed one time but never was filed as far as I know.

21       Q    Does it stem from your activities as a doctor?

22       A    Right.

23       Q    Was that -- that incident where did that happen?

24       A    That was in Roanoke, Virginia.

25       Q    Any other civil litigation you've been a party to?

Page 19

1    MR. PAYNE:  Can I ask you for a point of

2    clarification, Mike?

3    MR. NELSON:  Sure.

4    MR. PAYNE:  Are you referring to him personally or

5    any entity he might have an interest in because I just want to

6    make sure we're---

7    Q    Let me clarify the question.  Thank you for your

8    help.  When I say "you" at this point I'm talking about you as

9    an individual?

10    A    Okay.

11    Q    So any other litigation -- well, first of all let's

12    go back to this litigation with Vaughn and Frost, were you named

13    individually in that lawsuit?

14    A    I was the managing partner for the Village of Lake

15    Norman yes.  But really as the part of Lake Norman Pavilion

16    which was the other entity that made up The Village of Lake

17    Norman.

18    Q    Any other litigation where you were named

19    personally?

20    A    Other than the one in Roanoke and as I said it never

21    went to court or anything and I don't think it ever was filed.

22    Q    Is that case settled?

23    A    Oh yeah.

24    Q    Okay.  Now, I guess we're going to have to get into

25    this at some point.  Can you take me through the different

Page 20

1    business entities that you have a financial interest right now?

2    And I'm not talking about you have stock in Pepsi but I'm

3    talking about companies that you have some financial interest in

4    where you're one of the members or one of the owners?

5        A    Basically, Lake Norman Pavilion which I'm a 49

6    percent owner of and The Hammocks.

7        Q    That's currently, right?

8        A    Right.

9        Q    Have you had an interest in any other business

10    entity either an LLC or a corporation or a partnership?

11        A    Yeah many.

12        Q    Okay.  Can you list those for me?

13        A    No.

14        Q    Why not?

15        A    Because it was work 20, 30 years ago.  I was

16    involved in real estate development and had lots of partners and

17    lots of partnerships.

18        Q    I understand your point about it was 20 or 30 years

19    ago but how about more recent times?

20        A    No.

21        Q    You can't or you haven't had any?

22        A    I haven't had any.

23        Q    Have you ever been terminated from any job?

24        A    No.

25        Q    When was the last time you were under someone else's

Dr. William Gray, Vol. I

Page 21

1    employment?

2          A      1968 or '70, something like that.

3          Q  ·· How were you employed?

4          A      I was working for the US government.

5          Q      In what capacity?

6          A      As a physician.  Somewhere back in there.

7          Q      Can you take me through your education?

8          A      Starting where?

9          Q      Let's go with post-high school, where did you go to

10   undergrad?

11         A      I went to undergrad at Wingate Junior College here

12   in North Carolina and then Wake Forest University, Medical

13   College of Virginia, Duke University.  Then I went to California

14   and worked at -- I was at US Public Health Hospital in San

15   Francisco in between those.  I must have left that out.  And

16   then I moved back to California later on and finished up my

17   residency out there in San Diego.

18         Q      Where in San Diego?

19         A      It was kind of a joint program between the

20   university and the mental health clinic and a child psychiatric

21   clinic.

22         Q      When you ultimately completed your study in

23   medicine, what type of degrees did you have or specializations

24   did you have?

25         A      I was a psychiatrist and had a MD degree.

Dr. William Gray, Vol. I

Page 22

1    Q    Board certified?

2    A    No.

3    Q    Were you licensed in any particular state to

4    practice medicine?

5    A    California, North Carolina, and Virginia.

6    Q    When was the last year you practiced medicine?

7    A    1990, I think.  I don't really remember.

8    Q    Let's go to the events that give rise to this claim.

9    It's my understanding the fire happened on March 19th, 2009,

10   does that sound right to you?

11   A    Yes.

12   Q    Have you had any interaction with any civil

13   authorities investigating the fire?  And when I say "the fire,"

14   I'm always talking about the one that happened on March 19th,

15   okay?

16   A    Yes.

17   Q    Have you had any interaction with any civil

18   authorities where they've questioned you in any way?

19   A    Yes.  The fire marshal on the night of the fire, the

20   State Bureau of Investigation, dog sniffing tests.  I don't know

21   who gave that but somebody had a dog there.

22   Q    The dog came and sniffed you?

23   A    Yeah several times.  Other than that no.

24   Q    You said the fire marshal, do you remember who it

25   was?

```
 1       A      No.  I don't know his name.

 2       Q      The State Bureau of Investigation, do you remember

 3   who it was?

 4       A      No.

 5       Q      You said the fire marshal questioned you the night

 6   of the fire, now are we talking about the morning of the 19th or

 7   later in the day?

 8       A      The morning of the 19th.

 9       Q      Where did that questioning take place?

10       A      He was out smoking a cigarette and I had gone down

11   to watch the fire from where I was staying and I opened the door

12   and he was there and I scared him but ended up talking to him

13   for about 15 minutes.

14       Q      What building were you in at that time?

15       A      At the garden pavilion, it's the lower building.

16              (Ambulance noise outside)

17              MR. NELSON:  Can you hear us okay?

18              MR. PAYNE:  First response.  Probably a fender

19   bender.

20       Q      Can you tell me if that person's first name is

21   Buddy?

22       A      No, I can't.

23              MR. PAYNE:  Can we go off record for a second?

24              MR. NELSON:  Sure.

25              (Discussion off the record.)
```

Page 24

1    Q    Does that ring a bell at all to you?

2    A    No.

3    Q    Can you describe the gentleman?

4    A    He was middle-aged, tall, fairly skinny, smoked.

5    Q    What kind of questions did he ask you?

6    A    He didn't know I was in the property at the time and

7 I explained to him where I had been and I asked him -- I said I

8 didn't hear any sirens or anything and he said well they turned

9 them off before they came up to that area of town.  Because I

10 was just real surprised.  I mean the whole thing was a shock.

11    Q    Did he ask you where you'd been that night?

12    A    I don't really remember what he asked me.

13    Q    Did he ask you any questions that seemed to question

14 whether or not you had anything to do with starting the fire?

15    A    No.

16    Q    So he didn't accuse you of being involved?

17    A    No.

18    Q    He didn't ask any pointed questions?

19    A    No, not that I remember.

20    Q    When did you meet with the folks from the State

21 Bureau of Investigations?

22    A    That day.

23    Q    The day of the 19th?

24    A    19th, yeah.  And the day after.

25    Q    Where did the first meeting take place on the 19th?

Page 25

```
 1      A     Both of them took place at the inn.

 2      Q     Whereabouts in the inn?

 3      A     Down at the garden pavilion.

 4      Q     Was it just you and the officers from the SBI?

 5      A     Right.

 6      Q     How many officers?

 7      A     Just one.

 8      Q     You said you talked to the SBI twice, two different

 9   days, same person both days?

10      A     Right.

11      Q     How long did that meeting take place on the 19th?

12      A     I don't remember but several hours.

13      Q     On the 19th did they ask you any questions that

14   would seem to indicate they were trying to evaluate whether or

15   not you had something to do with the fire?

16      A     No.  They just asked me if I was willing to have the

17   sniff test done and had I thought of anything else that I hadn't

18   told them the day before.  I had gotten some paperwork together

19   to sort of -- you know, to say these are some of the issues that

20   we were dealing with at the time and given it to him the next

21   day so.

22      Q     I'm a little unclear by what you meant you gave it

23   to him the next day, what are we talking about?

24      A     The day after the fire, the second time I met with

25   him.
```

Dr. William Gray, Vol. I

Page 26

1    Q    What did you give him?

2    A    Affidavits regarding our lawsuits and a copy of the

3    lawsuit and a letter my sister had written, my other partner.

4    Q    The letter to Mr. Sloggart?

5    A    Uh-huh.

6    Q    Is that a yes?

7    A    Yes.

8    Q    So you gave him some documents?

9    A    Right.

10    Q    Did you give him anything else?

11    A    No.

12    Q    On the 19th were you asked to submit to a polygraph?

13    A    No.

14    Q    On the 20th were you asked to submit to a polygraph?

15    A    Yes.

16    Q    Did you submit to a polygraph?

17    A    No, I said I needed to talk to a criminal lawyer.

18    Q    Did you speak to a criminal lawyer?

19    A    Yes, I did.  It was the following week.

20    Q    You don't need to tell me what you and the lawyer

21    spoke about but can you tell me who that was?

22    A    Ummm.

23    MR. PAYNE:  I can save you the time, it was Frank

24    Lay.  He's in Silva.  He got the card out yesterday for me.

25    It's L-A-Y.

Page 27

1    Q    Did you eventually submit to a polygraph test?

2    A    No, not yet.

3    Q    Do you intend to?

4    A    I don't know.  It depends on the lawyer.

5    Q    Besides asking you to submit to a polygraph test and

6    to give these documents -- well, actually let me strike all

7    that.  Forget those beginnings of questions, okay, Dr. Gray.

8         What did the SBI ask you that resulted in you giving

9    them some documents?  Did they say "We'd like these kinds of

10   documents or do you have anything that would" -- tell me about

11   what they said that resulted in you giving those documents to

12   them.

13   A    I can't remember the specific questions and words

14   but you know, they were wanting to know what issues we were

15   dealing with at the time, you know, that might have contributed

16   to it.  So the bankruptcy, the lawsuit, and our conflict with

17   the developer were all, you know, issues so I just provided them

18   with the documentation.

19        MR. PAYNE:  When you say "developer" specify who

20   you're talking about?

21        THE WITNESS:  Jim Sloggart.

22   Q    You were in the middle of an answer so?

23   A    So I had those papers readily available and so I

24   just made copies of them and gave it to him and gave it to your

25   investigators also.

Page 28

1     Q    When you say "your investigators," you kind of

2 gestured to this room so the two people in the blue shirts in

3 the room?

4     A    Yes.

5     Q    The documents that you gave to the investigators

6 from Harleysville are the same documents that you gave SBI?

7     A    As far as I remember.

8     Q    By the way what's your date of birth, Dr. Gray?

9     A    9/8/41.

10    Q    Are you married?

11    A    Yes.

12    Q    Who are you married to?

13    A    Emily Gray.

14    Q    How long have you been married to Emily Gray?

15    A    43 years, I think it is.  Thereabouts.

16    Q    Where does Emily Gray reside?

17    A    She lives at our home in Roanoke, Virginia.

18    Q    What's the address there?

19    A    5208 Archer Drive, Roanoke, Virginia.

20    Q    I'm not trying to suggest there's anything unusual

21 about a husband and wife living in different states but is there

22 any reason you can tell me why she lives there and you live in

23 North Carolina?

24    A    Yeah.  Our home's in Virginia and our property that

25 we own and the income that we live off of is there and we had

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Page 29

1    planned to retire to Mooresville.  My wife doesn't like cold

2    weather and it's warmer down near Charlotte so we bought

3    property down there and I lived down there and she was going to

4    follow then I started the assisted living and that turned into a

5    nightmare financially of building and construction and then

6    trying to run that and we needed the income from our apartments

7    and things to maintain so she stayed in Virginia and comes down

8    on the weekends or I go up there.  She usually comes down.

9         Q    You said -- go ahead.

10        A    So we were waiting till we got rid of all our

11   properties and could go on and retire.

12        Q    You said something about Roanoke, Virginia being

13   where you generate income, can you tell me how the property in

14   Roanoke generates income?

15        A    We have a lot of apartments that we own.

16        Q    So you have rental income?

17        A    Yes.

18        Q    Any other income stemming from your property in

19   Roanoke?

20        A    Yeah, rental income.

21        Q    Besides rental income?

22        A    No.

23        Q    Are those apartments held in her name or do you have

24   corporations or LLCs?

25        A    I don't really remember.  Her name and my name and I

1   think part of one of them is in a LLC but she's the partner.

2      Q      What's the name of the LLC?

3      A      I don't remember the name of it is but she's a

4   partner.

5      Q      How many apartments do you own?

6      A      At this point about 140 or so maybe.  I don't

7   remember.

8      Q      Are those spread in different locations?

9      A      Two different locations.

10     Q      So can I assume they're two different apartment

11  complexes?

12     A      Right.

13     Q      Besides that rental income, rental income from any

14  retail establishments?

15     A      We sold all those sort of things.

16     Q      You at one point had that?

17     A      Yeah, we owned a shopping center and some other

18  things.

19     Q      Okay.  Let's get back to the interviews with the

20  SBI, you told me the first day lasted several hours, how long

21  did the second day last?

22     A      I don't know, maybe 15 minutes.

23     Q      Anything in that day that seemed to you to be a

24  question where they were asking you if you were involved in the

25  fire?

Page 31

1     A    No.  Other than just if I'd be willing to do the

2  sniff test with the dogs.

3     Q    Did anybody either with the fire marshal's office or

4  SBI ever tell you what the cause of the fire was in their own

5  opinion?

6     A    No.  I read in the paper something.

7     Q    Now, Dr. Gray, you started to answer before I

8  finished my question so if you could just maybe hold it a little

9  bit, okay?

10          What have you read in the papers about the cause of

11  the fire?

12     A    That they suspected arson.

13     Q    When you say "they," are you talking about the civil

14  authorities?

15     A    The paper said that so.

16     Q    Did you ever express to anybody that you suspected

17  it was arson?

18     A    I sure did.

19     Q    Do you suspect it was arson?

20     A    I think so.

21     Q    What's the basis of that suspicion?

22     A    The fact that it was such an incredible blaze, you

23  know, the whole building was on fire.

24     Q    Anything else?

25     A    No.

Dr. William Gray, Vol. I

Page 32

1    Q    Did you interact with the press in any way after the

2    fire?

3    A    No.  They tried to interview me and I wouldn't.

4    Q    How many times were you asked to speak to an

5    interview?

6    A    Well, they started calling me one day when I was

7    arriving the next week and they didn't ask for an interview,

8    they just asked me a question and I said no and I went inside.

9    Q    What question did they ask you?

10    A    If we were going to give refunds to the brides.

11    Q    And you said no?

12    A    I said "No, I can't answer that right now."

13    Q    Did you ever take the position that you were going to

14    offer refunds to the brides?

15    A    Of course, yeah, I wanted to.

16    Q    And have you given any refunds to the brides?

17    A    Not many cause we don't have the money.

18    Q    But you have offered some or given some?

19    A    We've given some.  Yeah.

20    Q    Did you ever deny -- when you were interacting with

21    the press, did you ever deny being the owner of the Richmond

22    Hill Inn?

23    A    No.

24    Q    I'm going to show you a diagram.

25    MR. NELSON:  Counsel, I'm going to give you a smaller

Page 33

1    one, it makes it a little easier.  And I'm not sure we'll even

2    spread this out but---

3          MR. PAYNE:  Do you want me to move these out of the

4    way?

5          MR. NELSON:  That would be great.  And we're going

6    to mark this as 18a.

7    Q    And you'll see in handwriting over here it's a bit

8    upside down, it says, "Heating, air-conditioning first floor

9    plan" on Exhibit 18a.  But I'm not so interested in the heating,

10   air-conditioning as much as just roughly the depiction of the

11   layout of the plan.  So can you look at this plan and tell me

12   whether or not that looks like the drawing that would comport

13   with the first floor of what I think you guys refer to as the

14   mansion?

15          (Thereupon, Exhibit Number 18a is marked for

16   identification.)

17   A    Yes, it would.

18   Q    You've been in the mansion countless times, correct?

19   A    Right.

20   Q    You've eaten in the mansion?

21   A    Yes.

22   Q    Have you walked through all the different floors of

23   the mansion?

24   A    Yes.

25   Q    Been in the basement of the mansion?

Page 34

1      A      Occasionally.

2      Q      What I'd like to do, Dr. Gray, is identify how many

3   doors there were into that first floor area, I'm not talking

4   about the basement but I'm talking about the first floor area,

5   how many doors people could walk into the first floor directly?

6   Can you look at this plan and tell me?

7      A      This is the front door, over here there's a side

8   door somewhere here and then this is a door here, that came into

9   this is a ballroom and then there was a door over here from the

10  porch. So there'd be one, two, three, four doors.

11     Q      We're going to make it a little bit clearer.  We're

12  going to mark that exhibit with numbers.  So I want you to put a

13  number one with a circle on it by the door that you just

14  described when you pointed at the first door?

15     A      You mean the front door?

16     Q      Yes.  Put a one with a circle there.  You called it

17  the front door?

18     A      Yeah.  That's the front.

19     Q      Proceed to the next door you pointed out to?

20     A      This is the side door.

21     Q      Okay.  Put a two there.  Okay.

22     A      And then this is another door.

23     Q      Okay.  Put a three there.

24     A      Somewhere here.

25     Q      Is it a sliding glass door?

Page 35

1     A    No.  Anyway there's a door here somewhere.

2     Q    So put a three there.

3     A    And then there's a door here off to the porch.

4     Q    Is there a door over to the left-hand side of----

5     A    No.

6     Q    My left your right?

7          Okay.  How about this drawing on 18a, is that a

8 door?

9     A    No.  Not to the outside.  I mean I think it's a door

10 into a closet.

11     Q    I see.  Okay.  So you've drawn four numbers with

12 circles around them, correct?

13     A    Right.

14     Q    Just to make this easy where those circles are, I'd

15 like you to fill in with that orange marker on 18a roughly where

16 the openings were?  Because we're going to do the windows in a

17 different color.

18     A    I don't know where the windows -- I mean.

19     Q    Well, we'll talk about that in a minute.  If you

20 can't you can't.  But if you can just kind of fill in with the

21 orange marker where the doors were?

22     A    This represents a door here so I mean.

23     Q    Okay.  Just draw an orange line across it where the

24 threshold would be.  Okay.  Great.

25     A    And then this represents a door and this represents

Page 36

1    a door and this doesn't have a representation.

2          MR. PAYNE:  When you say "this," specify which

3    number you're referring to.

4          THE WITNESS:  This number three but it goes out on a

5    porch that's here.

6      Q      So can you just roughly draw it in where you think

7    it is?

8      A      It would have been opposite this.

9      Q      Great.  Now, I started to ask you looking at this

10   drawing can you identify the different windows in the building?

11     A      By the drawing I can't.

12     Q      Well, let's stay on the doors for a moment, okay.

13   At the time of the fire were the doors protected with a security

14   device of some kind so that if somebody entered the building

15   without disarming the security system a security alarm would

16   sound?

17     A      There's no security alarm on it as far as I know.

18     Q      Would you agree with me if I said half the building

19   was severely affected by fire and half was relatively unaffected

20   by the fire?

21     A      No.  Everything was affected by the fire from here

22   to here.

23     Q      Yeah.  See, that's what I'm trying to get to and I

24   want you to describe what you mean by that.  You put your arm

25   kind of halfway across the diagram in Exhibit 18a so part of the

Page 37

1    building is still standing, correct?

2    A    There are two rooms that are still standing.

3    Partially.

4    Q    If you could take a blue marker and just draw right

5    across the diagram where the remnants of that two rooms are?

6    A    This really isn't correct.  These are bathrooms.

7    Q    You're saying on the diagram those are bathrooms?

8    A    Yeah.  Those are bathrooms, those are the sinks and

9    the toilets and there's another room out here.

10    Q    You're indicating to the right of Exhibit 18?

11    A    Yeah.  There are two rooms.  This is the kitchen off

12    here and this is the ballroom off here and this all pretty well

13    is destroyed.  This was the service area and various stuff like

14    that and the bathrooms were partially destroyed.  So it's a part

15    this way that really isn't --- the first floor is fairly well

16    intact.

17    Q    Okay.  So I want to make sure that the record is

18    somewhat straight because you just made a few gestures, okay.

19    With your permission I'm going to draw what I think you just said.

20    That the building extended in the direction that I'm putting an

21    arrow?

22    A    Right in here too.

23    Q    And so I've marked two arrows to indicate the

24    building was larger than what's on this diagram, correct?

25    A    Right, it is.