Dr. William Gray, Vol. I

Page 76

1    History" there, sir?

2        A    Yes.

3        Q    I'd like you to look at the typing that fills this

4    in this section and tell me whether or not that's accurate?

5        A    You mean 07-08 ordered?

6        Q    Uh-huh.

7        A    I don't know what it means.

8        Q    Okay.  And then under remarks it says, "see attached

9    remarks overflow," do you know if that's accurate?

10        A    I don't know.  I mean, is there an attached

11    overflow?

12        Q    I don't know what you know about the application,

13    sir.

14        A    No.  I don't know anything about it so I

15    didn't have anything to do with it.

16        Q    Before today have you ever looked at any of these

17    insurance application documents?

18        A    No.

19        Q    I'd like to talk about your relationship with your

20    accountants.  When I say you, I'm talking about The Hammocks.

21    What accounting firm do you currently use?

22        A    It's kind of -- last year we were trying to get a

23    loan to get things refinanced and the bank required us to do a

24    forensic audit on the books since we bought the property.  So we

25    hired a company that they recommended to come in and do that and

1    then since they had all the material available at that time they

2    did our taxes for that year.  This was for '07.

3         Q    What company is that?

4         A    I can't remember their names.

5         Q    Do you want to look at the documents you've

6    produced?

7         A    Yeah.  It's there.

8         Q    They're in those boxes.

9         A    Huh?

10        Q    They're in those boxes.

11        A    I know I've given it to you but I don't remember

12   their name.

13        Q    Do you remember the accountant's name?

14        A    One of them's name was David.

15             MR. PAYNE:  It says David Worley.

16             THE WITNESS:  Worley.  Yeah.

17        A    And then there's a gal in his office that actually

18   did the work.  I've met with her several times when she was

19   doing that but I don't remember her name at this point.

20        Q    When you say they did your tax, are you talking

21   about 2008 taxes?

22        A    2007 taxes.

23        Q    That you filed in----

24        A    We got an extension for this year for last year and

25   they're going to do it for this year if it's approved by the

Page 78

1    bankruptcy court.

2         Q    For fiscal year 2007 and the tax returns to be filed

3    in 2008, do you understand what I mean by that?

4         A    I do.

5         Q    Is that the year that David Worley did the tax

6    returns?

7         A    2007.

8         Q    Yeah.  Were they filed in 2008?

9         A    Yes.

10        Q    Is he preparing the 2008 returns?

11        A    If it's approved by the bankruptcy court.

12        Q    But he's prepared them already, right?

13        A    Not that I know of.

14        Q    The bankruptcy court has to approve him preparing

15    them?

16        A    The last I heard it hadn't approved it.

17        Q    Okay.  Does he have all the work records that he'll

18    need to prepare the tax returns?

19        A    As far as I know they've been provided.

20        Q    Who was the accountant before David Worley?

21        A    Caldwell Baker Law Firm in Chattanooga has done our

22    taxes the previous two years or previous years for The Hammocks

23    for a number of years.

24        Q    Is that the law firm that Virginia Love works at?

25        A    Right.

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Dr. William Gray, Vol. I

1     Q    And the law firms handle your tax returns?

2     A    They have an accountant in the tax division.

3     Q    Virginia Love is your sister, right?

4     A    Right.

5     Q    And she has an ownership interest in The Hammocks?

6     A    She's the majority owner.

7     Q    What's her majority?

8     A    I don't know.  I provided you with percentages, it's

9  over 50 percent.

10     Q    I know you've provided me with the documents, I'd

11  like you to look at the documents and tell me what her percent

12  ownership is?

13     A    I don't know.

14     MR. PAYNE:  Do you want to move this map?

15     MR. NELSON:  Yeah, let's do that.

16     THE WITNESS:  It would be based on the questions.

17  It could be under 33.  I don't know where that would be.  Or 34

18  it could be there too.

19     MR. PAYNE:  These are just Bates stamped.  Let's see

20  here we go.  Lake Norman.

21     MR. NELSON:  While you guys are looking for that,

22  I'm going to use the men's room.

23     (Discussion off the record.)

24     Q    Dr. Gray, we've all been rooting around trying to

25  find some documents so the documents you and Attorney Payne have

Dr. William Gray, Vol. I

Page 80

1    directed me to is 1021 and 1022 of The Hammocks production.    Can

2    you tell me what these documents are?

3         A    This was the last amendment of the ownership of The

4    Hammocks.

5              MR. PAYNE:  Can we go off the record a second?

6              MR. NELSON:  Sure.

7              (Discussion off the record.)

8         Q    So you said this was the last version 1021, correct?

9         A    Right.

10        Q    Of The Hammocks operating agreement?

11        A    Right.

12        Q    And this says fifth so I'm assuming that there's

13   been five prior?

14        A    Right.  Yes.

15        Q    Okay.  Dr. Gray, you gotta let me finish my

16   question, okay.  I'm not trying to fuss with you.  Humans do

17   this all the time when they communicate but it makes the record

18   real hard, okay.  So there were four amendments prior to this

19   amendment and the original, correct?

20        A    Correct.

21        Q    Did you produce the other five versions of the

22   operating agreement?

23        A    Here's the first one----

24             MR. NELSON:  Let's go off the record.

25             THE WITNESS:  The second one.

Page 81

1          MR. NELSON:  Okay.  Let's go off the record.

2          (Discussion off the record.)

3      Q    Bates stamp numbers just give me the first and last

4   of those.

5          MR. PAYNE:  The first one starts at 1008.

6      A    Then the last one is the fifth one which is 1029.

7          MR. PAYNE:  It's 1023, Dr. Gray.

8          THE WITNESS:  I mean it's 1023.  Yes.

9      Q    So, Dr. Gray, feel free to look at those documents

10  if you want.  I'd like you to tell me in your own words how the

11  ownership of The Hammocks started when The Hammocks was first

12  created to the point where it is capsulated in the fifth amended

13  version?

14     A    The Hammocks started with a partnership out of

15  Charleston, South Carolina and we sold a piece of property down

16  there.

17     Q    What was the name of that partnership?

18     A    The Hammocks.

19         MR. PAYNE:  I think when he's saying partnership he

20  means LLC.  And I'm just saying this not to stick my nose in but

21  to clarify.

22     Q    I understand.

23     A    And when that property was sold it was traded into

24  the Richmond Hill Inn.  Our partner who is a developer wanted to

25  develop some land for some other projects and we looked

Page 82

1    throughout Charleston and the Charlotte area and the coastal

2    South Carolina to see what we could find and never could find

3    anything and then we found the inn with 40 acres that are

4    developable. And so he wanted us to and I wanted to buy it

5    thinking it was a very good project.

6        Q    And I want to go back and clarify a few things. Can

7    you just stay with me for a minute, Dr. Gray. So there was a

8    piece of property in Charleston, South Carolina that you sold?

9        A    Right.

10       Q    And that property was owned by The Hammocks, LLC?

11       A    Right.

12       Q    Who were the members at that time of The Hammocks,

13   LLC?

14       A    Initially the two guys that sued each other and then

15   ended up dropping out were members.

16            MR. PAYNE:  What's their names?

17            THE WITNESS:  Gene Vaughn and Roger Frost.

18       Q    Let me ask you some questions along the way. Let's

19   go back to square one. When The Hammocks, LLC was first

20   created, who were the original members?

21       A    Roger Frost, Gene Vaughn, Virginia Love, myself,

22   Mary Catherine Love, Mary Horton, and Skip Frieburg.

23       Q    When that organization was first created, was it

24   around the idea of owning some property?

25       A    No. It was around the idea of us starting and

Dr. William Gray, Vol. I

Page 83

1    developing another retirement community like we had in

2    Mooresville.

3         Q    So it was just an idea of let's start this LLC and

4    we'll buy some land to develop for a retirement community?

5         A    Uh-huh.

6         Q    Is that a yes?

7         A    Yes.

8         Q    And the first version of that document is Bates

9    stamped what?

10        A    Based what?

11        Q    The first version of that document is Bates stamped

12   what?

13             MR. PAYNE:  Are you talking about the first

14   amendment?

15             MR. NELSON:  No, the first original.

16   Because you got the first amendment as 108.

17             MR. PAYNE:  Right.  1008.

18        A    The operating agreement is 974 in the front part of

19   all this.

20        Q    Hold on for a second, Dr. Gray, let me catch up with

21   you.

22        A    937 is where you need to start.

23        Q    Where do the names appear?  Is it Exhibit B to the

24   operating agreement 972?

25        A    That was, yeah, one of them.

Page 84

1    Q    Okay.  When you say "one of them," is there another

2  one?

3    A    No, I guess that's it.

4    Q    Now you referred to somebody here as the developer,

5  who would that have been?

6    A    On that particular project Roger Frost and James

7  Sloggart were going to do the development.

8    Q    What was the project called?

9    A    The Hammocks.

10   Q    And that was located where?

11   A    In Mount Pleasant, Charleston, South Carolina.

12  Charleston County.

13   Q    Did that project ever come to fruition?

14   A    Nope.  I bought the land and had it rezoned and

15  planned and got all the approvals and everything for it and

16  Roger Frost had dropped out by then and Jim Sloggart never

17  developed it so I sold it.

18   Q    Who bought the land?

19   A    I did.

20       MR. PAYNE:  Are you asking who bought it at the sale

21  after The Hammocks acquired it?

22       MR. NELSON:  I'll clarify the question.  Thank you.

23   Q    When the land was first purchased which person or

24  which group purchased it?

25   A    The Hammocks purchased it but I was the one who was

Page 85

```
 1    buying it.

 2         Q     But The Hammocks took ownership of that land?

 3         A     Right.

 4         Q     Was it raw?

 5         A     Raw land in a sub development.

 6         Q     How many acres was that?

 7         A     40 acres.

 8         Q     In Charleston?

 9         A     Mount Pleasant.

10         Q     But is that Charleston?

11         A     Charleston County.

12         Q     The land was rezoned?

13         A     Yes.

14         Q     How come it was never developed?

15         A     Cause my partner didn't develop it.

16         Q     When you say "my partner," which are you referring

17    to?

18         A     Jim Sloggart.

19         Q     Does The Hammocks still own that land?

20         A     No, we sold it, traded it into Richmond Hill.

21         Q     Why did Sloggart never develop it?

22         A     You'd have to ask him.  I do not know.

23         Q     You have no idea?

24         A     Just like he didn't develop the one up here.  We

25    were the investors basically and he was the developer.
```

Dr. William Gray, Vol. I

Page 86

1    Q    When was the land first purchased by The Hammocks?

2    A    In Mount Pleasant?

3    Q    Yeah.

4    A    2002 or '03, I don't remember which.

5    Q    When was it sold?

6    A    2005.

7    Q    How much did you sell the land for?

8    A    I don't remember.  We cleared 2 million plus.

9    Q    And when you sold the land it wasn't developed in

10    any fashion?

11    A    No.

12    Q    Did the assets from the sale remain with The

13    Hammocks?

14    A    Yes.

15    Q    And you said that Frost dropped out?

16    A    Except for several people we paid their share off

17    that had minor parts of it and they didn't want to proceed.

18    Q    Was there a profit made on that sale?

19    A    Close to $2 million.

20    Q    Well, if you sold it for 2 million plus---

21    A    The profit was that----

22    Q    Netted 2 million.  How much was the purchase price?

23    A    I don't really remember.  I know I lent the money to

24    the thing and then got the money back afterwards.

25    Q    So it was a $2 million profit from the sale which

Dr. William Gray, Vol. I

Page 87

1  had to be shared by all the members of the LLC according to the

2  percentages of ownership?

3        A    Right.

4        Q    So the people that remained inside The Hammocks --

5  let me finish my question -- left their assets inside The

6  Hammocks?

7        A    Yes.

8        Q    So Frost drops out?

9        A    Yeah.

10       Q    Frieburg drops out?

11       A    Right.

12       Q    Mary Horton remain in?

13       A    Dropped out.

14       Q    Mary Mullins is your sister, right?

15       A    Stayed in.   Yeah.

16       Q    Lake Norman Pavilion stay in?

17       A    Stayed in.

18       Q    Virginia Love stayed in?

19       A    Right.

20       Q    Jim Sloggart individually stayed in?

21       A    Right.

22       Q    Please go to page 972 and then 973.   Sloggart is

23  listed there twice, do you know why?

24       A    No, I don't.

25       Q    Who is the law firm that drew up this agreement?

Dr. William Gray, Vol. I

Page 88

1    A    I don't remember.

2    Q    So then after the Mount Pleasant project didn't pan

3  out is that when you turned your sights on the Richmond Hill Inn

4  property?

5    A    Right.  After we sold that.

6    Q    When you use "that," that's where it gets confusing.

7    A    The project in Mount Pleasant then we looked for

8  another property because Jim Sloggart said he would develop

9  another project and really wanted to do that instead of

10  splitting the partnership up.

11    Q    Okay.

12    A    And that's when after looking for a good while we

13  found Richmond Hill Inn and the adjacent land and we decided to

14  buy that.

15        MR. PAYNE:  Can we go off record a second here?

16        MR. NELSON:  Yeah.

17        (Discussion off the record.)

18    Q    So according to the original operating agreement the

19  attorney who drew up the operating agreement was Timothy

20  Gavigan, it that correct?

21    A    That is correct.

22    Q    Why did the operating agreement become amended the

23  very first time, so we're looking at this very first amendment?

24    A    Because when we bought Richmond Hill property, Jim

25  Sloggart wanted to trade some money into it and so he wanted a

Page 89

1    bigger interest so that was the initial -- the first amendment

2    was after the close of the other property before we bought the

3    inn.  We only had one other property and that was Mount Pleasant

4    property.  This was the amendment after we sold that.

5        Q    Okay.  So can I take from your answer, Dr. Gray,

6    that the first amendment occurs because you sold the Mount

7    Pleasant property, the members have changed along the lines

8    we've already discussed and then Jim Sloggart wants to put a

9    bigger financial stake into this?

10       A    That's correct.

11       Q    And is this the agreement that was in operation at

12   the time that the Richmond Hill Inn was purchased from the

13   Michels?

14       A    The second one.  I believe it was the second one.

15            MR. PAYNE:  Don't guess.  I don't want you guessing,

16   look at the dates.

17            THE WITNESS:  This was the one after the sale.

18       Q    When you use "this is," that's not going to work?

19       A    Okay.  You ask the questions.

20       Q    I know.  So what operating agreement was in

21   existence at the time Richmond Hill Inn was purchased?

22       A    The second.

23            MR. PAYNE:  What was the purchase date?

24            THE WITNESS:  The 15th.

25            MR. PAYNE:  Okay.  Then the third is in effect.

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Dr. William Gray, Vol. I

Page 90

1    Hang on.

2        Q    Do you want to change your answer?

3        A    Yes, please.  The third was in effect.  They're all

4    signed at the same time.  I believe the third one was in effect.

5        Q    What do you mean they were all signed at the same

6    time?

7        A    They're all basically -- they had been prepared

8    previously and we couldn't get everybody together to sign them

9    and so finally I got them all together and people signed them at

10   different times but finally they were all finished basically at

11   the same time.

12       Q    Well, actually the third and the second seem to

13   differ in the third talks about added capital of $56,000.

14       A    Right.

15            MR. PAYNE:  I think what he's saying is the

16   effective dates of each of those are within 4 to 5 days of one

17   another.

18       Q    So I want you to tell me about why there was a

19   second agreement and why there was a third agreement.  We

20   already talked about the second was created because we just went

21   through three reasons.  Why the third agreement?

22       A    The third agreement is what it was at the time of

23   getting ready to close on Richmond Hill Inn.

24       Q    But why did the agreement change from the second to

25   the third?

Dr. William Gray, Vol. I

Page 91

1       A       Because Mr. Sloggart wanted to put some more money

2   into it.

3       Q       Is that the only basis for the change?

4       A       As far as I know, yeah.

5       Q       Why was the fourth amendment to the operating

6   agreement created?

7       A       Because Mr. Sloggart wouldn't put the money in that

8   we were having to put into the inn and so the other partners

9   were contributing money and so for tax purposes we did an

10  amendment to reflect the ownership.

11      Q       So on the fourth operating amendment it refers to

12  added capital of $10,000 by Sloggart?

13      A       Yeah.

14      Q       That means he contributed an additional 10,000?

15      A       Right.

16      Q       And then it refers to on the next page $2,832,883 by

17  Lake Norman Pavilion was that the contribution?

18      A       Right from Lake Norman.  Another contribution from

19  Lake Norman Pavilion.

20      Q       So the 10,000 plus the 2.8 are contributions made to

21  The Hammocks in order to support the Richmond Hill Inn?

22      A       Two million of it went to the Michels to pay off

23  principle and then the other 800,000 went to support the inn.

24      Q       Was that just operating revenues then?

25      A       To cover operating revenues.

Dr. William Gray, Vol. I

Page 92

1      Q      Was it $2 million even that went to the Michels?

2      A      Basically, yes.  A 100,000 had gone to them earlier

3   and then a million nine but it was all lumped in together so.

4      Q      So can I take from that answer, sir, that if you add

5   the 2.832 Lake Norman contribution with the $10,000 that

6   Sloggart put in an additional and then you subtract out 1.9 that

7   went to the Michels the remainder of that went to the operating

8   capital for The Hammocks to run the Richmond Hill Inn?

9      A      Yes.

10     Q      Why was the fifth amendment created to the operating

11  agreement?

12     A      Because Mr. Sloggart still wasn't willing to put his

13  share of the contributions in.

14     Q      What do you mean by contributions?

15     A      Well, as we needed money to support the inn we

16  contributed money to it and so it was left for my sister, Lake

17  Norman Pavilion or for me to come up with the money to put in.

18     Q      Looks like you contributed 75,000 at that time?

19     A      Yeah.

20     Q      And that Sloggart contributed 50,000?

21     A      Yeah.  Prior to that, yeah.

22     Q      What do you mean prior to that?

23     A      Prior to this amendment he had contributed that.

24     Q      So somewhere between the fourth and fifth amendment

25  he contributed an additional $50,000?

Dr. William Gray, Vol. I

Page 93

1   A   Yes.

2   Q   And then Virginia Love contributed $100,000?

3   A   Right.

4   Q   In addition to these documents that talk about the
5   operating agreements, have there been any other documents
6   created officially by The Hammocks, LLC or any of the members or
7   people that service The Hammocks that talk about these
8   transactions?

9   A   Not that I know of.

10   Q   Any minutes of the meetings?

11   A   We don't do that.

12   Q   Do you meet regularly as an organization?

13   A   No.

14   Q   When is the last time that all current members of
15   The Hammocks met to talk about business either by telephone or
16   in person?

17   A   We had a phone conversation, a conference call with
18   David Gray back in September of '08, I believe it was.

19   Q   Okay.  Was anybody with David Gray when that call
20   was made?

21   A   Myself.

22   Q   You were in his office?

23   A   Right.

24   Q   And I'm not asking you to tell me what was discussed
25   there except for the purpose of the meeting was to talk about

Dr. William Gray, Vol. I

Page 94

1    bankruptcy issues?

2        A    Bankruptcy and how to go about doing it and what we

3    needed to do.

4        Q    When you say "needed to do," we're talking about

5    needed to do in order to go into bankruptcy?

6        A    Right.

7        Q    Was there a vote taken on the phone call?

8        A    No.

9        Q    Did the organization The Hammocks ever have any

10   formal vote that---

11       A    No.

12       Q    Hold on, Dr. Gray.

13            MR. PAYNE:  Let him finish.

14       Q    Did The Hammocks, LLC ever have a formal vote of its

15   members to decide to go into bankruptcy?

16       A    No.

17       Q    Who made the decision to take it into bankruptcy

18   then?

19       A    All of us.  All the members.

20       Q    Was it a unanimous agreement?

21       A    Yes.

22       Q    When did that unanimous agreement take place?  In

23   the September phone call?

24       A    Right.

25       Q    Now, Dr. Gray, there's a reference to the Lake

Dr. William Gray, Vol. I

Page 95

1    Norman Pavilion organization.  I understand there's documents in

2    here that talk about ownership of Lake Norman Pavilion.

3        A    Right.

4        Q    And we'll get to those in a minute.  But can you

5    tell me roughly when the Lake Norman Pavilion, LLC was created?

6             MR. PAYNE:  Do you need to look at the documents?

7        A    I would have to look at the documents.  It's been a

8    long time.

9             MR. NELSON:  Why don't we take a break while you do

10   that?  It's 20 of 12:00.  So why don't we take a break, we'll go

11   till about 12:30 and we'll take lunch.  Okay.

12            (Discussion off the record.)

13       Q    Dr. Gray, I was asking you to look for some

14   documents, did you find the documents?

15       A    Yes.

16       Q    What number?

17       A    3 -- 3015 is the articles of organization.

18       Q    I'm sorry.  3---

19       A    3015.

20       Q    Just give me a second to catch up with you, okay.

21   (Discussion off the record.)

22       Q    Okay.  So 3015.  What was the reason for creating

23   the Lake Norman Pavilion, LLC, Dr. Gray?

24       A    I was going to buy some land in Mooresville to

25   develop a retirement community.

Dr. William Gray, Vol. I

Page 96

1      Q     Have you ever done any development of any kind?

2      A     The retirement community.

3      Q     So you did develop a retirement community?  Where

4    was that?

5      A     In Mooresville.

6      Q     Is this related to Lake Norman Pavilion?

7      A     Right.

8      Q     I see a reference to the Village at Lake Norman and

9    I know you told me about producing those documents but if you'd

10   just tell me what that's about?

11     A     The Village of Lake Norman was sort of the umbrella

12   entity that owned the assisted living.  Lake Norman Pavilion

13   bought the land, rezoned it, got everything approved and done

14   and then informed the Village of Lake Norman along with those

15   other two guys that were partners for a while and they were

16   supposed to do the development because I'm really not a

17   developer.  And then when they sued each other the judge kicked

18   them off the whole thing and we ended up owning it and I had to

19   finish the building and run it and do all the other development.

20     Q     Can I take from your answer that all this took place

21   in Mooresville?

22     A     Yes, it did.

23     Q     And Lake Norman Pavilion took possession of whatever

24   residual there was from the Village at Lake Norman?

25     A     It took possession of the Village at Lake Norman.

Page 97

1    It didn't change the entity until it was dissolved.

2        Q    But the assets of the Village of Lake Norman, became

3    the assets of Lake Norman Pavilion?

4        A    Right.

5        Q    Did you have to pay these other two gentlemen that

6    fought with each other something to get ownership interest?

7        A    No.  Because we owned it all to begin with.  They

8    had put no money in it.

9        Q    When you say "we," are we talking about the members

10    of the Lake Norman Pavilion?

11        A    Lake Norman Pavilion.

12        Q    So the members of the Village of Lake Norman were

13    you and your two sisters and then these other two gentlemen?

14        A    Initially.  Yes, initially.

15        Q    Does the Village of Lake Norman, LLC still exist?

16        A    No, it does not.

17        Q    And all the property and all the assets in the

18    Village of Lake Norman, LLC became Lake Norman Pavilion, LLC.

19        A    No, it was sold as the Village of Lake Norman.  And

20    Lake Norman Pavilion was paid back money that it had put in to

21    do the development.

22        Q    Was Lake Norman Pavilion by name part of the Village

23    of Lake Norman, LLC?

24        A    Yes.

25        Q    Okay.  So this agreement says the Lake Norman

Page 98

1   Pavilion, LLC is created the 10th October 1996, does that sound

2   accurate?

3          A      Yes.  It was filed on the 15th but I think it was

4   created slightly before that.

5          Q      And at the time it was created there's really only

6   two people that have an ownership interest Virginia Love and

7   Mary Mullins.  I'm looking at page 17, 3017.

8          A      Right.

9          Q      But you're listed as chief manager?

10         A      Yes.

11         Q      What were your responsibilities as chief manager?

12         A      To put all the money in to do it and run it.

13         Q      What do you mean put all the money in?

14         A      All the money except for that contribution to

15  develop this project and buy the land came from me.

16         Q      That's where it's a little unclear to me, Dr. Gray.

17  All the consideration to form Lake Norman Pavilion is reflected

18  as being Love and Mullins?

19         A      That's right.

20         Q      Where did your contribution come from?

21         A      It's money I put in to buy the land and do the

22  development.

23         Q      After this agreement was signed?

24         A      Yes.

25         Q      When was that?

Page 99

```
 1      A      Pretty much at the same time.

 2      Q      Okay.  So what's the second version of this

 3  agreement that reflects---

 4      A      We did some amendment somewhere along the line that

 5  designated the ownership of 49 percent mine, 49 percent my

 6  sister's and 1 percent my other sister.  Yeah.  It says this

 7  option here.

 8      Q      What page are you on?

 9      A      On 3056.

10      Q      Hold on.  Let me catch up with you.  Okay.  I

11  stopped you in the middle of your answer, Dr. Gray.

12      A      I forgot what it was.  But this was an option that

13  we signed that basically conveyed 49 1/2 percent of Lake Norman

14  Pavilion to myself.

15      Q      Well, this gives you as I read this the option to

16  purchase 49 1/2 percent?

17      A      Right.

18      Q      But when did you become invested in Lake Norman

19  Pavilion?

20      A      At that time as far as I know.

21      Q      So you pursued this option?

22      A      Yes.

23      Q      And is there a document that reflects you----

24      A      I don't know.  This is all I have.

25      Q      You have no document that reflects you now own part
```

Page 100

1    of Lake Norman Pavilion?

2        A    No, other than tax return filings.

3        Q    How much did you contribute?

4        A    Several million dollars.

5        Q    Do you know how much that is?

6        A    No but I paid it back.

7        Q    What do you mean you paid it back?

8        A    When we sold the Village of Lake Norman I paid

9    myself back a good part of what I put in.

10        Q    Okay.  I'm a little confused.

11        A    I loaned the money to this entity and then when we

12    sold the Village of Lake Norman I paid some of that back and

13    then some of it I had loans rolled into what we gave the

14    Michels.

15        Q    Okay.  So around this time October of 1996 you

16    gave---

17        A    We bought some land for $1,000,000.

18        Q    Where did you buy the land?

19        A    In Mooresville.

20        Q    Okay.  And did you develop that land?

21        A    Yes, part of it.

22        Q    And is that what became the Village of Lake Norman?

23        A    Some of it, yes.

24        Q    And then some that remained----

25        A    Some of it we sold off to other entities to shopping

Page 101

1    centers.

2        Q    Is it raw land?

3        A    Raw land.  Zoned but raw land.

4        Q    When you purchased it was it raw land?

5        A    Yes.

6        Q    How many acres?

7        A    Put together the number of parcels it was about 72

8    acres, I think.

9        Q    So you develop some of it, you sold some Of it off?

10        A    Right.

11        Q    And then you eventually sold what you developed?

12        A    Yes.  We still owned some.

13        Q    And you still owned some acres?

14        A    Yes.

15        Q    How many acres do you own?

16        A    Sixteen or 18 something like that.

17        Q    And are those held by Lake Norman Pavilion right

18    now?

19        A    Yes.

20        Q    So in addition to Lake Norman Pavilion having some

21    ownership interest in The Hammocks, Lake Norman Pavilion also

22    owns some land?

23        A    Yes.

24        Q    And since Lake Norman Pavilion is part of The

25    Hammocks, LLC and The Hammocks, LLC actually has a land interest

Page 102

1    that's held by Lake Norman Pavilion?

2        A    No.

3        Q    What part of that is incorrect?

4        A    The Hammocks has no interest in anything the Lake

5    Norman Pavilion owns.

6        Q    Okay.  Lake Norman Pavilion has interest in The

7    Hammocks?

8        A    In The Hammocks.

9        Q    I had it backwards.  How much money went into Lake

10   Norman Pavilion?  And I think you told me you don't know but

11   let's make sure we get that answer.  How much money did Lake

12   Norman Pavilion get from you?

13       A    Over what period of time?

14       Q    In total?

15       A    I honestly don't know but it's in the numbers of

16   millions of dollars.

17       Q    How many versions of the operating agreement are

18   there besides this original operating agreement for Lake Norman

19   Pavilion?

20       A    I don't think there's any others.

21       Q    But as far as you're concerned you own 49.5 percent

22   interest in Lake Norman Pavilion?

23       A    Right.

24       Q    I thought I saw a document that refers to your

25   splitting the ownership interest into class a and class b

Dr. William Gray, Vol. I

Page 103

1    ownership for Lake Norman Pavilion?

2          A    I don't know.

3          Q    You don't know anything about that?

4          A    (Witness nods head no.)

5               MR. PAYNE:  Answer aloud.

6               THE WITNESS:  No, I don't.

7          Q    You don't recall seeing any documents referred to a

8    retirement account of yours being somehow an asset or an

9    investment?

10         A    No.  I don't remember that.  But some of the money

11   that we rely on was from a retirement account of mine.  That may

12   have been something my sister prepared just to protect.

13         Q    Is it possible that the Lake Norman Pavilion percent

14   of ownership is different than the financial interest of the

15   properties -- of Lake Norman Pavilion?  I'm sorry.  Not

16   properties.  Do you want me to restate the question for you?

17         A    In The Hammocks?

18         Q    No.  According to your own perspective you have a

19   49.5 percent ownership interest in Lake Norman Pavilion, is it

20   possible you have a greater financial interest than 49.5

21   percent?

22         A    No.  Not that I'm aware of.

23         Q    By the way, there will probably be an accountant

24   coming in here who's going to sit through and make sure we

25   understand the financial aspects of all this and it will be

Page 104

1    around 12:30.  So when he gets here let's take a break so we can

2    start fresh with that.

3              Have you had any discussions with anybody from the

4    White Agency since the loss?

5         A    Since who?

6         Q    The loss, the fire?

7         A    Your agency?

8         Q    The White Agency?

9              MR. PAYNE:  White in Black Mountain.

10        A    No, I haven't.

11        Q    Anybody on behalf of The Hammocks, LLC as far as you

12   know?

13        A    I think the lawyer did and my secretary has talked

14   to them.

15        Q    Who's your secretary?

16        A    I mean not secretary, Sarah McCullough has talked to

17   them.

18        Q    At the time of the fire who were the key employees

19   of The Hammocks, LLC?

20        A    The people who worked at the inn.

21        Q    Can you tell me by name?

22        A    No, not totally.  But Susie Zimmerman was our

23   manager, Sarah McCullough was the financial bookkeeper, Cedric

24   Finch was the maintenance, Sharon Olson was the dining room

25   manager, Perry -- I can't remember his last name.

Page 105

1      Q      Hendricks?

2      A      Hendricks was the chef, Laura something or another

3  was the pastry chef. And then we had -- I don't know cause I

4  didn't handle much of the managerial. There were six or eight

5  concierges, reservation people.

6      Q      Those are people you'd consider to be key employees?

7      A      Yeah, they're all -- we had laid off all the people

8  that we didn't need to operate at that time.

9      Q      Who did Susie Zimmerman report to?

10     A      To me.

11     Q      Who did Sarah McCullough report to?

12     A      To me or to Susie.  Mostly Susie.

13     Q      Who did Cedric Finch report to?

14     A      Everybody reported to Susie but me.

15     Q      Cedric Finch reported to her?

16     A      Yeah.

17     Q      Sharon Olson reported to Zimmerman?

18     A      Yeah.

19     Q      Hendricks reported to Zimmerman?

20     A      Right.

21     Q      Laura reported to Zimmerman?

22     A      Right.

23     Q      And the concierges reported to Zimmerman?

24     A      Right.  But at the same time everybody was pretty

25  autonomous in taking care of their departments.

Dr. William Gray, Vol. I

Page 106

1     Q     I understand there were periodic management

2     meetings?

3     A     Yes, there were.

4     Q     How often would they occur?

5     A     Every couple of months we would have one.  We had

6     not had any this year.

7     Q     Would you attend those?

8     A     Usually yes.

9     Q     Was anybody in charge of running those meetings?

10    A     I normally would have been.

11    Q     Now, I understand there was a meeting a few days

12    after the fire with the management folks?

13    A     Right.

14    Q     Who ran that meeting?

15    A     I did.

16    Q     Any documents handed out?

17    A     No.

18    Q     Did anybody quit at that meeting or shortly

19    thereafter?

20    A     Yes, they did.

21    Q     Who is that?

22    A     The two chefs quit -- well, everybody in the kitchen

23    and the dining room service quit.

24    Q     When is the last time that you had a management

25    meeting?

Page 107

1       A       I don't know.  I mean, I talk to Susie every day

2   that I'm up here.

3       Q       But I'm talking about meetings where you bring the

4   management team together?

5       A       She was the management team for the last three

6   months.  Prior to that we had an assistant innkeeper and we

7   would meet at least once a month with her and Susie and myself.

8   Yeah.

9       Q       I started off asking you about the different

10  accounting firms that had been used and we talked about the firm

11  that did the audit.  Have you used any other accounting firms at

12  any point and when I say "you" meaning The Hammocks?

13      A       Yes.  When we first were trying to get refinancing

14  during the first year, we employed a firm to try to go through

15  the books and prepare a financial package for us to present to

16  the banks but they never finished it so.

17      Q       Okay.  Do you recall what the audit said or

18  concluded that was done by David Worley's company?

19      A       That it was a failed business venture.

20      Q       Did you provide a copy of that report to other

21  members of The Hammocks?

22      A       Yes.

23      Q       Did you provide a copy to Sloggart?

24      A       Yes.

25      Q       And Love?

Dr. William Gray, Vol. I

Page 108

```
1       A      Right.

2       Q      And Mullins?

3       A      Not Mullins.

4       Q      Does Mary Mullins know that she's a member of The

5   Hammocks?

6       A      Yes, she does.

7       Q      At the time the organization was first created was

8   Mary Mullins aware that she was listed having ownership

9   interest?

10      A      Yes.

11      Q      Were you surprised that the accountants came to the

12  conclusion when they did the audit that the business was a

13  failed business?

14      A      Not at all.  I knew that beforehand.

15      Q      When did you know it?

16      A      When I bought it.

17      Q      So you knew when you bought the business was a

18  failing business?

19      A      Right.  We had to develop it to be successful.

20      Q      Did you have any sense of how much of a failing

21  business it was when you purchased it?

22      A      No because the innkeeper at the time had gone

23  through all their books and everything with me and showed how we

24  could save a lot of money and that, you know, we could break

25  even and make money if all these different things were done and
```

Page 109

1    I believed him.  Then basically it turned out everything he said

2    or told us was a lie.

3        Q    Was that Robert Holland?

4        A    Yes.

5        Q    Did he ever generate a report for you that said we

6    can take these steps to reduce expenses?

7        A    Yes, he did.

8        Q    Do you know where that report is today?

9        A    No.  Some of it may be in the various lawyers'

10   offices that we've used to sue him.

11       Q    So he basically put together a plan to reduce

12   expenses?

13       A    Right.  Reduce expenses, he could cut labor costs by

14   30 percent and increase revenue by 10 or 15 percent.  That the

15   Michels used the inn to write off a lot of personal expenses

16   eliminate that.  And he guaranteed us really that within the

17   first year we would have $1 million profit to pay down on the

18   mortgage and to help with the refinance.

19       Q    Was that million dollars in the plan?

20       A    In the what?

21       Q    Did he refer to that million dollar figure in the

22   plan?

23       A    No, he did not.

24       Q    So that representation that you'd have $1 million

25   worth of profit if you did these things was not stated in the

Page 110

1    plan?

2        A    No, it was not.

3        Q    Was there anything in the plan that said here's the

4    projection if you do these things?

5        A    There was some.  I don't really remember the details

6    of it.  But certainly it wasn't $1 million but it certainly

7    looked like we could at least break even which is what we wanted

8    to do until we had done the development and when we bought it we

9    had at least two years of reserves to support it.

10        Q    When I hear that, Dr. Gray, what I'm hearing is that

11    you knew you were losing money and it was going to take you awhile

12    to turn it around and you had enough money in reserve to pick up

13    the shortfall?

14        A    Right.

15        Q    Do you know how much the reserve value was?

16        A    I guess I had enough probably -- over $1 million

17    that I could lend to the inn to keep it going.

18        Q    Is that you personally?

19        A    My pension plan.

20        Q    So that million would have come out of your pension

21    plan?

22        A    Yes.

23        Q    Is that like a self-directed IRA?

24        A    Right.

25        Q    Do you still have $1 million in your self-directed

Dr. William Gray, Vol. I

Page 111

1    IRA?

2         A      No.

3         Q      How much is in your self-directed IRA at this point?

4         A      $8,000.

5         Q      How much was in there at the time of the fire?

6         A      $8,000.  Or thereabouts.  I don't know for sure.

7         Q      Did you have any conversations with the Michels

8    about how much the shortfall would be when you purchased the

9    property?

10        A      No.  You know, they said they had never been able to

11   operate it for a profit except for one year.  That they again

12   indicated that they really weren't doing as much hands-on

13   management that they felt with appropriate care you could cut

14   back expenses but they never really indicated how much.

15        Q      I understand part of the plan was also to develop

16   the adjacent land?

17        A      Right.  That was the plan.

18        Q      And I also understand that either The Hammocks or

19   entities that you have some relationship with have ownership in

20   11 parcels of land around the Richmond Hill Inn, does that sound

21   right?

22        A      Yes and no.  The inn is made up of multiple parcels

23   to begin with and then there's this extra land which is another

24   parcel and then there's another land that's part of the whole

25   thing too that's another parcel and then there were three