Dr. William Gray, Vol. I

Page 112

1   parcels that we bought after we bought after we bought the inn

2   to kind of surround the area.

3       Q   I have one of these aerial photographs with the plat

4   plans drawn on it so after lunch I think we'll take that up and

5   maybe you can take us through that a little bit, okay.  Yeah.

6   You know what, let's take a break for lunch now, okay.

7               MR. PAYNE:  Yeah.  How long do you want to take?

8               (Thereupon, a recess is taken from 12:15 p.m. to

9   1:21 p.m.)

10              (Thereupon, Dusty Bredeson enters the examination

11  room.)

12      Q   Dr. Gray, we're back from lunch and you're still

13  under oath so that, of course, means you still have to tell the

14  truth, do you understand that?

15      A   Yes, sir.

16      Q   Okay.  Who at The Hammocks -- I'm just going to say

17  Richmond Hill when I'm getting to these questions and I want you

18  to understand I'm not talking about Richmond Hill, Inc. owned by

19  the Michels, I'm talking about the facility owned by The

20  Hammocks, okay?

21      A   Yes.

22      Q   So at Richmond Hill who had responsibility for the

23  books and records and the financial accounting?

24      A   Sarah McCullough.

25      Q   Did Susie have anything to do with the oversight of

Page 113

1   that?

2        A     No.

3        Q     Does Sarah still work for you?

4        A     Yes.

5        Q     Now would Sarah McCullough produce reports

6   periodically about how the organization was doing financially?

7        A     Basically, every month usually a month late she'd

8   have a breakdown of income and expenses and loss.

9        Q     Would those be given to you?

10       A     Yes.

11       Q     Were they also given to the other members of The

12  Hammocks, LLC?

13       A     In general, yes.  We also gave them to the Michels.

14  On a regular basis they seem to never get them when we fax them

15  to them or emailed them to them but they got them some of the

16  time.

17       Q     Was it your understanding that that's what they

18  wanted they wanted to see these reports?

19       A     Right.

20       Q     So when you first began operating the Richmond Hill

21  Inn is Sarah McCullough in position at that point?

22       A     No.  We had a CPA that worked there her name was

23  Carol Ann Labowski and she -- we fired her and she's one of the

24  people we sued with Bland Holland for misappropriation or

25  misspending about $300,000 that we were not informed of.

Page 114

1    Q    So Labowski was fired?

2    A    Right.

3    Q    And McCullough took her job?

4    A    Took her job after a month or two.  We tried

5    somebody else for a little while and that didn't work out.

6    Q    Can you take me through the process whereby

7    McCullough would get information about the financial

8    transactions that were occurring within the Richmond Hill Inn?

9    A    We had night auditors who audited and entered into

10   the computer all the transactions of that day and then so she

11   would be able to pull them up the next day.  She didn't actually

12   enter them herself.

13   Q    And from that information that was accumulated by

14   the auditors that became the work that McCullough would then

15   drain off of to come up with her understanding of what was going

16   on?

17   A    Yes.

18   Q    Besides monthly reports did McCullough have to

19   produce any other reports to you?

20   A    She gave us annual reports.

21   Q    From the standpoint of the reports we talked about

22   both revenue and operating cost?

23   A    Right.  Yes.

24   Q    Who's responsible for paying the bills?

25   A    Sarah McCullough.

Page 115

1    Q     How many operating accounts did Richmond Hill have

2    when you were responsible?

3    A     We had two with Carolina First.  One initially and

4    then somebody got some of our checks and started writing checks

5    on it so we got another account.  So we end up and we recently

6    had two accounts.

7    Q     At the time of the fire you had two accounts that

8    were active?

9    A     Yes.

10   Q     Who had authority to approve the bill paying

11   process, the financial authority?

12   A     Sarah.

13   Q     Besides the two -- when we're talking about

14   operating accounts, we are talking about checking accounts?

15   A     Yes.

16   Q     Did you have any other savings accounts or any other

17   place where funds were stored?

18   A     No.

19   Q     Did you have any lines of credit at the time of the

20   fire?

21   A     We had a line of credit with Carolina First that we

22   had tapped out back in '06.

23   Q     How much was that line of credit for?

24   A     190,000.

25   Q     Did you ever try to get additional monies on that

Dr. William Gray, Vol. I

Page 116

1    account?

2        A    No and yes.  Not initially but after the fire I

3    called to see if I could because the property was worth more and

4    they had said before they could give me more if I needed it.

5    And I called to see if I could get enough to refund the deposits

6    from the brides and then at that point they wouldn't give me

7    anymore.

8        Q    Did you have to fill out a loan application for

9    that?

10       A    No, I just called our personal guy and talked to

11   him.

12       Q    Who was that person?

13       A    I'll think about it in a minute.  I can't remember

14   his name.

15       Q    At the time of the fire you said that line of credit

16   had been tapped out, were you delinquent in paying those bills?

17       A    No.

18       Q    So you were current in servicing the debt---

19       A    We were current.

20       Q    Okay.  Again, Dr. Gray, let me finish.

21       A    We were current then.

22       Q    At any point from the time you decided you might be

23   interested in buying the Richmond Hill Inn until the fire, did

24   you apply for any other financing with any financial

25   institution?

Page 117

1    A    We applied for 50 different loans with different

2    banks through brokers and various --- I was trying to get it

3    refinanced and we were turned down all the time because of the

4    polybutylene in the mansion and no one would touch it and also

5    because the first year we had run up such a deficit in income.

6    Q    Okay.  So you applied for loans about 50 times?

7    A    At least 50 different banks, yeah.

8    Q    And the two reasons they gave you for not approving

9    the loan was the piping?

10    A    Was the piping and the deficit financing.  The

11    deficit in operating.

12    Q    Do you have copies of any of those loan

13    applications?

14    A    No, I don't.

15    Q    Do you know what banks you applied to?

16    A    Some of them.  I know Carolina First, BB&T,

17    Wachovia, Bank of America.  Just endless more out west.  Again,

18    we used brokers mostly.

19    Q    What brokers did you use?

20    A    I can't remember the names right now.

21    Q    Do you have documents that refer to those brokers?

22    A    At least one of them I do.

23    Q    You said you used brokers, did you use a broker to

24    try to help arrange the financing?

25    A    Right.

Page 118

1      Q      Okay.  So you applied for funding, you didn't get

2    it, you had a line of credit you were tapped out, any other

3    transactions or attempted transactions or arrangements where

4    financing would be secured for the Richmond Hill Inn?

5      A      No.  Once Dr. Michel had written us a letter in

6    February of '08, I guess it was, saying he was going to call the

7    note we really, you know, pretty well had given up by then

8    refinancing and we had a buyer to buy the inn.  And so we were

9    counting on that occurring and then that fell through in August

10    and then we ended up putting it on the market and then we have a

11    buyer who's been interested in it since November and had given

12    us some verbal offers and said they were going to buy it, this was

13    before the fire.  And then they're coming into town next week to

14    try to renegotiate what they had agreed on before.

15      Q      Okay.  I'll get back to the whole attempts to sell

16    it after you buy it in a minute.  I want to stay with how the

17    financial records are maintained inside your organization.

18    Besides reports showing revenue and expenses, any other reports

19    come to mind?

20      A      No.

21      Q      Did you have to create any reports about

22    turnarounds, I know Holland said -- you told us Holland created

23    this report that was kind of a plan, any other versions of that

24    report?

25      A      No.  I don't know how to run a computer so I depend

Page 119

1    on anything from somebody else so.

2        Q    You don't know how to use e-mail?

3        A    No.

4        Q    You don't have an e-mail account?

5        A    No.

6        Q    Do you have an e-mail address at the---

7        A    I used to but I never used it.  I never accessed it.

8        Q    Who is responsible for paying your taxes?

9        A    Sarah McCullough.

10        Q    When I saw "your," I'm talking about The Hammocks?

11        A    Sarah McCullough.

12        Q    What kind of taxes was The Hammocks responsible for

13    as it concerns operating the Richmond Hill Inn?

14        A    I guess FICA and Social Security and state and

15    federal withholding and property tax and sales tax.

16        Q    At the time of the fire were you delinquent in any

17    of those taxes?

18        A    All of them.

19        Q    Did you have a separate account where you would

20    store the funds to pay these taxes?

21        A    We did not then, we do now.

22        Q    But at the time of the fire you did not?

23        A    No.

24        Q    No time before that you didn't either?

25        A    No.

Dr. William Gray, Vol. I

Page 120

1        Q       Had either the federal government or any other

2    governmental agency had any tax liens on the property at the

3    time of the fire?

4        A       The state does for I think approximately 12,000 to

5    14,000.  I don't remember.  They did that last year.

6        Q       When last year?

7        A       Last summer sometime.

8        Q       What was that for?

9        A       State withholding tax.

10       Q       State withholding from a stand point of an employee

11   withholding?

12       A       Uh-huh.

13       Q       Did you get that as a yes?

14       A       Yes.

15       Q       Besides the $12,000 to $14,000 for state withholding

16   related to employee payroll, right?

17       A       Right.

18       Q       Were you delinquent in any way for any kind of tax

19   at the time of the fire?

20       A       I told you all of them.

21       Q       Okay.  I'm sorry.  You did.  How much were you

22   delinquent at the time of the fire for FICA?

23       A       I really don't know specifically between all of them

24   at least $300,000, maybe more.

25       Q       When did you become aware that there was a tax lien?

Page 121

1      A      When people started calling me to see if I wanted to

2   hire them to negotiate it.

3      Q      When was that?

4      A      Last summer.

5      Q      You're talking about the summer of '08, right?

6      A      Right.

7      Q      How do you know the number is $300,000 in delinquent

8   taxes?

9      A      I don't.  I just say it's at least that much.

10      Q      Where do you come up with that approximation?

11      A      I don't know.  Like I told you I don't know exactly

12   what it is but I know it's at least that much because I had seen

13   that figure some other time.

14      Q      That's what I'm asking.  Where did you see that

15   figure?

16      A      From Sarah's material that she had given me.  And I

17   don't remember when that was so.

18      Q      Okay.  Would Sarah have known about the tax liens?

19      A      Yeah, she does know about them.

20      Q      Did she know about it at the time that they were put

21   on you?

22      A      No.  They sent the information to me and she didn't

23   find out about it till later.

24      Q      What's later?

25      A      Sometime in the ensuing couple of months after I

Page 122

1    found out.

2        Q    So sometime after the summer?

3        A    Right.

4        Q    How do you know if she found out then?

5        A    Because I told her about it.

6        Q    Why did you tell her about it?

7        A    I talk about our business things with her and where

8    we're at and what we need to pay and how much money we need to

9    put into it to keep it afloat.

10        Q    Sir, I'm assuming that notice of a tax lien would be

11    made to The Hammocks when the liens were first put into place.

12        A    Right.

13        Q    Are you saying that The Hammocks never received that

14    notice?

15        A    I didn't receive that notice at that time, I did

16    finally get a letter saying that that had happened but it was

17    after I had heard about it from all these other people.

18        Q    Had you ever told the other members of The Hammocks

19    that there was some delinquent taxes?

20        A    Oh yes.

21        Q    At any point during the period that The Hammocks

22    owned the Richmond Hill Inn, had any of the vendors that you

23    used refused to sell you goods on terms where you could pay

24    later as opposed to COD?

25        A    I don't know.  You'd have to ask Sarah.  Not that I

Page 123

1    know of until we filed for Chapter 11.

2        Q     So you weren't aware of any vendors saying we're not

3    selling to you unless it's COD?

4        A     We tried to stay current as much as we could.

5        Q     I know you told us that the accountants did an audit

6    and then they did your taxes, were copies of the financial

7    reports or results provided to the accountants on a periodic

8    basis?

9        A     I don't know exactly how Sarah does.  They send

10   somebody over to kind of review her computer stuff but I don't

11   know if we really give them anything on a quarterly basis.

12       Q     When did the accountant start coming in and taking a

13   look at your computer stuff?

14       A     Back when we hired them last year in the wintertime

15   before that audit that we got -- it was actually in '07.

16       Q     So since they were engaged to do that audit they've

17   been coming in periodically to look at your---

18       A     Periodically.

19       Q     Let me finish my question, sir.  Since they were

20   engaged to do the audit, they would come in periodically to look

21   at your books?

22       A     Right.

23       Q     Did you ever take any money out of any operating

24   account -- you personally take any money out of the operating

25   account or use any funds from The Hammocks for your own personal

Page 124

1    purposes?

2        A      No.  Never.

3        Q      Ever take a loan out?

4        A      No.  Never.

5        Q      Did you ever authorize a loan to a person out of the

6    operating account?

7        A      No.  Never.

8        Q      During the period that The Hammocks owned Richmond

9    Hill were any assets of The Hammocks sold to anybody?

10       A      No.

11       Q      Besides the one loan we've talked about, any other

12   kind of financing arrangements for leasing equipment and that

13   sort of thing put in place?

14       A      Yes.  I mean the telephones are leased, we have

15   waffle irons that were leased, the soft drink dispenser things

16   were leased.  I don't know what else but I know those things.

17       Q      Did you have to put any financing applications

18   together in order to arrange those leases?

19       A      They may have.  I didn't handle any of that so I

20   don't know.

21       Q      Over the course of time that you owned the Richmond

22   Hill Inn, did you have to put together any statement of values

23   that an assessment of some sort as to the assets of Richmond

24   Hill for the Michels?

25       A      No.  Not for the Michels.

Page 125

1      Q      Did you ever have to submit personal financial

2   statements to the Michels?

3      A      No.

4      Q      Did you ever have to put together personal financial

5   statements, I'm talking about the members of The Hammocks, for

6   any other reason during the time you owned the Richmond Hill

7   Inn?

8      A      Yeah.  Everybody -- when we applied for loans we

9   would send that material.

10     Q      Do you have copies of the personal financial

11  statements?

12     A      My own.  I gave you already but I don't have anybody

13  else's.

14     Q      But The Hammocks didn't keep personal financial

15  statements that were used to support loan applications?

16     A      No.

17     Q      You said you gave me a personal financial statement,

18  can you identify where that is?

19     A      No.  I can't.  But I'll look for it.

20          MR. PAYNE:  It's in there somewhere.  I remember

21  seeing them.  I couldn't tell you where it is.  It'll take

22  awhile.

23          MR. NELSON:  I think I'll ask for your indulgence.

24  We need to go over that so.

25          (Discussion off the record.)

Page 126

1      Q      Dr. Gray, as far as your understanding of how the

2  finances of The Hammocks was handled or the Richmond Hill Inn

3  management was handled, do you have any reason not to believe

4  that all the expenditures were recorded on the checking

5  accounts? What I'm getting to is the checking accounts reflect

6  all payments of all kind to outside parties?

7      A      Yes, I mean everything was paid for by check or

8  debit card in some cases.

9      Q      Had a petty cash account, some petty cash hanging

10 around?

11     A      A little but never very much.  And those again were

12 receipted.

13     Q      So the checking account should reflect all

14 expenditures?

15     A      It should.  Yes.

16     Q      Did that checking account also reflect payroll

17 payments?

18     A      Yes.

19     Q      Did you handle a payroll service or did you do it

20 yourself?

21     A      We had a payroll service up until fairly recently.

22 And I don't know whether Sarah had started doing it before the

23 fire or right after the fire but we planned to do it the first

24 part of the year sometime.

25     Q      Okay.  At any point did you or any of the members of

Page 127

1    The Hammocks take any income out of the Richmond Hill Inn

2    business?

3         A    Not at all.  No one.  Put money in it ourselves.

4         Q    So the only assets that were dispersed is payments

5    to any one person were through the payroll records?

6         A    Right.

7         Q    Expenditures for assets, equipment, that sort of

8    stuff that's all recorded in the checking account records as

9    well?

10        A    I think almost all of it is.  There were some things

11   I bought personally and put at the inn because the inn didn't

12   have the money for it.

13        Q    Did you get reimbursed for those purchases?

14        A    No.  But there were some major things that I did

15   that I did that way.  And then there were a couple of major

16   things that we needed that I gave the inn the money for and then

17   they ran it through their account so it would show up on the

18   checking.

19             MR. NELSON:  Let's go off the record.

20             (Discussion off the record.)

21        Q    Dr. Gray, you've provided personal financial

22   statements of your own to your attorneys?

23        A    Yes.

24        Q    For what years?

25        A    I don't know but for at least the last four years.

Page 128

1      Q      What do you believe your personal financial net

2   worth is today as we sit here?

3      A      About 20 million.

4      Q      Is that your personal wealth or is that wealth you

5   share with?

6      A      My wife.

7      Q      Your wife.

8          (Discussion off the record.)

9          MR. NELSON:   So, Counsel, feel free to correct me if

10   I'm wrong because I think where we are your office has personal

11   financial statements and a few other documents that you're

12   prepared to produce shortly.

13          MR. PAYNE:   They're in the process of copying them

14   as we speak.

15          MR. NELSON:   And we're anticipating taking

16   additional testimony from Dr. Gray tomorrow so I'll get a chance

17   to look at them today and then we can continue questioning him

18   about them tomorrow.   We're also requesting a copy of whatever

19   work documents that Roy has that he will use to generate the

20   2008 tax return if he's so authorized by the bankruptcy court.

21          MR. PAYNE:   Have those been previously requested?

22   I don't recall if they were.

23          MR. NELSON:   They would be part of what was

24   requested as part of our other document request, our initial

25   document request EUO letter.   So it wouldn't be framed the way

Page 129

1    as whatever documents he has but it would have been the same

2    work papers, ledgers, that sort of stuff.  But I'll make sure

3    it's in the letter to you post EUO.  Okay.

4         Q    So you believe your personal financial wealth is

5    around $20 million?

6         A    Somewhere in that range.  It depends on the market.

7         Q    Is that a net figure?  In other words it takes into

8    account anything you may owe debt on?

9         A    No, that's a gross.  Net is probably more like 16 or

10   14.

11        Q    So there is some debt service owed on some of the

12   assets you're claiming as part of your wealth?

13        A    Yeah.

14        Q    Have you at any point in the last couple of years

15   had any personal tax liens?

16        A    No.

17        Q    Or any debt obligations that have been delinquent?

18        A    No.

19        Q    Do you have any other business transactions that you

20   yourself or your wife have been involved in where the

21   transactions have been business failures?

22        A    No.

23        Q    So before lunch we talked briefly about the fact

24   that you had a cushion of $1 million to help fund the Richmond

25   Hill Inn while you turned it around?

Page 130

1    A    Right.

2    Q    At some point it became obvious that you were going to

3    go through that million dollars, correct?

4    A    Correct.

5    Q    Did you make any other plans to fund it over and

6    above the million dollars?

7    A    When we sold the assisted living I paid myself back

8    but at the same time I saved that money to put back into the inn

9    as it was needed.

10    Q    Is assisted living a nursing home?

11    A    No, it's assisted living.

12    Q    Is it----

13    A    The Village of Lake Norman.

14    Q    So did it trade under the name of assisted living?

15    A    Yes.

16    Q    When did you sell assisted living?

17    A    In February of '07.

18    Q    How much did you sell it for?

19    A    I provided you with all the closing of that.  But we

20    sold the land for 2 million something and then the assisted

21    living I think we netted out less than 2 million out of it.

22    Q    But it was more than 1 million?

23    A    Yes.

24    Q    So approximately $4 million?

25    A    Approximately, 4 million for all of it.

Dr. William Gray, Vol. I

Page 131

1              MR. PAYNE:  He's talking a net figure, correct?

2              THE WITNESS:  Yeah.

3        Q      Did all 4 million of that go into the Richmond Hill

4    Inn?

5        A      Pretty much all of it has gone into it.

6        Q      I understand there were two $2 million payments to

7    the Michels lump sum?

8        A      Right.

9        Q      Is that where that $4 million went?

10       A      No.  One of them was that.

11       Q      Where did the other $2 million dollars come from?

12       A      From closing when we bought it.

13       Q      I'm sorry.  Can you explain that to me?

14       A      When we bought it we put $2 million into it and that

15   was the first 2 million.  The second 2 million was at the

16   closing of the land for a retirement community or assisted

17   living.

18       Q      Where did the other 2 million go from selling---

19       A      There wasn't another 2 million that went to the

20   Michels.

21             MR. PAYNE:  I think you'll do better if you'll let

22   him finish his question.

23       Q      Thank you.  Both these transactions concerning

24   assisted living happened in '07?

25       A      Right.

Dr. William Gray, Vol. I

Page 132

1    Q    That was after you purchased the Richmond Hill Inn?

2    A    Yes.

3    Q    So where did the $4 million go from the sale of

4    assisted living?

5    A    All of it went to the inn in one way or the other.

6    Q    To EN?

7    A    To the inn.  Richmond Hill Inn.

8    Q    And that's what I'm trying to get to.  Did the

9    Michels get this 4 million?

10    A    No.

11    Q    2 million went to the Michels?

12    A    Right.

13    Q    And 2 million went to operating----

14    A    Right.

15    Q    Let me finish my question.

16        MR. PAYNE:  Hang on a second.

17        (Discussion off the record.)

18    Q    So 2 million of the assisted living asset went to

19    the Michels and then 2 million went to the operating account for

20    the Richmond Hill Inn?

21    A    Over a period of time it really was loaned to the

22    operating.

23    Q    And how were the non-Michels' money, how was that

24    reflected as far as transactions to The Hammocks?

25    A    I would just write a check on the account where the

1    money was and give it to the bookkeeper.

2       Q    Was that an account that was held in the name of

3    Lake Norman Pavilion?

4       A    Some of it was in Lake Norman Pavilion, some of it

5    was in my pension plan.

6       Q    Okay.

7       A    And some of it was personal put in.

8       Q    I know we're throwing around millions of dollars and

9    I'm sure there's decimal points and odd figures here.  But I'm

10   not talking about the money that went to the Michels, I'm

11   talking about now how much money came to Richmond Hill after the

12   purchase of the Richmond Hill Inn?  And so there's 2 million

13   that came as a result of the sale and then there's a million out

14   of your personal self-directed IRA?

15      A    Right.

16      Q    So there's 3 million more that gets floated to The

17   Hammocks for the Richmond Hill Inn, is that correct?

18      A    That's correct.

19      Q    Besides that infusion of $3 million, any other

20   infusions of capital from any other source?

21      A    Yes there have been other infusions.

22      Q    And where did those come from?

23      A    Lake Norman Pavilion and from my wife and myself,

24   from my sister, some from Jim Sloggart.

25      Q    How much came from Lake Norman Pavilion over and

Dr. William Gray, Vol. I

Page 134

1    above----?

2        A    I do not know.

3        Q    Well, how would you -- there must be documents to

4    reflect this somewhere, sir, right?  Copies of checks?

5        A    Copies of checks maybe.

6        Q    How about from your wife?

7        A    She has checks too.

8        Q    She wrote a check out?

9        A    Yeah.

10       Q    How many times?

11       A    Sometimes every month.

12       Q    How much do you think your wife's contributed

13   directly?

14       A    Maybe $600,000, something like that.

15       Q    Has she gotten in exchange for that any ownership

16   interest in the----

17       A    No.

18       Q    Let me finish my question, sir.  Has she gotten an

19   exchange for contributing the $600,000 any ownership interest in

20   The Hammocks?

21       A    No.

22       Q    Your sister has written out checks?

23       A    Yes.

24       Q    We're talking about Virginia Love?

25       A    Right.

Page 135

1     Q     How much has she written out checks for?

2     A     I don't know for sure.

3     Q     Any approximation?

4     A     I think on the thing -- before we redid the

5     partnership thing she had contributed 150,000, 200,000.

6     Q     When you say "partnership," are you talking about

7     The Hammocks, LLC?

8     A     Uh-huh.

9     Q     And so are we talking about every time this shows

10    her infusion of capital on The Hammock, LLC documents that was

11    what we're talking about?

12    A     Yes.

13    Q     Any funds in addition to that?

14    A     Yes.  Since then.  Since then everything that went

15    into The Hammocks has been dealt with as a loan.

16    Q     Any documents reflecting that loan?

17    A     Nothing other than what's on the books or personal

18    checks.

19    Q     Who agreed to accept the loan from her on behalf of

20    The Hammocks?

21    A     I did.

22    Q     How is this loan documented?

23    A     Hopefully, she's documenting what she contributes

24    and, you know, Sarah is hopefully documenting it.

25    Q     Let me finish this and I'll get to what Sarah is

Page 136

1    documenting.   Sloggart has contributed some funds?

2         A     Yes.

3         Q     Do you know how much money Sloggart has contributed

4    in addition to what's reflected in those operating agreement

5    addendums?

6         A     I believe 60,000 last year.

7         Q     Now do you consider those loans or do you

8    consider----

9         A     Loans.

10        Q     So it's not contribution of asset?

11        A     No because we redid the partnership.

12        Q     So these loans that Hammocks has been accepting you

13   said something about I hope Sarah's writing it down, do you know

14   where she'd be writing that down?

15        A     In her computer somewhere.

16              MR. NELSON:  So, Counsel, I'm going to add to our

17   list of documents just to ask for this ledger that reflects the

18   infusion of this cash that's coming in as loans from The

19   Hammocks members.  I'll send you a letter that outlines that,

20   okay.

21        Q     I'm going to just use round numbers, Dr. Gray,

22   understand that I'm just approximating based on what you're

23   telling me.  But it sounds like the 2 million comes in not to

24   pay the Michels but to float the business, a million comes in

25   from you to float the  business, then money's coming in from

Page 137

1    you, your sister, your wife, and Sloggart.  It sounds like it's

2    about $4 million that comes in to float the business, does that

3    sound about right?

4           A       Somewhere between six and four.  I don't know for

5    sure.

6           Q       Six million and four million?

7           A       Uh-huh.  No.  No, that's not right.  Somewhere

8    between three and four million.

9           Q       Okay.  I want to get to the potential purchasers of

10   the property.  You referred to one group that came in for six

11   months it looks like you had a deal February through August or

12   November, was that RAM?

13          A       No.

14          Q       Who was that?

15          A       It was a group out of Florida.  One of their members

16   lives up here.

17          Q       That's not RAM?

18          A       No.

19          Q       What's that group called?

20          A       I don't remember it now.

21          Q       Did they create----

22          A       In Florida the Keys somewhere.

23          Q       Were there some documents to reflect letters of

24   understanding?

25          A       Yeah.

Page 138

```
1        Q      Maybe some principle?

2        A      There was a contract, I think.  I may still have it.

3   I may have tossed it out.  I don't know.

4        Q      Did you have an attorney looking over the deal on

5   your behalf?

6        A      No.

7        Q      Who would've been reviewing these documents on

8   behalf of The Hammocks?

9        A      Me.

10       Q      And you're not sure you have a file on that?

11       A      I don't know if I kept it or not.  I usually don't

12  keep things.

13       Q      How much was the agreed upon sale price?

14       A      For the inn 8.8 million.

15       Q      Was there anything else besides the inn?

16       A      No.  Now at one time the land.

17              MR. PAYNE:  Now, explain to him what you mean when

18  you say the inn.  Cause he needs to understand this.

19              THE WITNESS:  The inn is a 10 acre multi-parcels

20  that make up 10 acres.

21       Q      Were you selling anything else besides the 10 acre

22  parcel?

23       A      No.

24       Q      So they were just going to get the 10 acre parcel with

25  the inn for 8.8 and then the other land was going to be held by The
```

Dr. William Gray, Vol. I

Page 139

1 Hammocks?

2     A    Right.

3     Q    Why did that deal fall apart?

4     A    Their inn in the Keys kept falling through escrow

5 and they couldn't get funding to buy this till they sold that

6 because they didn't have cash.  And then they had a whole series

7 of other investors that were interested in going in with them

8 but it always seemed to fall apart.  The last time I talked to

9 them they were putting another contract in and this was

10 February, I guess.

11     Q    February of what year?

12     A    Of this year.  But they never got it together so.

13     Q    You use the term or phrase "inn kept falling through

14 escrow," what do you mean by that?

15     A    They had a contract to sell it and then whoever was

16 buying it backed out or couldn't get financing for it.

17     Q    So they were selling a property in the Keys in order

18 to buy the Richmond Hill Inn?

19     A    (Witness nods head yes.)

20     Q    And that deal didn't get consummated in the Keys

21 so----

22     A    Repeated deals didn't get consummated.

23     Q    So because they couldn't consummate the sale down in

24 Florida they couldn't follow through with the deal to purchase

25 Richmond Hill Inn from you?



Page 140

1      A      Right.

2      Q      So I saw the name RAM somewhere else.  Did you ever

3  have any negotiations to buy the Richmond Hill Inn----

4      A      There was another company that was going to buy it at

5  one time.

6      Q      Is that RAM?

7      A      Yes.

8      Q      They're out of Florida as well, aren't they?

9      A      Right.

10     Q      Did they ever put an offer in?

11     A      They put in a letter of intent, I guess it was.

12     Q      Did it talk in terms of figures that they would pay?

13     A      Yes.

14     Q      Were they going to pay more than the 10 acre parcel?

15     A      They were buying everything.

16     Q      What was the figure for that?

17     A      I don't really remember.  Somewhere between 14 and

18  16 million because we had several offers at 16 million in the

19  past.  So I don't remember what that was.

20     Q      Why didn't that deal go through?

21     A      The RAM deal?  Mrs. Michels apparently called the

22  person that we were dealing with and told him that she was

23  foreclosing on the property and would sell it to him cheaper if

24  they'd hold off a couple months.  That's what I was told by

25  somebody but anyway I don't know.

Page 141

```
1        Q      Who's this somebody that told you that?

2        A      Bland Holland.

3        Q      When did Bland tell you this?

4        A      I don't know when.  It fell through in April of '06,

5    I guess it was.

6        Q      Had the Michels ever put you on notice at any point

7    in '06 that they were foreclosing on the property?

8        A      Yes.  They just told me they weren't going to renew it

9    and then they end up renewing it.

10       Q      Have you had any offers to buy the property through

11   anyone else and I'm not talking about broker offers, I'm talking

12   about documents?

13       A      Yeah.  We had another offer or another contract.

14   But the guy was really flaky and I didn't think would follow

15   through so I didn't push to get that even consummated into a

16   contract.

17       Q      But it was a written offer to purchase?

18       A      Yes.  16 million.

19       Q      Was that for everything?

20       A      Yes.

21       Q      When did that offer come in?

22       A      '07, I think.

23       Q      You said flaky do you mean he didn't have the assets

24   to buy the inn?

25       A      I didn't think he did.  He was buying it for some
```

Page 142

1    other investors and it was just a rigamarole of stories so.

2        Q      Did you reject the offer?

3        A      Uh-huh.

4        Q      Is that a yes?

5        A      Yes.

6        Q      Did you put that rejection in writing?

7        A      I don't think so.  I just didn't sign the contract.

8        Q      You've had a relationship with Ms. Munden to handle

9    some of these transactions, right?

10       A      Yes.

11       Q      Was she involved in all three of these?

12       A      The RAM one and the one for 16 million she was, not

13   the other one.

14       Q      Not the one with the group out of Florida with the

15   property in the Keys?

16       A      No.  She wasn't involved in that.

17       Q      Does she even know about that one?

18       A      I don't know.

19       Q      Now you said the group with the property in the Keys

20   this is what I at least understood was interested in making an

21   offer now?

22       A      They were but they haven't come through.  But there

23   is another buyer that has said they want to buy it.

24       Q      Who is that buyer?

25       A      A hotelier out of New York and he has a partner in

Page 143

1    Memphis or Knoxville -- Nashville, excuse me.  They've told

2    their brokers that they're going to deal with it, you know, they're

3    going to put in a contract.  This was back in March and then the

4    fire and now they're coming next week to negotiate another

5    contract to try to put something together.

6        Q    What broker are they working through?

7        A    Prudential here in Asheville and the broker in

8    Florida by the name of Ricky Lapomardo.  And he's the one we

9    deal with.

10        Q    This group in New York and Nashville, they haven't

11    put a written offer together?

12        A    No, they have not.

13        Q    And who are they meeting with next week?

14        A    Me.

15        Q    Do they understand that the mansion has fire damage?

16        A    Right.

17        Q    Do you have any sense how much they're going to offer

18    you next week?

19        A    No.  They've asked me how much I would take.  But I

20    haven't talked to my partners enough about it to give an answer.

21        Q    Do you believe that they're interested in buying all

22    of the property?

23        A    Yes.  They had not intended to use the inn as an

24    inn, they intended to use it as an amenity center for the land

25    development around it.  Which our land is zoned for 749 units.

Page 144

1    So I think it's something like that, maybe a little bit more.

2    So they were going to build condos or something like that on it.

3        Q    How do you know the land is zoned for 749 units?

4        A    Because I got it zoned for that.

5        Q    Do you have a document that reflects that commitment

6    for the zoning?

7        A    No.   There's a recorded one in the Town of Woodfin.

8            MR. PAYNE:   Can we go off record for a second?

9            (Discussion off the record.)

10       Q    Dr. Gray, we've done some work off the record to

11   kind of speed things up.  The main piece of property where the

12   mansion and the pavilion are in I'm going to mark with a one with a

13   circle.  Are you following me there?

14           (Thereupon, Exhibit Number 18b is marked for

15   identification.)

16       A    Yes.

17       Q    Then there's the biggest piece of property I'm going to

18   mark with a two.  You with me so far?

19       A    Yes.

20       Q    And then there's another piece of property that I'm

21   going to mark with a three and then four and then a five, a six, a

22   seven, -- oh that's six there.

23           MR. PAYNE:   You've got two sixes now.

24           MR. NELSON:   Yeah, I know.  That's -- I can't see it

25   upside down.

Dr. William Gray, Vol. I

Page 145

1    A    I think it's nine, six, eight, 11, and 10.

2    Q    Now, this is 12?

3    A    12.

4    Q    That's what it was.  That's right.  So this is a 10

5    here and this is 11, this is eight, this is nine.  Am I doing

6    that right?  Can you make that a nine for me?  My brain's not

7    allowing me to handle that.  And then this is---

8    A    That's not ours.

9    Q    Yeah.  That's not yours.

10    A    But this is incorrect right here.

11    Q    What's incorrect about it?

12    A    There are three lots in here not just two.

13    Q    But it's inside that though?

14    A    It's inside its parameter but there are three lots.

15    I don't know if it's this, this, and that or---

16    Q    You're talking about the two lots that are marked 10

17    and 11 on Exhibit 18?

18    A    Right.  Yeah.  But there are actually three lots.

19    Q    Okay.  So we've marked 18b with numbers one through

20    12 for the parcels of land but Dr. Gray is saying that actually

21    there's another parcel in amongst all these other parcels.  So

22    there's 13 parcels of land, does that sound right?

23    A    I don't know for sure but it sounds okay.

24    Q    Can you take us through when you purchased the

25    Richmond Hill Inn which parcels did you take possession of?

Page 146

1       A       We took possession of one, two, three, four, five,

2   six, and seven, eight and nine from the Michels and then we

3   bought this separately and we bought this separately.

4               MR. PAYNE:   When you say "this" you need to refer to

5   numbers.

6       Q       Number 12?

7       A       Number 12 and then we have here 10 and 11 we bought

8   those separately.

9       Q       Okay.   That makes sense.   When did you buy those

10  three parcels that you didn't buy from the Michels?

11      A       In '05, I think.

12      Q       But you bought them around the same time you

13  acquired the inn?

14      A       Soon after.   Yeah.

15      Q       Lot two on 18b, that's the 41 acres that was going to

16  be developed into a conference center?

17      A       Right.

18      Q       Did you ever go through the process of having plans

19  developed for that development?

20      A       You can ask my partner.   I didn't.

21      Q       Did you ever hear that you had?

22      A       He was working on the things.

23      Q       Besides hearing he worked on it, do you have any

24  other information that any steps were made to actually develop

25  this?

Page 147

1      A      He brought an architect up here and a site planner

2    one time.   Never would show me any of the things that came from

3    that. And then one time he brought somebody who was a shyster

4    wanting us to pay him to do a condo-hotel complex type of thing

5    on it.   And other than that I don't think anything else

6    happened.

7      Q      Do you know if he ever paid the contractor -- the

8    architect or the person involved---

9      A      No, I do not.

10     Q      Let me finish my question, sir.   Do you know if he

11   ever paid the architect or the land planning person?

12     A      No, I do not.

13     Q      Since you took possession of all this land that's on

14   18b, has any of it been sold?

15     A      No.

16     Q      Was there some master plan as to how all of this

17   land would be ultimately used for the benefit of The Hammocks?

18   You know, a conference center, other units, developing the 749

19   units, has anybody ever put together some document, some

20   thoughts?

21     A      Not that I know of.

22     Q      I heard there was some plan to reroute the road that

23   goes to the Richmond Hill Inn, had you had any plans to put a

24   new road in?

25     A      No.  I didn't.