1      Q      Did you ever tell anybody you were going to put a new

2    road in?

3      A    No.

4      Q      Was there anything wrong with the existing road?

5      A      It's pretty dangerous.  I understood the city was

6    thinking of doing something because they built an Armory up here

7    over in this area somewhere.

8      Q      Above?

9      A      Yeah.  Above us.  And you come down in here and I

10    don't know where it goes but somewhere, maybe it's down in here.

11    And Richmond Hill Drive is the main way to get there and

12    there's also this is all a big park.  And they were talking

13    about trying to reroute the road at some point but I never saw

14    any plans or details on it.

15           MR. NELSON:  Okay.  I'd like to talk about the

16    litigation against the Michels.  Let's go off.

17           (Thereupon, a recess is taken from 2:32 p.m. to 2:38

18    p.m.)

19           (Thereupon, Dusty L. Bredeson leaves the examination

20    room.)

21      Q      Dr. Gray, we're back on the record.  Exhibit 4 is a

22    letter that was sent to attorney Payne that's a supplemental

23    document demand, I don't know if you've ever seen it but it

24    basically is asking for additional records.  And we'll be

25    provided additional records address, I just want to make sure

Page 149

1    that we have in the EUO transcript record that there were two

2    requests for records, one as part of the EUO letter and one

3    supplementing it dated May 13th, 2009.

4                Is that your understanding, Dr. Gray?

5                (Thereupon, Exhibit Number 4 is marked for

6    identification.)

7        A    Yes, it is.

8        Q    Okay.  Dr. Gray, I'm showing you what's Exhibit 10.

9    Can you take a look at that letter?

10               (Thereupon, Exhibit Number 10 is marked for

11   identification.)

12       A    Yeah, I'm familiar with it.

13       Q    Did you receive that letter around the same time it

14   was written?

15       A    Yes.  It was faxed to me.

16       Q    Who gave it to you?

17       A    My sister's secretary faxed it to me.

18       Q    Your sister's an attorney so was she representing

19   the interest of The Hammocks at the time?

20       A    Yes.

21       Q    Does she still represent the interest of The

22   Hammocks?

23       A    When we need her.

24       Q    Not to belabor the point but she was authorized to

25   write this letter as the attorney for The Hammocks, right?

Page 150

1      A      Right.

2      Q      So do you know why this letter was written to Mr.

3   Sloggart?

4      A      Yes because we were in foreclosure and we were

5   getting ready to file bankruptcy and he had refused to transfer

6   the property that was partially in his name and Gateway

7   Properties' name because of the initial 1031 exchange.  He had

8   refused for the past few years to transfer it to The Hammocks as

9   originally agreed upon and he did not want to declare Chapter 11

10  for the Gateway and he was going to let the Michels take half of

11  the property back.  So this was an attempt to spur him to do

12  what he had agreed to do long before.

13     Q      Okay.  Where is the property that---

14     A      The----

15     Q      Let me finish my question.  Where was the property

16  that's the Gateway Park property?

17     A      The 40 acres had been titled in Lake Norman

18  Pavilion, The Hammocks, and Gateway Park Properties names.

19     Q      What 40 acres?

20     A      The 42 --- 41.

21     Q      On that map?

22     A      On that map.  Yeah.

23     Q      Number 2?

24     A      Right.  Number two.

25     Q      When did it become titled to Gateway Park

Page 151

1    Properties' name?

2        A    When we closed initially.

3        Q    Do you have an interest in Gateway Park Properties?

4        A    No.

5        Q    Is it an LLC?

6        A    Yes, it is.

7        Q    Who has an interest in Gateway Park Properties?

8        A    Jim Sloggart and Karen Sloggart.

9        Q    Is Karen his wife?

10       A    Yes.

11       Q    Parcel number two on Exhibit 18b, is that still in

12   Gateway Park Properties' name?

13       A    I honestly don't know.  His lawyer -- he finally

14   retained a lawyer up here and supposedly they went to the

15   bankruptcy court to get okay to transfer to The Hammocks.  And I

16   assume that occurred.  I do not know for sure.

17       Q    You said something about at some point he was going to

18   transfer half of it to the Michels?

19       A    No.  He was going to transfer his share to the Michels.

20       Q    How do you know that?

21       A    Because he wasn't going to file Chapter 11, he was

22   going to let them foreclose on Gateway Park Properties' percentage

23   of ownership.  The percentage in the property was 50 percent but

24   his partner -- the Gateway Park Property only owned I don't know

25   8 percent or 7 percent of the partnership so.

Dr. William Gray, Vol. I

Page 152

1      Q      Getting to this letter in Exhibit 10 he's identified

2      as being the developing partner?

3      A      He was.

4      Q      Was that an agreed-upon title that he would be the

5      developing partner?

6      A      That was in the partnership agreement that he has --

7      he got -- the way it was set up in the partnership agreement is

8      he got a percentage for developing it.

9      Q      For the efforts of developing it?

10      A      Efforts of developing it.

11      Q      The letter says that he's breached his agreement

12      with The Hammocks, how did he breach it?

13      A      First, he didn't develop the property in Charleston

14      and insisted in getting the development fee percentage of that

15      and then up here he's not developed anything.  As far as we know

16      he's not -- not one single thing has been done.

17      Q      The paragraph that's enumerated with the number one,

18      "The Hammocks is not going to sit by and let you swindle the

19      Hammocks like you did on the Mt. Pleasant property."  What is

20      that referring to?

21      A      I just told you.  He insisted on getting the

22      percentage that went to the developer even though he didn't

23      develop anything.

24      Q      There's a figure of $30 million referenced in this

25      letter as to the loss, "Your failure to carry out your

Dr. William Gray, Vol. I

Page 153

1    commitment to do such development of RHI adjacent land has

2    deprived the Hammocks of at least $30 million." Do you know

3    where the $30 million figure came from?

4        A    That was sort of our estimate of what our profit

5    would have been if he had developed it.

6        Q    Where did the $30 million estimate come from?

7        A    Just figuring out what -- we did some figures very

8    early before we bought the land and we figured the profit and an

9    optimal profit would probably be about $70 to $80 million and I

10   just -- when she was doing this I said just put 30 million

11   because the market's terrible right now and we probably wouldn't

12   have made what we originally thought.

13       Q    Are those figures recorded anywhere?

14       A    No.

15       Q    And then, "a loss of over 12 million in property

16   which is now in foreclosure in large part due to your failure to

17   perform said agreed development." Is that 12 million---

18       A    For the land.

19       Q    And Richmond Hill Inn?

20       A    No. It was the land that we were going to lose.

21       Q    Which land were you going to lose?

22       A    The 40 acres. Cause see if the Michels were able to

23   try to get title to half of it then there's another procedure

24   they could do to claim the whole thing in North Carolina. I

25   don't know what it's called but.

Page 154

1    Q    And there's a demand of $42 million from Mr.

2    Sloggart, were you aware that that demand was going to be made

3    before this letter was written?

4    A    Yes.

5    Q    Did you agree to that demand?

6    A    Yes.  I didn't think it was that much but.  We

7    demanded 9 million.

8    Q    Well, if you look at the last sentence in paragraph

9    1, sir, it says, "Therefore, the Hammocks is hereby demanding 42

10   million dollars in damages."

11   A    Okay, yeah, I see that.

12   Q    So when you just said that you didn't think it was

13   that much, how much did you think it was?

14   A    I thought it was 32 million.

15   Q    What's the basis of 32 million?

16   A    I told you that's what we estimated we probably

17   would have made in this market if we developed it.

18   Q    Now, if you go down to paragraph number 2, it's a

19   rather lengthy sentence, I'm going to read the whole thing just so

20   we make sure we're talking about the same comments.  "Your

21   failure to so contribute the Gateway properties to the

22   partnership in exchange for Gateway's interest in the Hammocks,

23   has deprived the Hammocks of all of the property which it should

24   rightfully own, resulting in the foreclosure of 12 million

25   dollars of property and, in addition, resulting in damages to

1    Lake Norman Pavilion, LLC of $3,500,000 of collateral on other

2    properties that are now jeopardized by the foreclosure against

3    RHI and such collateral of Lake Norman Pavilion, LLC." Can you

4    tell me what that means, sir?

5        A    Lake Norman Pavilion pledged $3,500,000 worth of

6    property in Mooresville to the Michels on this loan. And

7    they're trying to foreclose on that, too.

8        Q    So in addition to the $42 million claimed in

9    paragraph 1 you're also claiming 3.5 million?

10       A    That's what Lake Norman Pavilion would be losing on

11   property that is not related to Richmond Hill Inn.

12       Q    How do we know it's 3.5 million that you would lose?

13       A    That's about what it's worth.

14       Q    How do you know that?

15       A    Tax records.

16       Q    And then the next page it says, "Your failure to

17   live up to your obligations to contribute the Gateway properties

18   to the Hammocks in exchange for its partnership interest in the

19   Hammocks has resulted in additional loss of ten and one half

20   million dollars." Do you see where I read that?

21       A    No.

22       Q    It's at the very top?

23       A    Yeah.

24       Q    So paragraph 1 talks in terms of 42 million and then

25   paragraph 2 talks in terms of 3.5 million and then 10.5 million.

Page 156

1      A      Right.

2      Q      Did I read that right?

3      A      Right.

4      Q      Paragraph number 3 refers to a failure to contribute

5  its pro rata share on the mortgage payments or taxes.  Do you

6  know how much that failure was?

7      A      It's about 600 and some odd thousand dollars.

8      Q      What's the basis of that?

9      A      How much money other people put in.

10      Q      And what he should've paid?

11      A      Uh-huh.

12      Q      Is that a yes?

13      A      Yes.

14      Q      Number 4, "When financing was available through

15  Shawn Jacobs, you refused to sign loan documents on behalf of

16  Gateway, therefore contributing to the foreclosure of RHI

17  against the Hammocks."    Who is Shawn Jacobs?

18      A      He was one of the brokers that we were dealing with,

19  he had a private loan lined up so it was expensive money but it

20  would have gotten us out from under the Michels and since he

21  hadn't signed the Gateway Park Properties over to The Hammocks

22  then Gateway Park Properties had to sign on that agreement and

23  he wouldn't do it so.

24      Q      When was that financing made available to you?

25      A      In January of '07, I think.  No, January of '08.

Dr. William Gray, Vol. I

Page 157

1       Q       How much would that loan have been for?

2       A       8-something million.

3       Q       Were you guaranteed those funds except for the fact

4    that he wouldn't sign the document?

5       A       No.  We weren't really guaranteed it but supposedly

6    it was lined up.

7       Q       What company does Shawn Jacobs work for?

8       A       Some company out in LA.

9       Q       Who dealt with Shawn Jacobs on behalf of The

10   Hammocks?

11      A       I did.

12      Q       What loan documents did Mr. Sloggart refuse to sign?

13   Was it a loan application?

14      A       No.  It was an agreement, a loan agreement.

15      Q       Do you have a copy of that loan agreement?

16      A       No, I sent it to him.

17      Q       You sent it to Sloggart?

18      A       Uh-huh.

19      Q       Is that a yes?

20      A       Yes.

21      Q       So you used the word "him" and then said "uh-huh" so

22   I'm trying to---

23      A       I don't have a copy of it.  I sent the copy to

24   Sloggart.

25              MR. PAYNE:  What he's trying to tell you is when you

Page 158

1    go "uh-huh" and it's that lady's job and it's hard enough

2    becomes next to impossible.

3        Q    And when you use the term "him," we're talking about

4    a lot of people here so if we can try to be fact specific.  So

5    Shawn Jacobs sent you a loan agreement and then you forwarded it

6    on to Sloggart?

7        A    Right.

8        Q    You didn't keep a copy of it?

9        A    No.

10       Q    Paragraph 5 refers to you illegally deducted losses

11   from the Hammocks on Gateway's interest.  How do you know that,

12   sir?

13       A    Because he filed his taxes based on our Hammocks

14   returns.

15       Q    And your position is that he shouldn't have done

16   that?

17       A    Well, not unless he had put that land in initially.

18       Q    So he was claiming losses that The Hammocks suffered

19   when he shouldn't have?

20       A    Right.

21       Q    How do you know that?

22       A    Cause I saw his tax returns.

23       Q    How did you see his tax returns?

24       A    He gave them to me to put in for applications for

25   loans and things.

Page 159

1    Q    But you don't have those tax returns anymore?

2    A    No.  I just make a copy and send them to the people.

3    Q    Okay.  Did you have tax returns from the other

4    partners as well?

5    A    My sister Virginia, yes.

6    Q    Paragraph 6 says, "When RHI was listed for sale,

7    Gateway wrongfully refused to sign the listing agreement thereby

8    making it impossible to do anything with the property, to the

9    great detriment of the Hammocks and therefore leading to the

10    foreclosure against the Hammocks."  What listing agreement did

11    he refuse to sign?

12    A    On the land we had people interested in buying it

13    and listing it with a broker.

14    Q    When you say "the land," are you talking about the

15    42 acres?

16    A    The 42 acres, yeah.  And he wouldn't sign that

17    listing agreement.  I did sign for him and we went on and listed

18    it.

19    Q    You signed his name?

20    A    No, I signed my name.

21    Q    I see.  Because he wouldn't sign the listing

22    agreement you couldn't sell the land?

23    A    We couldn't put it on the market until I went on and

24    signed the agreement for Gateway Park Properties and so we did

25    list it and we had a lot of interest in it and then the economy

Dr. William Gray, Vol. I

Page 160

1    collapsed, this was last year and the listing finally ran out.

2          Q     But this letter says because he refused to sign it

3    became impossible to list it for sale, is that true?

4          A     Right.  It's true.

5          Q     But you said you signed it---

6          A     I did and I told the broker that, you know, any deal

7    we had it would depend on getting him to sign it but he took it

8    any way.

9          Q     Did you have the authority to sign on behalf of

10   Gateway Park Properties?

11         A     No, I did not.

12         Q     But you signed your name to it?

13         A     Yes.

14         Q     The letter then says that, "The Hammocks is willing

15   to settle all of its damages by the payment of $9,000,000 in

16   cash". Did you get a response back to this letter?

17         A     No.  The only thing we got back was he did

18   supposedly deed his Gateway Park Properties to The Hammocks and

19   that was it.

20         Q     By the way, sir, have you ever met with anybody with

21   any taxing authority where there was some discussions about the

22   money that was owed by The Hammocks?

23         A     Yes, the State Bureau of Investigation, we met with

24   them a number of times.

25         Q     The State Bureau of Investigation---

Dr. William Gray, Vol. I

Page 161

1    A    I mean---

2    Q    Let me finish the question.  The State Bureau of

3  Investigation people associated with the fire or with the taxing

4  issues?

5    A    With the tax issues.

6    Q    When did that meeting take place?

7    A    Earlier this year.

8    Q    2009?

9    A    Right.

10    Q    Before the fire?

11    A    Yes.

12    Q    Where did that meeting take place?

13    A    Down at the inn.

14    Q    Were you represented by counsel?

15    A    No.

16    Q    How many people did you meet with from SBI?

17    A    Two.  Well, I assume they were SBI but I think they

18  really were revenue investigators.  They went through our books

19  and also the accountant's books on us.

20    Q    Did they tell you how much you owed in back taxes?

21    A    At that time, yes.

22    Q    How much did they tell you?

23    A    I don't remember.

24    Q    Did they ask you why the taxes hadn't been paid?

25    A    Sure.  Yes.

Page 162

1        Q      What did you tell them?

2        A      We didn't have the money to pay it.

3        Q      When you say "we," are you talking about The

4    Hammocks?

5        A      The Hammocks, yeah.

6        Q      Did they say what would happen if you didn't pay

7    them?

8        A      No.  They said I could be put in jail maybe but, you

9    know, they...

10       Q      So they did bring up the idea that you could be

11   facing---

12       A      If I was---

13       Q      Let me finish my question, sir.  Did they bring up

14   the idea that you could be facing criminal prosecution if you

15   didn't pay these taxes?

16       A      Right.

17       Q      You personally?

18       A      Yes.

19       Q      Did that make you think you needed to pay these

20   taxes and find ways to do it?

21       A      There's no money to pay it.  Then they called me and

22   said they weren't going to prosecute.

23       Q      They said they wouldn't prosecute?

24       A      Right.

25       Q      When did they call you and tell you that?

Page 163

1       A      Back in February.

2       Q      Any other conversations with them?

3       A      Not after that.

4       Q      So they said they're not going to prosecute you but you

5    still owe us money?

6       A      Yes.  We readily admitted we owed them money.

7       Q      Did they say why they weren't going to prosecute?

8       A      No, they just said they didn't feel like it was a

9    criminal case.

10      Q      Did you have any discussions with your Hammocks'

11   members that you were being threatened with criminal prosecution

12   and that arrangements should be made to pay these taxes?

13      A      No.

14      Q      How come?

15      A      Well, I knew Jim Sloggart wasn't going to do

16   anything and my sister didn't have any money at the time.

17      Q      When you say "your sister," are you talking about

18   Virginia Love?

19      A      Right.

20      Q      You said at the time, does she have more money now

21   as opposed to then?

22      A      She gets bonuses in February so she had some after

23   that.

24      Q      Have you or your sister made arrangements to pay

25   those taxes?

Page 164

1      A      No, we have not.

2      Q      This will be 8.  Mr. Gray, are you familiar with

3      Exhibit 8?

4              (Thereupon, Exhibit Number 8 is marked for

5      identification.)

6      A      I've seen it, yeah.

7      Q      Was this deal consummated?

8      A      No.

9      Q      Why not?

10     A      I don't know.  They pulled out of it at some point.

11     Q      You have no idea why they pulled out of the deal?

12     A      No.  I sold it to somebody else.

13     Q      You sold it to someone else?

14     A      Yeah.

15     Q      Did you accept this proposal?

16     A      Yes.

17     Q      So can you tell me why if you accepted the proposal

18     you then sold it to someone else?

19     A      Because they pulled out of it.  I told you.

20     Q      I think what you testified to, sir, maybe I

21     misunderstood your testimony when I said why didn't this deal go

22     through and you said I sold it to someone else?

23     A      No.  I said they pulled out and I sold it to

24     somebody else.

25     Q      So it was them pulling out not you?

Dr. William Gray, Vol. I

Page 165

1    A    Right.

2    Q    Do you know how much you sold the property for

3    that's part of this deal here?

4    A    No.

5    Q    But it was less than 4.5 million?

6    A    Would you state that over again?

7    Q    It was less than 4.5 million?

8    A    No.  State your other question.

9    Q    Sure.  The party that you eventually sold it to you

10   said you don't know how much you sold it for and then I said was

11   it less than 4.5 million?

12   A    No.  It was like 16 million but they assumed all the

13   loans and everything.  And this was a contract that gave us

14   4,500,000 cash and then they took the property and the loans on

15   it and everything or refinanced those.

16   Q    So what I think you're telling me is the deal that's

17   evidenced by Exhibit 8 would have been a net payment to you of

18   4.5 million?

19   A    Right.  Yes.

20   Q    How much did you net from the sale to the other

21   group?

22   A    Less than 4 million.  Or thereabouts.

23   Q    How soon after did you sell the property to this

24   other group?

25   A    September of -- I mean in February of '07 is when

Page 166

1    they closed.

2        Q      Okay.   This is nine.   Dr. Gray, can you tell me what

3    Exhibit 9 is?

4                (Thereupon, Exhibit Number 9 is marked for

5    identification.)

6        A      This is an appraisal that we had just before we

7    bought it done.

8        Q      Who commissioned this appraisal?

9        A      I did.

10       Q      The appraisal has on page 2 of it or page 3 there's

11   a Bates stamped number RHI0311.   It's a letter sent to Trent

12   Bradshaw at First Carolina Bank.   Do you see what I'm talking

13   about?

14       A      Right.

15       Q      So the appraisal's being sent to North Carolina Bank

16   -- I'm sorry.   First Carolina Bank, right?

17       A      Right.

18       Q      Why was it being sent to First Carolina Bank?

19       A      Because we were trying to finance it through them at

20   first.

21       Q      Did they refuse to finance it?

22       A      Yes.

23       Q      I think at some point I asked you how many different

24   types of loans had you tried to arrange for this and you told me

25   there were 50 loans?

Page 167

1        A        Probably yes.

2        Q        I think you also told me that the reason you didn't

3    get the 50 loans was because of the poor performance of the inn

4    and you gave me a second reason?

5        A        Polybutylene piping.

6        Q        So either one of those reasons the reason why First

7    Carolina Bank didn't go through with the loan?

8        A        This loan was applied for before we bought it.  And

9    the inn had been operating at a deficit for a long time.  They

10    didn't know about the polybutylene piping and I didn't know

11    about it either for years.

12        Q        So why did First Carolina Bank tell you they weren't

13    giving you the funding for this particular transaction?

14        A        Because of the negative cash flow on the property

15    under the Michels.

16        Q        Now this appraiser refers to Richmond Hill Inn as a

17    diamond in the rough, do you remember reading that?

18        A        No, I don't.  Oh I see it now.

19        Q        Did the values that are referred to in the report,

20    did they seem to be accurate values based on what you were

21    buying the property for?

22        A        I thought at the moment the inn values were probably

23    close to correct.  I'm not a contractor but the land values

24    seemed a little bit on the low side considering the potential of

25    what we could get it zoned for once you got it zoned.

Page 168

```
 1          Q       Did you have the zoning at the time that this report

 2    was written?

 3          A       No.

 4          Q       Whose handwriting is on this report?

 5          A       I have no idea.  It's not mine.

 6          Q       On page 26 of the report, right above the heading

 7    that says, "Highest and Best Use of Vacant Land."

 8          A       Yes.

 9          Q       There's a paragraph that says, "In analyzing the

10    feasible use of the subject property, we have considered the

11    factors previously listed.  The property contains a total of

12    approximately 54.5 acres of which approximately 13 are allocated

13    to the Inn and the property is located in the historic district,

14    which is characterized primarily by residential and office

15    facilities.  In view of this, we believe a bed and breakfast

16    facility or Inn is considered economically feasible under

17    current market conditions."  Do you remember reading that when

18    this was written?

19          A       No.

20          Q       Did you know that they said that the inn was

21    economically feasible?

22          A       I think it should have been.  I didn't know they

23    said it but I thought it should have been.

24          Q       But at the time it wasn't, right?

25          A       It wasn't.
```

1    Q    There are some projections about rate occupancy,

2  occupancy rate, that sort of thing in the report.  Did you look

3  at any of those aspects?

4    A    I did.  Most of those I think came from Bland

5  Holland.

6    Q    Now, this appraisal was written prior to you

7  actually consummating the deal with the Michels, correct?

8    A    Yes.

9    Q    As I understand it when you couldn't get the

10  financing from this bank you then approached the Michels about

11  them financing what you couldn't afford to pay for?

12    A    Well, we tried several banks, it wasn't just this

13  bank and I went back to them and said we can't get the financing

14  and actually was canceling the contract and then I don't know

15  how their financing came up whether it was through Bland Holland

16  or Connie Munden or my approaching them but I don't think I had

17  approached them directly on that without somebody else saying go

18  do it because they'd indicate they will do that.  But they did

19  agree to that.

20    Q    So you think they initiated the discussions that

21  they would agree to owner financing?

22    A    Either Bland Holland did or Connie Munden did.

23    Q    What were the terms as you understood them when they

24  were going to owner finance it?  How long would they owner finance

25  it for?

Page 170

1      A      For a year.

2      Q      For one year?

3      A      Right.

4      Q      Was it an interest only loan?

5      A      Right.

6      Q      What happened after that?

7      A      In terms of what?

8      Q      Okay.  That wasn't a very clear question so thank

9   you. Let's go back.  Over the course of that one year you had a

10  plan to get financing in place?

11     A      Yes.

12     Q      What was that plan?

13     A      To get the inn up where it was being productive and

14  more profitable.  It had been allowed to be neglected for a

15  number of years and it was showing some decay to some degree.

16  Everything needed to be upgraded pretty much.  And Bland Holland

17  was the innkeeper who we were required to keep by the Michels

18  along with Carol Ann Labowski and actually all the employees we

19  were required to keep if they were going to finance it.  But again

20  he assured us he could turn it around and cover the debt on it

21  and then at the end of the year we would have some money to put

22  into it and by then we should have closed on the assisted living

23  originally that was the original contract and would've paid the

24  loan down by $2 million or more.  And then in April I looked at

25  the financial things that finally came out and everything was

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Page 171

1   just a mess and I started trying to figure out what was going on

2   and it turned out we were spending about $300,000 more than we

3   knew about plus he had given himself five raises and---

4            MR. PAYNE:  When you say he.

5            THE WITNESS:  Bland Holland.

6       A    Plus he had raised all the employees -- Bland

7   Holland had raised all the employees and as a result of that

8   that was another $80,000 in expenses that occurred up to that

9   point.

10      Q    I'm going to take that one year story answer back and

11  break it down in little pieces, okay?

12      A    Okay.

13      Q    So the owner financing was a swing loan until you

14  could get permanent financing in place?

15      A    Correct.

16      Q    You thought you were going to get the inn profitable in

17  that year?

18      A    Correct.

19      Q    April you get some kind of information that showed

20  you the inn was performing a lot worse than what you thought?

21      A    Correct.

22      Q    How much did you think the inn was operating at a

23  deficit at the time you purchased it?

24      A    Somewhere under $100,000.

25      Q    So you thought they were losing $100,000 a year when

Dr. William Gray, Vol. I

Page 172

1    you purchased it?

2         A    Yeah.

3         Q    And in April you figure out it's closer to $400,000

4    a year?

5         A    At that point, we were losing more than that like

6    $600,000.

7         Q    By April you had already lost $600,000?

8         A    Yes.

9         Q    And that was more than you thought it was going to be?

10        A    Right.  We anticipated 200 or 300 maybe.

11        Q    Before April of 2006 you didn't realize it was that

12   bad?

13        A    No.

14        Q    You also planned to sell the property in Charlotte

15   to pay for a portion of paying what the Michels still held?

16        A    Yes.

17        Q    And you were going to get funding for whatever you

18   couldn't pay down?

19        A    Right.

20        Q    Is that when you applied for those 50 loans?  Better

21   said applied for loans from 50 different institutions?

22        A    We applied for many loans then.  But that's not the

23   time we applied for 50 loans.  That was in '07.

24        Q    So in '06 you applied for many loans?

25        A    Right.

Page 173

1    Q    None of those were approved?

2    A    Right.

3    Q    How many -- give me -- was it 10?

4    A    Probably more than that but I can't -- but not too

5    many more than that, 10 to 15 maybe.

6    Q    Do you know much you were looking for for financing?

7    A    At that point, the property hadn't sold so 8.8

8    million.

9    Q    And you hadn't sold this piece of property that we

10    just looked at where Chain Bridge was involved, right?

11    A    Correct.

12    Q    You didn't sell it until 2007?

13    A    Right.

14    Q    So that wasn't helping the situation either?

15    A    Correct.

16    Q    So it came time to make good on the loan after the

17    one year swing loan with the Michels, when did you start to tell

18    them you were having trouble?

19    A    I let Mr. Holland go and they immediately came up

20    here and so I told them then I had been trying to get financing

21    and hadn't been able to.

22    Q    Let me stop you there.  At the time you let Mr.

23    Holland go was the first time you told the Michels that you were

24    having a hard time getting financing?

25    A    Right.  That was July.

Page 174

1    Q    Did you tell that to both of them?

2    A    Yes.

3    Q    In July of '06?

4    A    Right.

5    Q    What was their reaction at that point?

6    A    Basically, their reaction is always the same, we

7    want our money.

8    Q    If you were having a hard time getting financing and

9    you couldn't sell the property to pay for part of it, what was

10   your reaction to them?

11   A    Just listened to them pretty much and tried to

12   continue to get loans and then as the day got closer, I went to

13   a lawyer to write their lawyer to see if we could arrange an

14   extension.

15   Q    What lawyer did you go to?

16   A    Albert Sneed.

17   Q    This would've been around October of '06?

18   A    September.

19   Q    Who secured the extension from them?

20   A    Their lawyer.  I gave them $100,000 and they

21   extended it till January of '07 at which point we had to pay up

22   another 2 million or the 900,000.

23   Q    Did you pay that payment by January?

24   A    (Witness nods head yes.)

25   Q    Is that a yes?

Page 175

1    A    Yes.

2    Q    January of '07 you paid 2 million?

3    A    1,900,000.

4    Q    You already paid $100,000?

5    A    Yes.

6    Q    So at the time that you paid that $2 million, had

7    you sold the property that was referred to in this Chain Bridge

8    transaction?

9    A    I sold the land part.

10    Q    And you sold that for 2 million?

11    A    Yeah.  Basically.

12    Q    All right.  So we're doing fine from the chronology

13    standpoint.  And that 2 million then goes to pay that $2 million

14    promise, correct?

15    A    Right.

16    Q    So at that point, you now owe them $6.8 million?

17    A    Correct.

18    Q    Was the idea that in October of 2007 they were going to

19    get paid the 6.8 million?

20    A    Yes.

21    Q    That's when you applied for the loans from the 50

22    different banks?

23    A    No.  We started applying in April or February

24    something like that.

25    Q    But the idea that you were going to have to pay this

Page 176

1    off in October of 2007?

2        A    Right.

3        Q    So then you weren't able to get financing?

4        A    No.

5        Q    When did you start to have the conversation with the

6    Michels that you couldn't pay this obligation in October of

7    2007?

8        A    Summer of that year.  Summer of '07.

9             MR. PAYNE:  You mean '08.

10            THE WITNESS:  No.  '07.

11       Q    It's '07.  Who did you have that conversation with?

12       A    The Michels.

13       Q    Directly?

14       A    Yes.

15       Q    Is this over the phone or in person?

16       A    In person.  They came up here about every 2 or 3

17   months and stayed overnight with me.

18       Q    What was their reaction at that point?

19       A    They want their money.

20       Q    Were they going to extend the----

21       A    No, they never agreed to.

22       Q    So when it came time in October of 2007 to make good

23   on this commitment?

24       A    I told them we couldn't do it and they just kept

25   taking the payments on it.

Page 177

1     Q     They kept taking the interest payments?

2     A     Right.

3     Q     Before October of 2007 had they ever issued a notice

4     of foreclosure?

5     A     No.

6     Q     When was the first time you received a notice of

7     foreclosure?

8     A     Dr. Michels wrote a personal one in February of '08.

9     Q     Were you behind at that point?

10    A     No.

11    Q     The premise for the foreclosure notice----

12          MR. PAYNE:  Excuse me.  Do you mean behind other

13    than the fact the note had matured?

14          MR. NELSON:  Yeah.  I'm sorry.

15          MR. PAYNE:  Okay.

16    Q     Let's make sure.  The note had matured by October of

17    2007 but you're still making interest payments?

18    A     That's correct.

19    Q     You hadn't fallen behind on the interest payments

20    before the February '08 letter from Dr. Michels to you?

21    A     No.  No.

22          MR. NELSON:  Were you able to get all that in proper

23    sequence?

24    Q     Okay.  So after you received that notice of

25    foreclosure what happened?

Page 178

1        A        I continued to make the payments.  And then I

2    finally got a contract.  I sent -- I always let them know what

3    was going on so I'd send copies of things to them.  But I sent a

4    copy of the contract to them and continued to make the payments.

5    They had their lawyer contact the buyer's lawyer just to verify

6    it.

7        Q        Is this the Florida Keys folks?

8        A        Right.

9        Q        Okay.  And did they have a reaction to you sending

10   them this contract?

11       A        (Witness nods head no.)

12       Q        Is that a no?

13       A        Not that I'm aware of.  Nothing directly to me.

14       Q        So while you were trying to consummate the deal with

15   the folks from the Florida Keys and I keep saying Florida Keys

16   cause there's another Florida group, right?

17       A        Right.

18       Q        So while you're trying to consummate the contract

19   with the Florida Keys folks, were you making payments on the

20   interest?

21       A        Oh yes.

22       Q        Now the folks from the Florida Keys backed out of

23   the deal when?

24       A        The latter part of September.  I mean excuse me.

25   The latter part of July.

Dr. William Gray, Vol. I

Page 179

1      Q    Of?

2      A    '08.

3      Q    Did you notify the Michels that they backed out?

4      A    Yes, I did.

5      Q    From February until July did you get any more

6   notices of foreclosure?

7      A    No.

8      Q    After that July sale --- after the July notice to

9   them the sale had fallen through, did they have a reaction of

10  any kind?

11     A    They came up here in August, we met and talked, they

12  didn't say anything one way or the other, I explained to them I

13  was listing it on an international basis with Prudential

14  International and continue to make the payments to them.   In

15  September they sent us --- their lawyer up here sent us a

16  foreclosure or a demand letter I guess it was at that point.

17  And at the time the demand letter was sent we were still current

18  with payments.

19     Q    I'm sorry, when did you have this meeting with the

20  folks from the SBI or the revenue services where they told you

21  you could face criminal prosecution?

22     A    In January or February of this year.

23     Q    So September of '08 there's a demand letter and then

24  is there another notice of foreclosure?

25     A    Yes.   I think they gave us 30 days or something like

Page 180

1   that.

2        Q      Is that through Marjorie Mann?

3        A      Yes, it is.

4        Q      Then at the expiration of the 30 days did they start

5   foreclosure proceedings?

6        A      I think so, yeah.

7        Q      Is that why you met with Attorney Gray?

8        A      Yes.

9        Q      Let's go to the lawsuit that you commenced against

10  the Michels, when did that happen?

11       A      I guess I went to Albert Sneed to get him to file

12  it, he didn't want to file it.

13              MR. PAYNE:  Now listen.  I'm going to advise you not to

14  say anything that your lawyer said to you.  That's not what he's

15  asking you.  He asked you when the lawsuit started.

16              THE WITNESS:  The lawsuit started prior to October

17  15th when we got an extension to file the lawsuit because of due

18  diligence -- I mean -- three months -- three years----

19              MR. PAYNE:  No, it's not.  Can we go off the record,

20  Mike?

21              MR. NELSON:  Yeah.

22              (Discussion off the record.)

23       Q      So when did you apply to the court for this

24  extension of time?  Do you know?

25       A      I believe the lawyers applied prior to October.

Page 181

1    Prior to the 15th.

2        Q      But the idea was that you needed to make sure you

3    stayed within the three-year statute of limitations?

4        A      That's right.

5        Q      Had you at any point put either Bland Holland or the

6    Michels on notice that you considered the transaction that you

7    entered into with them, and when I say "you," I'm talking about

8    The Hammocks, that you considered the transaction that you

9    entered into with them to buy the Richmond Hill Inn to be

10   fraudulent?

11       A      Yes.

12       Q      How did you put them on notice of that?

13       A      One time we were discussing the extension on the

14   note and I just said, "If, you know, you foreclose on it I'm

15   going to file Chapter 11 and file these lawsuits." And Albert

16   Sneed who was our lawyer at the time sent a letter to their

17   lawyer basically saying the same thing.

18              MR. NELSON:  Counsel, I don't think I've seen that

19   letter.

20              THE WITNESS:  I don't have that letter.

21              MR. PAYNE:  I don't know that I've seen it.  Are you

22   talking about a demand letter from Albert?

23              THE WITNESS:  No.  Not a demand letter.  Just simply

24   saying this and then that's when they extended the note for

25   another year.

Page 182

1          MR. PAYNE:   He's talking about in '08.   Can we go

2    off the record for a second?

3          (Discussion off the record.)

4     Q    Dr. Gray, why don't you tell us what you think was

5    in Sneed's letter to the Michels or whoever he wrote it to on

6    behalf of the Michels?

7          MR. PAYNE:   Can I ask a question?   Did -- do you

8    remember if this letter went to the Michels or did it go to

9    somebody at Robert Stevens?

10    A    No, it went to Abell who's their lawyer in

11   Greensboro.

12    Q    Can you characterize what the letter said?

13    A    No, not very well.

14    Q    Can you characterize it in any way?

15    A    Basically, that if they foreclosed on it we were

16   going to file for Chapter 11 because we'd already talked to David

17   Gray at that point too.   And they had withheld information

18   regarding the condition of the property or something like that.

19   Polybutylene piping.

20    Q    Did Attorney Sneed also send notice of any kind

21   prior to October of '08 to Holland that he was part of the

22   fraud?

23    A    We had sued Holland prior to that, yes, on another

24   case.

25    Q    For a different issue.   That was all about whether