# LONG, PARKER, WARREN, ANDERSON & PAYNE, P.A.

### ATTORNEYS AT LAW
14 SOUTH PACK SQUARE, SUITE 600
ASHEVILLE, NORTH CAROLINA 28801

(828) 258-2296

ROBERT B. LONG, JR.
WILLIAM A. PARKER
STEVE R. WARREN
PHILIP S. ANDERSON
RONALD K. PAYNE
ANDREW B. PARKER

*MAILING ADDRESS*
Post Office Box 7216
Asheville, NC 28802

*FACSIMILE*
(828) 253-1073

May 21, 2009



Michael R. Nelson
Nelson Levine de Luca & Horst, LLC
518 Township Line Road, Suite 300
Blue Bell, PA 19422

      RE: Policyholder: The Hammocks, LLC d/b/a "The Richmond
            Hill Inn"
            Fire Loss
            Date of Loss: March 19, 2009
            Harleysville Insurance Claim № : S0-840619

Dear Mr. Nelson:

On behalf of the Hammocks, LLC, I have documents bates-stamped
HAMMOCKS1-HAMMOCKS1283, in response to the request for documents
in David Brown's April 2, 2009 letter. I will enclose
additional documents in FedEx packages to follow.

N.C.G.S. § 58-44-15, which provides the substance and printed
form of the Standard Fire Insurance Policy for North Carolina,
provides that "[t]he insured…, as often as may be reasonably
required, shall produce for examination all *books of account,
bills, invoices and other vouchers…*." (Emphasis added.)

The Common Policy Conditions in the Harleysville Fire Insurance
Policy permit the examination and audit of the insured's "books
and records that relate to the policy," and paragraph #5 of the
policy section regarding "What Must Be Done in Case of Loss"
requires the insured's production of "*records,* including tax
returns and bank microfilms of all canceled checks *relevant to
value, loss, and expense….*"

While we believe that the requests in Mr. Brown's April 2, 2009
letter exceeded the scope of documents described in the Standard
Fire Insurance Policy and even in the Harleysville Fire
Insurance Policy, the Hammocks, LLC has nevertheless, out of an

EXHIBIT

17

Gray

abundance of good faith and in the exercise of reasonable
diligence, assembled and produced the enclosed documents. We
did not produce any documents relating to the ownership of The
Village at Lake Norman, LLC since that entity held no interest
in the Hammocks, LLC or the insured property, and there were
several requests for which the Hammocks, LLC had no responsive
documents. If there is a specific document that you are seeking
that we have not produced, please identify it with particularity
and we will check to see if the Hammocks, LLC has it.

If you have any questions, please call me.

Sincerely,

Ronald K. Payne

enclosures
cc:  David L. Brown

# LONG, PARKER, WARREN, ANDERSON & PAYNE, P.A.

ATTORNEYS AT LAW
14 SOUTH PACK SQUARE, SUITE 600
ASHEVILLE, NORTH CAROLINA 28801

(828) 258-2296

ROBERT B. LONG, JR.
WILLIAM A. PARKER
STEVE R. WARREN
PHILIP S. ANDERSON
RONALD K. PAYNE
ANDREW B. PARKER

*MAILING ADDRESS*
Post Office Box 7216
Asheville, NC 28802

*FACSIMILE*
(828) 253-1073

May 22, 2009

RECEIVED
MAY 2 6 2009
By

Michael R. Nelson
Nelson Levine de Luca & Horst, LLC
518 Township Line Road, Suite 300
Blue Bell, PA 19422

RE: Policyholder: The Hammocks, LLC d/b/a "The Richmond Hill Inn"
Fire Loss
Date of Loss: March 19, 2009
Harleysville Insurance Claim №: SO-840619

Dear Mr. Nelson:

On behalf of the Hammocks, LLC, I have enclosed documents bates-stamped HAMMOCKS1284-HAMMOCKS2131 and HAMMOCKS2134-HAMMOCKS2602, in response to the request for documents in David Brown's April 2, 2009 letter. I will enclose additional documents in FedEx packages to follow.

If you have any questions, please call me.

Sincerely,

Philip S. Anderson

enclosures
cc (w/o enclosures):
    David L. Brown

# LONG, PARKER, WARREN, ANDERSON & PAYNE, P.A.

ATTORNEYS AT LAW
14 SOUTH PACK SQUARE, SUITE 600
ASHEVILLE, NORTH CAROLINA 28801

(828) 258-2296

ROBERT B. LONG, JR.
WILLIAM A. PARKER
STEVE R. WARREN
PHILIP S. ANDERSON
RONALD K. PAYNE
ANDREW B. PARKER

*MAILING ADDRESS*
Post Office Box 7216
Asheville, NC 28802

*FACSIMILE*
(828) 253-1073

May 22, 2009

RECEIVED
MAY 26 2009
By

Michael R. Nelson
Nelson Levine de Luca & Horst, LLC
518 Township Line Road, Suite 300
Blue Bell, PA  19422

> RE:  Policyholder: The Hammocks, LLC d/b/a "The Richmond
> Hill Inn"
> Fire Loss
> Date of Loss: March 19, 2009
> Harleysville Insurance Claim Nº:  SO-840619

Dear Mr. Nelson:

On behalf of the Hammocks, LLC, I have enclosed documents bates-
stamped HAMMOCKS2603-HAMMOCKS3011 and HAMMOCKS3015-HAMMOCKS3906,
in response to the request for documents in David Brown's
April 2, 2009 letter.  I will enclose additional documents in
FedEx packages to follow.

If you have any questions, please call me.

Sincerely,

Philip S. Anderson

enclosures
cc (w/o enclosures):
    David L. Brown

## LONG, PARKER, WARREN, ANDERSON & PAYNE, P.A.
### ATTORNEYS AT LAW
14 SOUTH PACK SQUARE, SUITE 600
ASHEVILLE, NORTH CAROLINA 28801

(828) 258-2296

ROBERT B. LONG, JR.
WILLIAM A. PARKER
STEVE R. WARREN
PHILIP S. ANDERSON
RONALD K. PAYNE
ANDREW B. PARKER

*MAILING ADDRESS*
Post Office Box 7216
Asheville, NC 28802

*FACSIMILE*
(828) 253-1073

May 28, 2009

RECEIVED
MAY 2 9 2009
By

Michael R. Nelson
Nelson Levine de Luca & Horst, LLC
518 Township Line Road, Suite 300
Blue Bell, PA  19422

RE:    Policyholder: The Hammocks, LLC d/b/a "The Richmond
       Hill Inn"
       Fire Loss
       Date of Loss: March 19, 2009
       Harleysville Insurance Claim Nº:  SO-840619

Dear Mr. Nelson:

On behalf of the Hammocks, LLC, I have enclosed documents bates-stamped HAMMOCKS3907-HAMMOCKS4589 and HAMMOCKS4592-HAMMOCKS4597, in response to the request for documents in David Brown's April 2, 2009 letter.  I have also enclosed a DVD with a virtual tour of the Manor.  I will enclose additional documents in FedEx packages to follow.

By way of correction, one of my 5/22/9 letters erroneously stated that I had enclosed documents including those bates-stamped HAMMOCKS3436 and HAMMOCKS3746-HAMMOCKS3751.  I omitted these documents from the production as non-responsive.

If you have any questions, please call me.

Sincerely,

Philip S. Anderson

enclosures
cc (w/o enclosures):
    David L. Brown

# Transcript of the Testimony of **DR. WILLIAM GRAY**

**Date:** June 11, 2009
**Volume:** 2

**Case:** IN THE MATTER OF THE FIRE LOSS OF RICHMOND HILL INN

Printed On: 7/19/2009

## ORIGINAL

Emert Reporting Service, Inc.
Phone:336-998-9551
Fax:336-998-9568
Email:EmertReport@aol.com
Internet:

Page 1

IN THE MATTER OF THE HAMMOCKS LLC d/b/a

THE RICHMOND HILL FIRE LOSS,


DATE OF LOSS:  March 19, 2009

HARLEYSVILLE INSURANCE CLAIM NO.:  SO-840619

---

Asheville, North Carolina

June 11, 2009

9:04 a.m.


- - - - - - -


EXAMINATION UNDER OATH


OF


DR. WILLIAM GRAY


VOLUME II


- - - - - - -

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Page 2

```
1    APPEARANCES:

2         RONALD K. PAYNE, ESQ.

3         LONG, PARKER, WARREN, ANDERSON & PAYNE, P.A.

4         14 South Pack Square, Suite 600

5         Asheville, NC 28801

6         Appearing on behalf of the Deponent.

7

8         MICHAEL R. NELSON, ESQ.

9         NELSON, LEVINE, de LUCA & HORST, LLC

10        518 Township Line Road, Suite 300

11        Blue Bell, PA 19422

12        Appearing on behalf of Harleysville Mutual

13        Insurance Company.

14

15

16

17   ALSO PRESENT:  Chris Logan, Larry Williams of Harleysville

18   Mutual Insurance Company; Douglas Y. Christian, Esquire

19

20

21

22                        - - - - - - - -

23

24

25
```

Page 3

```
 1                       I N D E X

 2    WITNESS              DIRECT      CROSS      REDIRECT      RECROSS

 3

 4    DR. WILLIAM GRAY, VOL. II

 5

 6    By Mr. Nelson              6

 7                            -- -- -- -- -- --

 8                       E X H I B I T S

 9

10    NUMBER                  DESCRIPTION                        PAGE

11

12      7        The Hammocks Financial Statements

13                   For Year Ending December 31, 2007..........58

14     14        Non-Waiver Agreement...........................57

15     15        Permission to Examine Fire Scene...............58

16     20a       Personal Financial Statement for

17                   8/31/08....................................7

18     20b       Personal Financial Statement for

19                   5/1/06.....................................7

20     20c       Personal Financial Statement for

21                   4/30/08....................................7

22     20d       Personal Financial Statement for

23                   4/30/09....................................7

24     20e       Personal Financial Statement for

25                   10/1/05....................................7
```

Page 4

1

2                                    - - - - - - - -

3                    Quoted material is verbatim and

4              may/may not reflect a direct quote.

5

6                                    - - - - - - - -

7

8

9

10

11

12

13

14

15

16

17     Note:  Exhibit 2 was retained by Mr. Payne after the EUO.

18

19

20

21

22

23

24

25

Page 5

1          The examination of DR. WILLIAM GRAY was taken by

2     Harleysville Mutual Insurance Company for use as evidence, IN

3     THE MATTER OF THE HAMMOCKS LLC d/b/a THE RICHMOND HILL INN FIRE

4     LOSS OF APRIL 1, 2009, Asheville, North Carolina pursuant to the

5     policy of insurance, before DEBORAH O. EMERT, CVR, Verbatim

6     Court Reporter and a Notary Public in and for the County of

7     Davie, State of North Carolina, on the 11 day of June, 2009, at

8     the offices of Long, Parker, Warren, Anderson & Payne, P.A., 14

9     South Pack Square, Suite 600, Asheville, North Carolina 28801,

10    commencing at 9:04 a.m.

11

12                              - - - - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1    Thereupon:

2                          DR. WILLIAM GRAY

3    was called as a witness pursuant to notice and agreement of

4    counsel in the above-entitled cause and, being duly sworn in the

5    manner provided by law, was examined and testified upon his oath

6    as follows:

7                          DIRECT EXAMINATION

8    BY MR. NELSON:

9         Q    Dr. Gray, you've just been sworn in again.  You

10   understand that, right?

11        A    Yes.

12        Q    We're going to continue with your examination under

13   oath.  And once again I'm an attorney and I represent the

14   Harleysville Mutual Insurance Company.  Do you have the personal

15   financial statements in front of you?

16        A    Yes, I do.

17        Q    We're going to mark those as an exhibit.  And I

18   think we're at 20.

19             THE COURT REPORTER:  I don't know cause we were kind

20   of all over.

21             MR. NELSON:  We'll go 20 a, b, c, d, e for all of

22   them.

23             THE COURT REPORTER:  Okay.

24             MR. NELSON:  Dr. Gray, can you hand them to the

25   court reporter so she can----

Page 7

1          THE COURT REPORTER:  How many do you have?

2          MR. NELSON:  I think there's five.

3     Q    Dr. Gray, the one that's marked 20a in front of you,

4    what's the date on that one?

5          (Thereupon, Exhibit Numbers 20a through 20e are

6    marked for identification.)

7     A    This is 8/31/08.

8     Q    Could I see that?  Could I see the one that you're

9    looking at?  Okay.  Why did you create this document?

10    A    I have no idea.

11    Q    Did you assist in the creation of it?

12    A    No, my wife did it.

13    Q    Is this her handwriting on the document?

14    A    Yes, it is.

15    Q    Does she know the information that is necessary to

16   fill out one of these documents?

17    A    She pretty well keeps our personal finances.

18    Q    So she has enough information about your personal

19   finances to complete one of these things?

20    A    As far as I know.

21    Q    Okay.  Have you had a chance to look at this at all?

22    A    No.

23    Q    Can you please take a look at it and tell me whether

24   or not it seems accurate or inaccurate in any way?

25         MR. PAYNE:  You mean as of the date it was

Dr. William Gray, Vol. 2

Page 8

1    submitted?

2                MR. NELSON:   Right.

3                (Discussion off the record.)

4        A     The only thing I see that's not quite right is on

5    the---

6        Q     Dr. Gray, why don't you wait till your attorney

7    comes back in the room and answer?  Okay.  Dr. Gray, you were

8    about to answer that question.

9        A     The only one that I see that might not be correct is

10   the 16 acres in La Cresta that we own half of it and the second

11   thing of figures it has 40,000 instead of 400,000.

12       Q     I want to make sure I understand what you're talking

13   about.  Let me find La Crest here, okay.  Is that on the first

14   page?

15       A     No, it's on the second page.  It's the very bottom

16   thing on the second page.

17       Q     Okay.  Is that raw land?

18       A     Yes, it is.

19       Q     What's not accurate about that?

20       A     It should be 400,000 instead of 40,000.

21       Q     And that's the cost of the land?

22       A     No, I was wrong then.  That's about what we paid for

23   it then.

24       Q     Then there's a reference to 800,000 and it looks

25   like it says, "our share"?

Dr. William Gray, Vol. 2

Page 9

```
1      A    Yeah, that's right.

2      Q    So the property you own one half?

3      A    Right.

4      Q    So the property's worth 1.6 million?

5      A    Probably more than that.

6      Q    That looks like it's in California?

7      A    Yes, it is.

8      Q    Whereabouts is this part of California?

9      A    Southern California.

10     Q    San Diego?

11     A    Out of San Diego, yeah.

12     Q    And it looks like there's two other parcels of land?

13     A    Yes, there are.

14     Q    Do you own all 25 acres of that one lot?

15     A    Yes.

16     Q    And then all two and a half acres of the other lot?

17     A    Right.

18     Q    And all three of those parcels are raw land?

19     A    Yes.

20     Q    How far away from downtown San Diego is it?

21     A    I don't know 15 miles.

22     Q    Inland?

23     A    Yes.

24     Q    You said this statement was accurate except for --

25     well, I guess you corrected it with -- did you make another
```

Page 10

1    point about it being inaccurate?

2        A    No.

3        Q    And you're now saying it's probably accurate, you

4    misunderstood what it was saying?

5        A    Right.

6        Q    So I'd like to get this in some kind of chronology

7    if you would, Dr. Gray, if you could tell me which of the 20 --

8    Exhibit 20 personal financial statements is the most recent I'd

9    appreciate it?  Tell me by exhibit number.

10       A    Here it is.  It's 20d.

11       Q    What's the date of that?

12       A    4/30/09.

13       Q    And the one that's most recent before that?

14       A    20a.

15       Q    And most recent to 20a?

16       A    20c.

17       Q    Most recent to the 20c?

18       A    20b.

19       Q    And the oldest?

20       A    20c.

21            MR. PAYNE:  I believe that's an "e".

22            THE WITNESS:  Oh an "e".

23            MR. NELSON:  So if I could see those, Dr. Gray.

24            MR. PAYNE:  Just keep them in order, why don't you?

25       Q    Yeah.  That's great.  Dr. Gray, I'd like you to look

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Dr. William Gray, Vol. 2

Page 11

1     at 20d and tell me whether or not that is accurate.

2          A     B or d?

3          Q     D.

4          A     Yes, as far as I know it is.

5          Q     Is there anything you don't know?

6          A     My wife filled it out so I really don't know.  I

7     don't keep the books.

8          Q     Does your signature appear on that document?

9          A     Yes, it is.

10         Q     Can you look at the other four of those personal

11    financial statements 20a, c, b, and e and see if your signature

12    appears on them?

13         A     I don't see my signature on a.  It is on c.  It is

14    on b.  It is on the e and b and c.

15         Q     Would you have signed any document that you thought

16    was inaccurate?

17         A     I would've thought it was accurate, yes.

18         Q     Were all five of these at some point used to try to

19    obtain financing?

20         A     No.  I think some of them are just renewal of loans.

21         Q     So they would've been provided to financial

22    institutions?

23         A     Yes.

24         Q     So you understood that's what they were created?

25         A     Right.  (Witness nods head yes.)

Page 12

1      Q      Is that a yes?

2      A      Yes.

3      Q      Okay.  On 20d can you tell me what your net worth is

4      as reflected on that document?

5      A      13 million.

6             MR. PAYNE:  Let me -- I believe that's a joint

7      statement.

8      Q      When I say "you," I'm talking about you and your

9      wife's?

10     A      13 million.

11     Q      $13,139,100?

12     A      That's what it says.

13     Q      Can you go to the 20a Exhibit?

14     A      28a?

15            MR. PAYNE:  No, 20a.

16     Q      What was your net worth, you and your wife's net

17     worth?

18     A      15,543,000.

19     Q      And can you go to 20c?

20     A      17,595,662.

21     Q      20b?

22     A      15,517,000.

23     Q      And 20d?

24     A      15,517,000.

25     Q      So the two most recent statements -- actually put

Page 13

1    the three in front of you 20c, 20a, and 20d.  The net worth from

2    4/30/08 to 4/30/09 drops from 17.6 million down to 13 million?

3         A    Right.

4         Q    Can you explain where the 4.5 million dollars went

5    over the course of the year?

6         A    Decrease in value of property for a great degree.

7    But we also sold some property in that time.

8         Q    If you sold the property you would've gotten cash

9    for that property?

10        A    Yes.

11        Q    So then the cash you had to spend otherwise it would

12   still be something you owned, right?

13        A    The cash would've been, yeah.

14        Q    So can you explain what happened to the 4.5 million

15   dollars in assets over the course of one year?

16        A    I told you it was based on the value of the

17   property.  Decreasing the value in that period of time.

18        Q    But then you said you sold some property, too?

19        A    Right.

20        Q    So where did the cash from the sale of that property

21   go?

22        A    Most of it went to support ourselves and then to the

23   Richmond Hill Inn.

24        Q    How much of the 4.5 went in to supporting the

25   Richmond Hill Inn?

Page 14

1          A      I really don't know.

2          Q      Who would know that?

3          A      My wife.  She wrote the checks.

4          Q      But that would be reflected in the ledger that Sarah

5   McCullough maintains?

6          A      I don't know if it would be or not.

7          Q      There's checks that your wife wrote to the Richmond

8   Hill Inn?

9          A      No.   Wrote to Lake Norman Pavilion and/or to

10  Richmond Hill Inn which then went to the inn.

11         Q      Dr. Gray, did the Michels -- were they aware that

12  the inn was not performing well during the three years you owned

13  it?

14         A      I'm sure they would be since we sent them statements

15  on a regular basis.

16         Q      Did they know that you were contemplating bankruptcy

17  before you filed it?

18         A      Yes.  They have people in our organization who

19  report everything to them.

20         Q      Who's that?

21         A      I don't know.

22         Q      What do you mean "we have people in our

23  organization"?

24         A      Just that.  There are employees of ours that report

25  to the Michels everything that goes on.

Dr. William Gray, Vol. 2

Page 15

1      Q      You mean like gossip?

2      A      No.  Just whatever I say, whatever we're doing.

3      Q      Is it their job to report it?

4      A      No, it's not.

5      Q      Well, then can you tell me why you believe that?

6      A      Because there are things I say and do that the

7   Michels know about within a day or two.  And then they call

8   somebody else who then calls me and, you know.

9      Q      Was it generally known among your key employees that

10  The Hammocks was going to go into bankruptcy?

11     A      Yes, it was.

12     Q      Was it known in the fall of 2008 that The Hammocks

13  was going to go into bankruptcy?

14     A      Uh-huh.  Right.

15     Q      And do you believe the Michels would've known that

16  The Hammocks was going into bankruptcy around that time?

17     A      I'm sure they would've.

18     Q      Dr. Gray, I don't want to dwell anymore on your

19  history involving your medical practice and the complaints made

20  against you any more than I have to.  But I got to ask you a few

21  more questions about that.  Were the Michels aware of your

22  background in that regard?

23     A      I have no idea.

24     Q      Were the Michels aware that there were tax liens

25  filed against The Hammocks as it concerns the events in 2008 and

Page 16

1    2009?

2         A    I don't know.

3         Q    Were your employees aware that there were tax liens

4    filed against you?

5         A    Yes.

6         Q    Did Sarah McCullough know that there were tax liens

7    filed against you in 2008?

8         A    Yes.

9         Q    And was Susie Zimmerman aware that there were tax

10   liens filed against you in 2008?

11        A    Yes.

12        Q    Do you have any reason to doubt that the Michels

13   would have heard that from those two people?

14        A    I would doubt it from those two people.  But there

15   were certainly a lot of other people that maintain their

16   friendship with the Michels.

17        Q    Would those people have known about the tax liens?

18        A    Yes.  At least one of them.

19        Q    Who is that one person you're thinking of?

20        A    Sarah Hodgen who was our assistant innkeeper for a

21   couple of years was always telling everything that went on in

22   administrative thing to everybody.  So it would have spread

23   around very easily.

24        Q    Okay.  I'm not talking about the arrest or the legal

25   proceedings brought against you concerning the allegations of

Post Office Box 2152
Advance, NC 27006
EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS
TEL: (336) 998-9551
FAX: (336) 998-9568

Page 17

1    sexual misconduct but I'm talking about the claims of assault by

2    the one employee at the nursing home and by the police officer

3    concerning I think you called it resisting arrest?

4         A    No.   Interfering with a police officer.

5         Q    Interfering with a police officer.   What was the

6    final disposition in those two events?

7         A    I think I pleaded no contest to both of them and I

8    was convicted and released.

9         Q    Besides all that we talked about yesterday and what

10   you just told us today, is there anything else about your

11   background that has a criminal history of any kind, any other

12   arrests?

13        A    Not that I remember.

14             MR. PAYNE:  Mike, just so it's clear I assume you're

15   excluding traffic citations?

16             MR. NELSON:  Well, I wouldn't consider those

17   arrests.

18             MR. PAYNE:  Some people do.

19        Q    So we're excluding traffic citations from that,

20   okay.  Do you understand that?

21        A    Yes.

22        Q    But anything else more significant than a traffic

23   citation?

24        A    Not that I'm aware of.

25        Q    Do you have any DUI arrest?

Page 18

1      A      No.

2      Q      Have you ever been treated for alcoholism?

3      A      No.

4      Q      Dr. Gray, I'd like you to get the proof of loss in

5      front of you.  It's the exhibit that's -- it should be Exhibit

6      1.

7              MR. PAYNE:  It's Exhibit 2.

8      Q      Before I look at that, Dr. Gray, at some point

9      yesterday we were talking about who might or might not have a

10     motive to cause the fire.  And you said something that I took to

11     mean one thing but I want to make sure we're clear on this.  You

12     listed three groupings of people.  You listed the Michels, you

13     listed Bland Holland, and you listed Sloggart and you said

14     mostly Mrs. Michels.  What did you mean by that?

15     A      She's the -- between the Michels she's the one that

16     manipulates everybody and plays the games and is the one that I

17     heard the most from.  Dr. Michels is a little more withdrawn and

18     senile for one.  But she's the one that runs the family and has

19     pushed for the foreclosure and things.

20     Q      Do you suspect she had a hand in starting the fire?

21     A      I do not know.

22     Q      I'm sorry?

23     A      I do not know.

24     Q      Do you have a suspicion?

25     A      No.  I don't.  I have nothing to base the suspicion

Page 19

1    on.

2         Q    So you have no reason to suspect she caused the

3    fire?

4         A    No.

5         Q    On the night before the fire when you were walking

6    those grounds before you returned to the pavilion for the last

7    time, did you see anybody else on the grounds?

8         A    No, I did not.

9         Q    Okay.   Do you have any reason----

10        A    Except for the -- as I had said before there were

11   people in the spa.

12        Q    But then after they left?

13        A    No.

14        Q    You didn't see anybody else?

15        A    No.

16        Q    And you have no other reason to believe there was

17   anybody else on the grounds that night?

18        A    Not other than if there was a fire.

19        Q    Go to the proof of loss and did you get assistance

20   from anybody else in preparing this group of documents and again

21   this group of documents goes from page one of Exhibit 1 to page

22   131?

23        A    Yes.   This is prepared by other people.   Not myself.

24        Q    Who prepared it?

25        A    Various staff members of mine.

Page 20

1      Q      Can you please tell me who they are?

2      A      Sarah McCullough, my wife helped some, there was an

3  audit of the property back in '06 so the -- from 004 to 0029

4  were prepared by a group of people that Connie Munden had hired

5  to come up and inventory the property in '06.  Number 30 I did

6  and 31, 32 was done by---

7      Q      Who did 31?

8      A      I did.  32 was done by Sarah McCullough, 33 was done

9  by one of the concierges who worked up there -- there were

10  several of them that went to get together to try to figure out

11  what was up there.  And then that's 33 through 36.

12      Q      Who's the concierge?

13      A      I said several of them.  I don't -- Diana something

14  was one of them.  She was kind of in charge of it.  Some of the

15  others helped her, I'm not sure which ones.  37 Sarah

16  McCullough, 38 Sarah McCullough, 39---

17              MR. PAYNE:  Do them page by page, it'll be a lot

18  easier.

19      A      40 Sarah McCullough, 41 is Sarah McCullough, 42 is

20  Sarah McCullough, 43 is Sarah McCullough, 44 is Sarah

21  McCullough, 45 is Sarah McCullough, 46 is Sarah McCullough, 47

22  is Sarah McCullough, 48 Sarah McCullough, 49 is Sarah

23  McCullough, 50 is Sarah McCullough, 51 is Sarah McCullough, 52

24  is Sarah McCullough, 53 is Sarah McCullough, 54 is Sarah

25  McCullough, 55 is Sarah McCullough, 56 was mine, 57 was Sarah

Page 21

1   McCullough, 58 was Sarah McCullough, 59 was Sarah McCullough, 60

2   is Sarah McCullough, 61 is Sarah McCullough, 62 is Sarah

3   McCullough, 63 was done by someone in the kitchen when they did

4   an inventory and I'm not sure who did it but Sarah McCullough

5   was able to produce it out of the computer.   64 the same Sarah

6   McCullough and the kitchen staff, 65 Sarah McCullough and the

7   kitchen staff, 66 Sarah McCullough and the kitchen staff, 67

8   Sarah McCullough and the kitchen staff, 68 Sarah McCullough and

9   the kitchen staff, 69 Sarah McCullough and the kitchen staff, 70

10  Sarah McCullough and the kitchen staff, 71 Sarah McCullough and

11  the kitchen staff.

12      Q    Let me just interrupt you for a minute.   63 through

13  71 appears to be strictly limited to wine, is that a fair

14  characterization?

15      A    Right.   That's correct.

16      Q    So this would reflect the----

17      A    Wine inventory.

18           MR. PAYNE:  Let him finish.

19      Q    This would reflect what you consider to be your wine

20  cellar?

21      A    Yes.

22      Q    Continue, please.

23      A    72 Sarah McCullough, 73 Sarah McCullough, 74 Sarah

24  McCullough, 75 Sarah McCullough, 76 Sarah -- let's see, that was

25  from Bill Aiken who had purchased the silver for us but Sarah