Page 22

1    McCullough was able to produce it, 77 was by Cedric Finch, 78 I

2    got from our demolition people, 79 was the concierges and

3    reservations staff working together to do 79, 81, 82 and 83, 84

4    was my figures based on the figures from Sarah McCullough.  And

5    she produced 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97,

6    98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110,

7    111, 112, 113, 114, 115, 116.

8         Q    Just so the record is clear, when you're saying

9    those numbers like that you're saying that Sarah McCullough

10   prepared them?

11        A    Right.  I think I had said that.  117, 118, 119,

12   120, 121, 122 that's my writing, 123 is Cedric Finch, 124 is a

13   gardener Pat something or another, I can't think of her last

14   name right now, 125 was done by Pat, 126 was done by Pat, 127

15   was my calculation of those pages.

16        Q    I'm sorry.  What do you mean by that?

17        A    By adding the garden material and the plants and

18   things in preparing the stream so it was an accumulation of 123

19   to 126 and added up on 127 by myself.  128 was done by Cedric,

20   129 these are repeats of the previous pages, 129 was by Pat, 130

21   was by Pat, and 131 was by Pat.

22        Q    Okay.  Well, let's go to 122.  The word stream has

23   the number beside it $4,270.75?

24        A    Right.

25        Q    What stream are we talking about?

Page 23

1   A   This stream that runs by the mansion down to the

2   ponds into the garden pavilion.  It's an artificial stream.

3   Q   And what plants are we talking about?

4   A   There's a list of the plants that were in the

5   mansion and the greenhouse and around the mansion.

6   Q   On the exterior of the mansion?

7   A   Yes.

8   Q   Why are you claiming the stream?

9   A   Because the pump was burned out in the fire.

10   Q   Did you replace it?

11   A   No, we haven't replaced it.  We were able to get it

12   working again by jerry-rigging it.

13   Q   How do you know the pump needs to be replaced?

14   A   Cedric said it needed to be replaced.  He pulled it

15   out.

16   Q   How did the pump get damaged?

17   A   During the fire somehow or another it was shorted

18   out.  Pretty much all the electrical stuff to that part of the

19   property went through the mansion and everything was fried.

20   Q   How much does it cost to replace the pump?

21   A   2,039 for one of the pumps and 541 for the other.

22   Q   So why are you claiming $4,270 for the stream?

23   A   If you look on the list and it says "replacing pumps

24   for the stream."

25   Q   I'm sorry.  What page are you looking at, sir?

Dr. William Gray, Vol. 2

Page 24

1    A    123 is the explanation for those figures.

2    Q    Who put these figures together?

3    A    Cedric Finch.

4    Q    And we're talking about 123, right?

5    A    Yes.

6    Q    But the pumps for the stream have not been replaced

7    yet?

8    A    No, they have not.

9    Q    Did you get an estimate from anybody saying the

10    pumps needed to be replaced?

11    A    He took them out and took them somewhere to try to

12    get them rewired.

13         MR. PAYNE:  That's not what he asked you.  Listen to

14    his question.

15    Q    The question was, Dr. Gray, did you have anybody

16    take a look at the pumps to give you an estimate as to whether

17    or not they needed to be replaced?

18    A    Cedric.

19    Q    But did Cedric go to anyone else to have the pumps

20    evaluated?

21    A    I do not know.  You'd have to ask Cedric that.

22    Q    You just told me he took it somewhere?

23    A    He took it somewhere but I don't know where.

24    Q    So Cedric definitely took them somewhere to have

25    them---

Page 25

1    A    As far as I know he did.

2    Q    Dr. Gray, please, let me finish.

3    A    Okay.

4    Q    As far as you know Cedric took the pumps somewhere

5    else and had them evaluated and that organization or person said

6    these pumps have to be replaced?

7    A    As far as I know.

8    Q    Then he took the same pumps that had to be replaced

9    and put them back in and he got the stream running?

10    A    Right.

11    Q    And somehow these pumps had to be replaced because

12    they were damaged by electrical shorts associated with the fire?

13    A    Right.   Right.

14    Q    Is the stream working right now?

15    A    Yes.

16    Q    How long has the stream been working for?

17    A    Maybe two weeks.

18    Q    Let's go to your wine inventory.   It begins on page

19    63 I believe, sir.   I think we already concluded that the wine

20    inventory runs to page 71, correct?

21    A    Yes.

22    Q    Was this the wine that was just in the mansion?

23    A    Yes.

24    Q    Do you store wine anywhere else?

25    A    We have wine down in the garden pavilion.

Page 26

1       Q       How much wine do you have down there?

2       A       Not a whole lot.  It's usually for events cause we

3  don't serve meals there.

4       Q       The primary storage of wine was in the mansion?

5       A       Yes.

6       Q       Was there a wine cellar?

7       A       Yes.

8       Q       What floor was it on?

9       A       In the basement.

10      Q       Was it over by that eating area?

11      A       Yes.

12      Q       When you purchased the Richmond Hill Inn, when The

13  Hammocks purchased it, what was the value of the wine cellar at

14  the time you purchased it?

15      A       I do not know.

16      Q       Did you have any sense of the value of the wine?

17      A       (Witness nods head no.)

18              MR. PAYNE:  Answer aloud.

19      A       I do not know.

20      Q       It's my understanding that one of the things that

21  the Richmond Hill Inn was very proud of from time to time it

22  would boast about the value of its wine cellar, is that a fair

23  statement?

24      A       Yes.

25      Q       While you had control of the organization of

Page 27

1    Richmond Hill Inn, did you ever brag about the extent of the

2    wine cellar?

3         A    No.

4         Q    You never talked about it?

5         A    (Witness nods head no.)

6              MR. PAYNE:  Please answer aloud, Doctor.

7              THE WITNESS:  No.

8         Q    So you never told anybody what the value of the wine

9    cellar was?

10        A    No.

11        Q    Were you surprised to see it was $36,000?

12        A    No, not really.  But I wasn't aware of what it was.

13        Q    Okay.  Isn't it true, Dr. Gray, that as you were

14   fashioning some cutbacks that the amount of the wine stored on

15   the premise was going down significantly?

16        A    I don't know if it was significantly but it was

17   definitely going down.  We did replacement buying for wines that

18   were selling.  But we didn't replace expensive wines that had

19   been there for years and didn't sell very well.

20        Q    So expensive wines that had been there for years if

21   they were consumed by a customer you didn't replace those?

22        A    Not normally, no.  Unless somebody requested it.

23        Q    Who was in charge of wine ordering at the Richmond

24   Hill Inn?

25        A    It varied a lot from time to time.  We had a wine

Page 28

1    steward for a long time and then the head of the dining room was

2    in charge after that.  And pretty much whoever was head of the

3    dining room remained in charge.  With our last chef he took some

4    hand in that.

5        Q    When was last time you had a wine steward?

6        A    Back in '97.

7             MR. PAYNE:  '97?

8             THE WITNESS:  I mean '07.

9        Q    Early part of '07, late part of '07?

10       A    I don't really remember when he left.  He had

11   lymphoma and had to leave.

12       Q    He left for health reasons?

13       A    Yes.

14       Q    You didn't lay him off?

15       A    No.

16       Q    But you chose not to replace the wine steward with a

17   wine steward?

18       A    Right.

19       Q    The wine steward did he have any other jobs when he

20   was employed there?

21       A    He was -- it depends on which one you're talking

22   about.

23       Q    The one who left who had lymphoma?

24       A    Yes.  He was also managing the dining room.

25       Q    But he was knowledgeable about wines?

Page 29

1      A    Yes.

2      Q    I think you said that the income for the Richmond

3  Hill Inn went down dramatically in terms of revenue in 2008.  Do

4  you remember that testimony?

5      A    Yes, it was a several hundred thousand dollar

6  decrease.

7      Q    Was that drop in revenue in any way related to the

8  quality of service customers are finding and the quality of food

9  or was it simply in your opinion part of the economic impact?

10     A    I think it was the economic impact.

11        MR. NELSON:  Can we just take a quick moment?

12        (Thereupon, a recess is taken from 9:51 a.m. to

13  10:01 a.m.)

14     Q    Dr. Gray, would it be permissible to have Chris

15  Logan, who's the adjuster with Harleysville, contact Sarah

16  McCullough and go through the inventories that she did to make

17  sure he understands what took place?

18     A    Sure.  That's fine.

19     Q    Would it be permissible to have Chris Logan contact

20  Cedric to make arrangements to inspect any aspect of the

21  building that the claim's made on?

22     A    That would be fine.

23     Q    Have you consulted with a building contractor,

24  engineer, architect about the cost to rebuild the structure?

25     A    No, we don't have the money to hire those kind of

1    people right now.

2        Q    Okay.  So you've made no plans to rebuild the

3    structure?

4        A    Not at this point.

5        Q    Have you consulted with the historical commission in

6    any way about whether or not that can be done?

7        A    No, I haven't.

8        Q    Can you tell me how the figure of $6,021,563 and no

9    cents was claimed on the proof of loss, how did you get to that

10   value?

11       A    Which page is that?

12       Q    It's your first page of the proof of loss, sir.

13            MR. PAYNE:  It's the very first page.

14       A    Which one of those was it?

15       Q    Number nine the amount claimed?

16       A    I think that was based on the value of the building

17   that the adjuster had appraised it at and the loss of the

18   contents that we provided this documentation for.

19       Q    And the value of the building and you said adjuster

20   and then you said appraiser, what are you referring to, sir?

21       A    The insurance company sent an appraiser out there

22   before they issued the policy and put values on everything.

23       Q    So that value of $5,089,119 comes from the policy?

24       A    Yes.  It came from the insurance company.

25       Q    But it came from the policy?

1    A    Yeah, it was on the policy.

2    Q    And then the word "see attached schedule B for other

3   claims", is that everything else besides what's in that

4   building?

5    A    Yes.

6    Q    That's reflected on schedule B on page 3 of the

7   proof of loss?

8    A    Right.

9    Q    You're claiming $63,262 in lost net income?

10    A    Right.

11    Q    How did you develop that number?

12    A    We took the -- I think all that's been provided to

13   you.

14         MR. PAYNE:   Can we go off record a second?

15         (Discussion off the record.)

16    Q    Who did you consult with, Dr. Gray, besides the

17   people you've already mentioned as having responsibility on the

18   documents?  You already mentioned some names so Cedric and Sarah

19   McCullough, who did you consult with besides those people about

20   how to establish this claim?

21    A    My lawyer.

22    Q    Anybody else?

23    A    No.

24    Q    Did you talk to the public adjuster about the claim?

25    A    No.  I really didn't.

Page 32

| | | |
|---|---|---|
| 1 | Q | The public adjuster--- |
| 2 | A | They prepared--- |
| 3 | | MR. PAYNE:  Now, correct that you did speak to him. |
| 4 | | THE WITNESS:  Well, I had spoken to them and they |
| 5 | | prepared a thing for me.  But I did not submit that. |
| 6 | Q | What did the public adjuster prepare? |
| 7 | A | A claim form. |
| 8 | | MR. PAYNE:  Can we go off the record for a second? |
| 9 | | (Discussion off the record.) |
| 10 | Q | So what did the public adjuster prepare? |
| 11 | A | He prepared a claim form. |
| 12 | Q | What claim form?  You just turned over Exhibit 1 |
| 13 | | page 1.  A proof of loss form? |
| 14 | A | Right.  He prepared a form like this, yes. |
| 15 | Q | Where is that document? |
| 16 | A | I threw it away. |
| 17 | Q | Okay. |
| 18 | | MR. PAYNE:  Mike, I want to make it clear.  I have |
| 19 | | it because they weren't hired through the bankruptcy court and |
| 20 | | they tried to come in the back door and that's why it was not |
| 21 | | submitted.  I just -- so the record would be clear, I have it. |
| 22 | | MR. NELSON:  Yeah.  I understand.  The record |
| 23 | | request asked for any information sent or received to the public |
| 24 | | adjuster. |
| 25 | | MR. PAYNE:  It wasn't sent to him. |

Dr. William Gray, Vol. 2

Page 33

1              MR. NELSON:  Or received from.

2              MR. PAYNE:  But it was not requested from -- I'll

3     see if I can find it but I'll tell you why it says to be

4     determined everything.

5         Q    Did the public adjuster do a statement of any kind

6     as to the values of either the building or the contents or the

7     income?

8         A    He filled out one of these which would've included

9     that.

10        Q    Did it have values on it?

11        A    Yes.  No.  It just said to be determined.

12        Q    Did they do an inventory of any kind?

13        A    No, they did not.

14        Q    Did they do an estimate of any kind?

15        A    No.

16        Q    Did you consult with the Michels at any point from

17    January 1st, 2009 until present about the insurance policy or

18    the insurance claims on how the loss occurred?

19        A    After the fire I talked to them.

20        Q    Who did you talk to?

21        A    To Dr. Michels and asked him if he agreed with --

22    you know, that we hire a public adjuster or if we needed a

23    lawyer to do that.  And he said I could do what I thought was

24    best and he would support me on that.

25        Q    Was this an in-person meeting?

1        A       It was on the phone and then---

2        Q       And then what?

3        A       And then I saw them up here.  They came up for a

4   bankruptcy hearing and I talked to them for a while.

5        Q       Where did you talk to them?

6        A       In the courthouse.

7        Q       So was your conversation strictly limited to whether

8   or not you hire a lawyer or hire a public adjuster?

9        A       No.

10       Q       So what else did you talk to them about?

11       A       Just about the fire and how devastating it was.

12       Q       This was all after the bankruptcy?

13       A       No.  This was after the fire.

14       Q       Okay.  But it was at the bankruptcy hearing?

15       A       No, it was on the telephone call to Dr. Michels

16   initially.

17       Q       How soon after the fire did you talk to Dr. Michels?

18       A       He called me one day after the fire, I think.

19       Q       Did he ask you how the fire started?

20       A       No.  He said they'd been through a fire before

21   themselves and knew how bad it was and how hard it was.

22       Q       Dr. Michels didn't ask you how the fire started?

23       A       No.

24       Q       Did he insinuate how he felt the fire started?

25       A       No, he did not.

Page 35

1       Q    So the day after the fire, did you ask him if he

2  thought you should hire a public adjuster?

3       A    No, not that day.  But within a day or two all these

4  public -- I never dealt with a fire before so all these public

5  adjusters started showing up and, you know, talking to me or

6  wanting to talk to me, I didn't talk to most of them.  And I

7  didn't know what to do so I called him and asked him what he

8  thought or what he had done before.  And so then he agreed that

9  we needed something, I just said this is beyond my capability of

10  dealing with.  So then I reviewed a number of people and sent

11  their packages to him to review.  And he got back to me again

12  and said, you know, it's up to me to choose whoever.

13      Q    How did he get back to you?  Did you speak to him?

14      A    Yes.

15      Q    Okay.  So you had several conversations with him?

16      A    Several.  Yes.

17      Q    Dr. Gray, you're stepping on my question.  Okay.

18  You got to let me finish.  You had several conversations with

19  him about hiring a public adjuster?

20      A    Yes.

21      Q    In any of the conversations you had have discussions

22  about how the fire loss occurred?

23      A    No, it did not.

24      Q    Dr. Michels never once asked you how the fire

25  started?

Page 36

| | | |
|---|---|---|
| 1 | A | Not that I remember. |
| 2 | Q | Prior to the fire, did you talk to Dr. Michels about |

3   the bankruptcy?

| | | |
|---|---|---|
| 4 | A | No. |
| 5 | Q | Did you talk to Dr. Michels about the suit that you |

6   had started against him and his wife?

| | | |
|---|---|---|
| 7 | A | No. |
| 8 | Q | I think in the pleadings, correct me if I'm wrong, |

9   but in the suit against the Michels it's not just The Hammocks,

10   LLC but I think you're also the plaintiff, is that right?

11   A   I don't know how to answer that.  I'm only the

12   plaintiff as far as I know as the manager of The Hammocks.

13   MR. PAYNE:  Do you know what Bates number that is?

14   MR. NELSON:  That's what I got to look for.

15   (Discussion off the record.)

16   Q   Dr. Gray, do you have 2990 in front of you?

17   A   Yes, I do.

18   Q   It's listing Dr. Gray and The Hammocks, do you see

19   that as plaintiffs?

20   A   Yes, I do.

21   Q   Do you know why you personally sued them?

22   A   I didn't personally sue them I was representing The

23   Hammocks.

24   Q   So your testimony is the only reason you're named as

25   a plaintiff is because you're acting as a representative of The

Page 37

1    Hammocks?

2         A    Right.

3         Q    Did you talk to the Grays [sic] at any point about

4    that piece of litigation?

5         A    The Michels?

6         Q    I'm sorry.  The Michels.  Yeah.

7         A    No.

8         Q    That's never come up?

9         A    No.

10        Q    Did you ever talk to either of the Michels or any of

11   their representatives or anybody on their behalf about what

12   rights they did or did not have under the insurance policy?

13        A    No, I never did.  I sent them a copy of the

14   insurance policy.

15        Q    When did you send it to them?

16        A    After the fire.

17        Q    Why did you do that?

18        A    I just thought it was the appropriate thing to do.

19        Q    Did they ask you for it?

20        A    No.

21        Q    When did you send them a copy of the policy?  How

22   soon after the fire?

23        A    The next week.

24        Q    Did you send any correspondence along with it?

25        A    What do you mean?  I sent the brochures and

Page 38

1    everything from the public adjuster's along with it.

2        Q    When you sent the information about the public you

3    also sent them the policy as well?

4        A    Yes.

5        Q    Did you send them anything else?

6        A    Not that I remember.

7        Q    Did you ever have a conversation with them about the

8    policy?

9        A    No.

10       Q    So they never said to you "How come we're not listed

11   on the policy?"

12      A    No.

13      Q    Nobody's ever said that to you?

14      A    No.

15      Q    Anybody ever say anything to you before the fire

16   about on behalf of the Michels that they wanted you to list them

17   on the policy?

18      A    Originally -- on the original policy did have them

19   listed I think when we bought it and then when we renewed it and

20   somehow or another -- again, I didn't ever deal with the

21   insurance things but somewhere along the line their name was

22   left off of some previous policies too.

23      Q    You don't know how that occurred?

24      A    No, I don't.

25      Q    Did the Michels ever get a copy of the policy prior

Page 39

1     to the loss?

2          A     Not that I know of.

3          Q     Dr. Gray, your 2008 personal returns have those been

4     completed?

5          A     No, they have not.

6          Q     Why not?

7          A     Because we got extensions.  We never file before

8     October.

9          Q     You applied for an extension for your 2008 return?

10         A     Right.

11         Q     Why do you need the extension?

12         A     Because people don't work very fast and don't get

13    things done.

14         Q     Have your personal income taxes been fully paid for

15    2008 as far as you've estimated?

16         A     Yes, yes.

17         Q     Dr. Gray, the million dollar self-directed IRA

18    account that we talked about yesterday, where was that prior to

19    drawing it down to $8,000?

20         A     It was in a bank account.

21         Q     Was it a savings account, mutual funds, CDs?

22         A     I don't know.  It drew some interest.

23         Q     I'm sorry?

24         A     It drew some interest but I don't know what you'd

25    call it.

Dr. William Gray, Vol. 2

Page 40

1        Q      What institution?

2        A      It used to be called Rowan Bank then it became some

3   other bank and now it's another bank.  It's like Community One

4   or something like that.

5        Q      The $8,000 that remains of that amount of money, is

6   it still in that bank?

7        A      Yes.

8        Q      Okay.  So while the bank's changed names several

9   times you haven't moved that account around---

10       A      No.

11       Q      Dr. Gray, you're not letting me finish my question.

12  While the name of the bank has changed a few times, you've never

13  moved the account around, correct?

14       A      Correct.

15       Q      Dr. Gray, the Lake Norman Pavilion, LLC, are you the

16  manager in charge of that as well?

17       A      Yes.

18       Q      Besides the holdings that Lake Norman, LLC has in

19  The Hammocks, does Lake Norman, LLC have any other assets?

20       A      Yes, it does.

21       Q      What are those assets?

22       A      Property.

23       Q      Where?

24       A      Here in North Carolina in Mecklenburg and Iredell

25  County.

Dr. William Gray, Vol. 2

Page 41

| | | |
|---|---|---|
| 1 | Q | I'm sorry.  The second county? |
| 2 | A | Iredell. |
| 3 | Q | Iredell.  And what's in Mecklenburg County? |
| 4 | A | Some land. |
| 5 | Q | Could you be more specific, Dr. Gray, how many |
| 6 | | acres? |
| 7 | A | 40 some odd acres. |
| 8 | Q | Is it undeveloped? |
| 9 | A | Yes. |
| 10 | Q | What's in Iredell? |
| 11 | A | About 14 to 16 acres. |
| 12 | Q | Is that raw land? |
| 13 | A | Yes. |
| 14 | Q | Are either of those parcels of land up for sale |
| 15 | | presently? |
| 16 | A | No, neither one of them are listed. |
| 17 | Q | Do you have any plans to develop them? |
| 18 | A | Not really.  At one point I did but not now. |
| 19 | Q | The 40 acres in Mecklenburg County, what's the value |
| 20 | | of that? |
| 21 | A | A million six maybe. |
| 22 | Q | Is it zoned residential or commercial? |
| 23 | A | Residential. |
| 24 | Q | How did you come up with that value of a million |
| 25 | | six? |

Page 42

1       A     We had it appraised some time awhile back.

2       Q     The 14 to 16 acre tract in Iredell County, do you

3   have any plans to develop that?

4       A     There's one piece of it when they put in a new road

5   I may build some office complexes on it.

6       Q     Do you have any concrete plans to develop it, any

7   architectural drawings?

8       A     No.

9       Q     Is it zoned commercial?

10      A     Yes, it is.  It's zoned highway business.

11      Q     It's zoned?

12      A     Highway business.

13      Q     Did you have to do anything to get it zoned highway

14   business?

15      A     I had it zoned highway business.

16      Q     When did you have that done?

17      A     10 years ago probably.

18      Q     How much is that land worth?

19      A     350 -- I mean 3,500,000 to 4,000,000.

20      Q     How do you know it's worth that?

21      A     Just based on property adjacent to it that I've sold

22   off in the past and taxes and generally what land is going for

23   in that area.

24      Q     Have you had it appraised?

25      A     Not recently.

Page 43

1   Q   When's the last time you had it appraised?

2   A   I had a realtor appraise it in '05 or something like

3   that.

4   Q   What was it appraised for?

5   A   I don't remember.

6   Q   But neither of those are up for sale right now?

7   A   No.

8   Q   Any particular reason why you're not trying to sell

9   those properties?

10   A   There's nothing selling right now.

11   Q   Because of the economy?

12   A   Yeah.

13   Q   Dr. Gray, I'm looking at your 2007 individual tax

14   returns.  Have you seen those before?

15   A   Yes.

16   Q   Did you give them to your attorney?

17   A   Yes.

18   Q   Do you realize you're listed as a physician on your

19   tax returns?

20   A   I don't pay any attention to that.

21   Q   You don't pay attention to how you describe your

22   occupation to the IRS?

23   A   No.

24   Q   No?

25   A   An accountant does it so it's just carried over from

Dr. William Gray, Vol. 2

Page 44

1    previous times.

2        Q    It looks like your income for 2007 from the real

3    estate was approximately $350,000, does that sound right?

4        A    Probably.

5        Q    Besides income from the real estate, do you have

6    income from any other source?

7        A    Nothing other than selling some property.

8        Q    Could you turn to document 220 for me, Dr. Gray?

9    No, that's the proof of loss, sir.  Your documents you prepared.

10            MR. PAYNE:  Page 220 you say?

11            MR. NELSON:  220.

12            MR. PAYNE:  Are these the more recent ones?

13            MR. NELSON:  220.

14            MR. PAYNE:  I'm talking about, are these the ones

15    that we mailed to you?

16            MR. NELSON:  Yeah.  220 was in those boxes.  Could I

17    see it, sir?  Yeah.  This is 220.

18            MR. PAYNE:  You said 220.

19            MR. NELSON:  I'm sorry.

20            MR. PAYNE:  So that's what I pulled.

21            MR. NELSON:  I misspoke.  I meant 2020.

22            MR. PAYNE:  Okay.  Sorry.

23            MR. NELSON:  I'm sorry.  I knew I wasn't looking for

24    an insurance policy.  It has something to do with occupancy

25    rates at the inn.

1          MR. PAYNE:  Here we go.

2     Q    Do you have 220 in front of you, sir?

3     A    Yes.

4          MR. PAYNE:  No.  He has 2020.

5     Q    I'm sorry.  Do you have 2020 in front of you, sir?

6     A    Yes.

7     Q    And can you tell me how many rooms the inn had

8     available to rent out on that document?

9     A    On what date?

10    Q    That's part of my question, Dr. Gray.  Since you

11    owned the inn you didn't add any additional rooms, did you?

12    A    The Michels had a private suite there and we added

13    that to our rental schedule and then in '08 we added two

14    cottages across the street to the rental schedule.

15    Q    See how month-to-month the number changes?

16    A    Yes.

17    Q    Can you explain to me why, for instance, January '08

18    it's 1,147, February it's 1,073, March it's 1,147, April it's

19    1,073?  Is that the number of days times the number of available

20    rooms?

21    A    Yes.  It would vary on the month.  And then also

22    sometimes the rooms are closed down like the leaks in the

23    mansion we closed the mansion down.  Or if there was some

24    problem in a room that needed to be redone.  We also revamped a

25    lot of the rooms over a period of time, some of them were

Page 46

1    painted or this or that.  So I would assume but I'm not sure

2    that's why some of this fluctuation is there.

3         Q    The occupancy rate seems to be the highest October

4    8th, 2005, am I reading that document correctly?

5         A    Correct.

6         Q    And it looks like October 6th it drops down to

7    72.97.  Did I read that correctly?

8         A    I think you did.  But one thing that's incorrect is

9    that the available rooms were much less in October because they

10   apparently closed part of the property down.  Is this when we

11   bought it?  So we had less rooms available then for some reason.

12        Q    I'm sorry, sir.

13        A    We had less –– if you look at the availability it's

14   851 nights available.  October is not a short month so they must

15   have had some of the buildings closed during that time whether

16   it was part of the mansion or cottages or something I do not

17   know.  I know we put new carpet in the cottages when we first

18   bought it so.

19        Q    What's the date that you purchased the inn?

20        A    October of '05.

21        Q    The 1st, October 1st?

22        A    No.  We took possession of it about October 1st, we

23   didn't actually close until about the 15th.

24        Q    Could this rooms available number reflect the fact

25   that you didn't have–––

Page 47

1     A    It has---

2          MR. PAYNE:  Let him finish.

3          MR. NELSON:  Thank you, Attorney Payne.

4     Q    Did the rooms availability number 851 did that

5 reflect the fact that The Hammocks didn't have possession of the

6 Richmond Hill Inn for all of October?

7     A    Right.

8     Q    So it may be that there was an occupancy rate of

9 83.8 and there were just as many rooms available in October as

10 there were in November but you didn't own it for all of October,

11 correct?

12    A    That's a possibility.  My understanding was we took

13 over management of it on October 1st.  That was our agreement

14 with the contracts.

15    Q    Who has the responsibility for managing this

16 document?

17    A    Carol Ann Labowski was the original person who

18 managed it until December of '06 and then after that Sarah

19 McCullough managed it.

20    Q    It looks like the highest number of nights in any

21 one month you had while The Hammocks owned Richmond Hill Inn was

22 October of '07, 785 rooms.  And I'm sorry, there's one for 837

23 in October of '06.  Did I read that right, sir?

24    A    I'm not following you.

25    Q    Rooms sold the highest value appears to be October

Dr. William Gray, Vol. 2

Page 48

1    6th, '06?

2           A      Right.

3           Q      837 rooms.   That's the highest monthly sale of

4    rooms, did I get that right?

5           A      That's right.

6           Q      And October is your best month, correct?

7           A      Yes.

8           Q      Why is that?

9           A      That's when more tourists come to Asheville.

10          Q      Does it have something to do with the leaves

11   turning?

12          A      Yes.

13          Q      I'm going to say his name and I'm probably not going

14   to get the pronunciation right.   Rocky Lapomardo who's a real

15   estate broker?

16          A      Yes.

17          Q      Okay.   Is he related in any way to someone in The

18   Hammocks either by relationship or friendship?

19          A      He's a friend of my sisters.

20          Q      Where is Rocky located?

21          A      Naples, Florida.

22          Q      And he's the one that's currently trying to sell

23   your property?

24          A      Right.

25          Q      When I say the Richmond Hill Inn, I meant the

Page 49

1   property?

2       A       And the land, too.

3       Q       Is he responsible for selling any other land?

4       A       No.

5       Q       Do you have a current relationship with Munden?

6       A       No, not really.  She had all these people that were

7   going to put contracts in on it and never came up with anything.

8       Q       I'm reading from the deposition of Dr. Michel taken

9   January 16th and you were present, Dr. Gray?

10      A       Yes.

11      Q       Do you remember being there?

12      A       Yes.

13      Q       At one point on page 28---

14              MR. PAYNE:  What Bates stamp, Mike?

15              MR. NELSON:  It's Bates stamped 2915.

16              MR. PAYNE:  2915?

17              MR. NELSON:  2915.

18              MR. PAYNE:  Okay.

19      Q       I'm just going to read the question and the answer

20   just to get a sense of it.  Dr. Gray might want to look at it.

21   On line 11, "Now after July and there was a contract, did you

22   continue to have discussions with Dr. Gray about things that

23   needed to be done and what would happen when he took over?"

24              14 answer, "While we talked about yes that is a true

25   statement, we talk extensively still.  I remember how impressed

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Page 50

1    I was, I still have it. When Mr. Sloggart one of the partners

2    came had done extensive projections and work on the conference

3    center, the cottages with the information that he had at hand of

4    what that would do to revenues." And he continues on talking

5    about those projections.

6            Do you remember seeing extensive projections?

7    A    Yes. There were some prepared actually by another

8    partner who was going in with us at the time.

9    Q    Who was that?

10   A    Miles Marschank. And then he backed out at the last

11   minute.

12   Q    Where are those projections?

13   A    I do not know.

14   Q    Did you ask Mr. Sloggart to produce them?

15   A    No. I don't have them.

16   Q    Did you ask Mr. Sloggart to produce them?

17   A    I don't speak to Mr. Sloggart.

18           MR. NELSON: Counsel, the document request is

19   directed to---

20           MR. PAYNE: We'll make a request and see if they

21   still exist.

22           MR. NELSON: Well, I'm going to ask that the

23   documents that we've asked for from The Hammocks be run past the

24   other -- I understand there is tensions, I'm not trying to

25   create more tensions but I'm trying to get the documents that

Dr. William Gray, Vol. 2

Page 51

1    address the document request.

2         MR. PAYNE:  Excuse me a second.  Okay.

3         Q    If you'll go to page 4585.  I'm sorry.  Why don't we

4    start on page 4583?  It should be the very last box.  Dr. Gray,

5    let me just tell you why I'm looking at these documents.  It

6    seems like there's a letter I'm missing.  So there's a February

7    27th correspondence that goes from Michelle Bray it's Abel

8    Aycock to Al Sneed.  And then there's October 4th, 2008 that

9    goes from Aycock and Abel to Sneed.  And then there's a letter

10   dated September 26th on Bates 4588 and that letter says at the

11   top "My clients have reviewed your letter of September 20th," do

12   you follow me?

13        A    Yes.

14        Q    Some I'm looking for the letter of September 20th.

15   Do you know where that is?

16        A    No, I don't.

17        Q    Turn to page 4593 and it should be right after that

18   grouping of documents but it should be---  The e-mail is dated

19   April 14th, 2008.  It's to Jim at Gateway Park, Mr. Sloggart, is

20   that Jim Sloggart?

21        A    Yes.  That would be.

22        Q    "Dr. Gray asked me to forward to you and expects you

23   will foreclose if the payment is not received soon, being he has

24   no funds to pay now.  He reports he put in $30,000 and needs you

25   to contribute A. Sneed."  Did Sloggart respond to this e-mail?

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Page 52

1      A      In '08 he put in $60,000, I believe, total.

2      Q      Dr. Gray, did Mr. Sloggart respond to this e-mail?

3      A      I do not know.

4      Q.     In that e-mail that I just read to you there's a

5      reference to "he reports he put in 30,000," is that you?

6      A      Yes.

7      Q      Dr. Gray, did you or anyone on behalf of The

8      Hammocks contact either Sloggart, Love, or Mullen and ask them

9      for documents that would be responsive to Harleysville's

10     document request?

11     A      No because they were addressed to me so I provided

12     what I had.

13     Q      Did you contact Mr. Sneed and ask him if he had any

14     documents that would be responsive to the document request?

15     A      No.  I just produced what I had.

16            MR. NELSON:  Counsel, do you want to say something?

17            MR. PAYNE:  We did.

18            MR. NELSON:  He didn't have any besides what was

19     produced?

20            MR. PAYNE:  We've given you what we've gotten from

21     Al but I'm going to follow up and see if there's something we

22     don't have.

23            MR. NELSON:  Well, if you look at 4583 it's a letter

24     February 27th of '08.  And it says, "Dear Al, thank you for your

25     letter on February 15th."  So it looks like there's

Page 53

1   correspondence between these two different groups that are

2   missing and I'm also wondering if we have all the appropriate

3   e-mails that would've been going back and forth between The

4   Hammocks members and their attorneys that touch upon the issues

5   that are addressed in the document request?

6        MR. PAYNE:  I think the easiest way for me to handle

7   it is to see if Al will just let me go in there and go through

8   his file.  I think that would be the quickest way.

9        MR. NELSON:  Including e-mails.

10       MR. PAYNE:  The complete file.  I don't have --

11  let's go off the record for a second.

12            (Discussion off the record.)

13   Q     Open up document 4236.  It's an age payable report.

14  Dr. Gray, the last one that we have is dated December 31st,

15  2008, are there other age payable reports that have been created

16  since then?

17   A     Yes.  I think you should have another one that was

18  filed with the bankruptcy papers.

19   Q     Okay.  But there should be age payable reports every

20  month, right?

21   A     She doesn't do it every month.

22   Q     No.  Okay.  Did you talk to Mr. Sloggart at all

23  about the fire or the claim being made against the insurance

24  company?

25   A     I don't -- as I said I don't talk to him normally

Page 54

1    cause he always hangs up on me every time I call.  But he did

2    call me after the fire.  And how he found out about it I don't

3    know.  But I guess it was the next day Thursday night and I just

4    told him there was a fire and that was all I talked about.

5        Q     When somebody called you up?

6        A     Sloggart called me up.

7        Q     Sloggart called you up, somebody you don't talk to

8    all the time and all you guys said was there was a fire?

9        A     He said "I heard there was a fire."  And I said

10   "Yes, it looks like the mansion is pretty well burned down."

11       Q     And then you hung up?

12       A     He said "Well, they're gonna blame us for doing it."

13   And I said, "Well probably."

14       Q     What else was said?

15       A     I don't remember much else that was said.  I didn't

16   talk to him but just a couple of minutes.

17       Q     Sloggart said "They're gonna blame us for doing it"?

18       A     Yeah.

19       Q     What did you say back to him after that?

20       A     I said "Probably."

21       Q     Okay.  What did he say in response to that?

22       A     I don't remember.

23       Q     Who's the "they"?

24       A     I don't know who the "they" is.  I would assume it

25   was the fire marshal.

Dr. William Gray, Vol. 2

Page 55

1      Q      Well, when you said "probably," why did you agree

2  with him?

3      A      Well, I mean why wouldn't they?

4      Q      What do you mean by that?

5      A      What the words say.  Why wouldn't people blame us

6  for it?

7      Q      What do you mean by that?  Why do you feel that way?

8      A      I just think that's the logical way to feel.

9      Q      Why?

10      A      I don't know.  I can't answer you on that.

11      Q      You must have some reasoning to explain why you

12  think it's logic that people would blame you for the fire?

13      A      No, I have no reason for that.  That's just the

14  logical thing.  You blame the people who are the closest or own

15  the property for a fire.

16      Q      Okay.  Blame -- so after you said probably, did he

17  have any response to that?

18      A      I don't really remember.

19      Q      Did he ask you if you set the fire?

20      A      No.

21      Q      Did he insinuate that you had set the fire?

22      A      No.

23      Q      Did he ask you if you had insurance coverage on the

24  property?

25      A      No.