Page 56

1     Q     He didn't ask you about insurance---

2     A     We didn't discuss those things.

3     Q     Dr. Gray, you're not letting me finish my question.

4           MR. PAYNE:  Let him finish, please.

5     Q     He didn't ask you about insurance in any way, shape

6   or form since the fire?

7     A     Not that I remember.

8     Q     He didn't ask you how much coverage you had on the

9   building?

10    A     No.

11    Q     He didn't ask you how much coverage you had in

12  general?

13    A     No.  I didn't know at that point any way so.

14    Q     Dr. Gray, do you have any business cards?

15    A     No.  Oh yeah.  I might.

16    Q     Do you have any other business cards for any other

17  business you're involved in?

18    A     No.

19    Q     After you talked to Mr. Sloggart that one time on

20  the phone, have you talked to him any other time about anything

21  related to Richmond Hill Inn?

22    A     Yes.  I took the quitclaim deeds to him in February

23  trying to get him to sign it.

24    Q     You took what to him in February?

25    A     Quitclaim deeds that Albert Sneed had prepared for

Dr. William Gray, Vol. 2

Page 57

1   him to sign.  And I hand delivered them to him, my wife went

2   along with his wife and we sat and talked for 15 or 20 minutes.

3        Q    Was this at his residence?

4        A    At his residence, yeah.

5        Q    Where are the quitclaim deeds?  I don't think I've

6   seen a copy of those.

7        A    I don't have them.  Those are the ones he wouldn't

8   sign.

9        Q    Who prepared them for you?

10       A    Albert Sneed prepared them.  But he wouldn't sign

11  it.

12       Q    I understand.  But they were prepared?

13       A    As far as I -- yes.

14       Q    Okay.  Who were the quitclaim deeds in favor of?

15       A    From the Gateway Park Properties back to The

16  Hammocks for the land.  I was trying to get him to sign that

17  prior to our foreclosure and bankruptcy.

18       Q    Dr. Gray, on the document that's Exhibit 14, does

19  your signature appear on that document?

20            (Thereupon, Exhibit Number 14 is marked for

21  identification.)

22       A    No.

23       Q    May I see it, sir?  Do your initials appear on the

24  document?

25       A    I don't think so.  But I think there might have been

Page 58

1    but supposedly.  It's not the way I do initials.

2         Q    Sir, I'm going to circle what I believe are your

3    initials on Exhibit 14.

4         A    I know I said that.  And I said I don't know if

5    they're my initials because that's not the way I usually do my

6    initials.

7         Q    So those could be your initials?

8         A    It could be.  Yes.

9         Q    Dr. Gray, I'm showing you Exhibit 15, is your

10   signature on that document?

11             (Thereupon, Exhibit Number 15 is marked for

12   identification.)

13        A    Right.  Yes, it is.

14             MR. PAYNE:  Do you need a couple of minutes, Mike?

15             MR. NELSON:  I'm set.  I'm ready.

16        Q    Okay.  Dr. Gray, I'm showing what's been marked as

17   Exhibit 7.  Do you recognize that document?

18             (Thereupon, Exhibit Number 7 is marked for

19   identification.)

20        A    Yes.  This is prepared by David Worley's office for

21   us.

22        Q    This is prepared by David Worley?

23        A    Office.

24        Q    Was this the first financial statement prepared

25   regarding The Hammocks' ownership of the Richmond Hill Inn after

Dr. William Gray, Vol. 2

Page 59

1    it was purchased?

2        A    No.  They did an annual statement every year.

3        Q    So David did an annual statement in 2006?

4        A    No.   This is what he prepared.   The others were

5    prepared by people at our inn.

6        Q    Okay.  Is there a year end statement for December

7    31st, 2006?

8        A    Yes.

9        Q    Do you know if you produced that?

10       A    I think so.   But this is one that we had done---

11            MR. PAYNE:  Dr. Gray, excuse me -- let's go off the

12    record a second.

13            (Discussion off the record.)

14       Q    Dr. Gray, was there a year end statement done --

15    financial statement done for the Richmond Hill Inn Hammocks for

16    2006?

17       A    Yes.

18       Q    Do you know where that is?  Who has possession of

19    it?

20       A    It's on the computer I know.

21       Q    Okay.  Was there a financial statement for year end

22    2008?

23       A    Yes.

24       Q    Where is that document?

25       A    I know it's on the computer.   I'm sure I gave them

Page 60

1    to my lawyer.

2        Q    Meaning Mr. Payne?

3        A    Yes.

4        Q    Dr. Gray, were you aware that a gentleman named Al

5    Wolford tried to contact you on the day of the fire?

6        A    No.

7        Q    Were you aware that somebody representing the

8    insurance company tried to contact you on the day of the fire?

9        A    No.

10        Q    Okay.  Nobody from your staff told you that they

11    wanted to speak to you?

12        A    No.

13        Q    This is while you were in the pavilion?

14        A    What do you mean?

15        Q    Well, the adjuster visited the pavilion and asked a

16    member of your staff to speak to you on two occasions that day.

17    One time he was told you were sleeping and the other time he was

18    told you were unavailable.  Were you aware that somebody asked

19    to speak to you on that day?

20        A    No.

21        Q    Okay.  Dr. Gray, the layoffs that took place because

22    of the financial problems the inn was having, how many people

23    were laid off?

24        A    I don't know.  We laid off —— normally we laid off

25    people in January.  We laid off a bunch of people in the first

Dr. William Gray, Vol. 2

Page 61

1     of December instead of January.  But I don't know how many there

2     were.

3          Q     Dr. Gray, yesterday we talked about layoffs that you

4     did because you were restructuring and you were streamlining?

5          A     Right.

6          Q     And then you said there were layoffs later on

7     because of the financial problems the inn was having, remember

8     that?

9          A     Right.

10         Q     How many people were laid off----

11         A     I don't know.

12         Q     How many people were laid off as a result of the

13    second reason, the financial problems?

14         A     Which year?

15         Q     Any year, sir?

16         A     In '06 we laid off seven or eight people.

17         Q     When was that?

18         A     It was over a period of six months.

19         Q     Beginning when?

20         A     In July of '06.

21         Q     So then ending by the year end '06?

22         A     Yes.

23         Q     That was because the inn was struggling financially?

24         A     No.  It was just because they were getting paid too

25    much.

Dr. William Gray, Vol. 2

Page 62

1      Q      Sir, I asked you how many people have been laid off

2   because the inn has been struggling financially and you said

3   Susie laid off seven or eight.  So I'm asking you again how many

4   people were laid off because the inn was struggling financially?

5      A      You have to be very specific on the date.

6      Q      I'm telling you all dates since the time the inn was

7   started or was taken over by The Hammocks till the time of the

8   fire how many people were laid off because the inn was

9   struggling?

10      A      That's really hard to explain.  But we laid people

11   off temporarily in the winter and then hired them back in the

12   spring. That's normal procedure.  There were -- in '06 there

13   were about eight permanent layoffs.  And then in '07, we did the

14   normal routine of laying people off in the winter and I don't

15   know how many.  But the garden people were laid off after

16   October usually for three months and then brought back.  Then in

17   -- at the end of October of '08 we laid off people early.  I

18   don't know how many instead of waiting till the end of December.

19   And then in January of '09 we laid off some people.

20      Q      How many?

21      A      I don't know.  I have no idea.

22      Q      At the height of its operation---- Strike that.

23   At the time The Hammocks acquired Richmond Hill Inn, how many em

24   loyees full-time, part-time did you----

25      A      I don't know.

Page 63

1    Q    Dr. Gray, let me finish.  At the time The Hammocks

2    purchased the Richmond Hill Inn, how many employees did the

3    Richmond Hill Inn employ?

4    A    I do not know.

5    Q    At the time of the fire, how many employees did the

6    Richmond Hill Inn employ?

7    A    I don't know how many we had.

8    Q    Dr. Gray, did you have difficulty selling the

9    nursing home in Charlotte?

10   A    Not really.

11   Q    Did you have any problems with zoning issues in the

12   township?

13   A    No.

14   Q    The city?

15   A    I had it all zoned before we built it.

16   Q    Did you have any problems with inspections or

17   defections in the way the building was constructed?

18   A    No.  But these -- the state changed the law while we

19   were building and then we had to sue the state to allow us

20   extension on our building time so we could finish the building

21   in the time that it needed to be finished.

22   Q    Who sued the state?

23   A    I did.  The partnership.

24   Q    You're talking about Lake Norman Pavilion?

25   A    The Village of Lake Norman.

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Page 64

1          Q      What was the outcome of that suit?

2          A      They gave us an extension so we got the building

3    built and sold.

4          Q      What was the extension for?

5          A      The time frame to get the building completed.

6          Q      Is that the only reason you had difficulty selling

7    the nursing home?

8          A      Right.  We had to get that settled before we could

9    sell it.

10         Q      How long did that problem cause a delay?

11         A      A year or more.

12         Q      Why was Sarah Hodgen laid off?

13         A      What was that?

14         Q      Why was Sarah Hodgen laid off?

15         A      Because we were trying to cut back on financing or

16   expenses.

17         Q      Prior to the fire, when is the last time that

18   security, formal security program was in place at the Richmond

19   Hill Inn?

20         A      I believe -- I don't know for sure.  But I believe

21   through December of '08.

22         Q      At one point you had two gentlemen that were in

23   charge of security Gary and Larry?

24         A      Right.

25         Q      Do you remember them?

Page 65

1          A       Right.

2          Q       Isn't it true that you laid them off in the summer

3     of '08?

4          A       No.  I think they continued to work there as far as

5     I know.

6          Q       But were they only working weekends?

7          A       I don't know.

8          Q       So what I'm asking is when is the last time you had

9     people who were employed to be security who worked seven days a

10    week?

11         A       I believe in December of '08.

12         Q       Seven days a week?

13         A       As far as I know.

14         Q       What was the condition of the furniture in the inn

15    or the mansion?  Was any of it showing signs of wear and tear?

16         A       We replaced some of it, most of it was in very good

17    shape.

18         Q       Sir, was any of the furniture showing signs of wear

19    and tear?

20         A       Not that I'm aware of.

21         Q       Sir, if any of your employees described you as being

22    an alcoholic would that be accurate?

23         A       No, it would not.

24         Q       Have you ever appeared visibly intoxicated in front

25    of your employees?

Page 66

1          A        Yes.

2          Q        Have you ever appeared visibly intoxicated in front

3     of your guests?

4          A        No.

5          Q        Have you ever passed out because of alcohol while on

6     the inn premise?

7          A        No.

8          Q        Dr. Gray, is your cell phone number 704-663-9988?

9          A        Yes, it is.

10         Q        Is that the only cell phone you have?

11         A        It is at this point.

12         Q        Did you have a cell phone with a different number---

13         A        I had a cell phone with---

14         Q        Dr. Gray, let me finish my question.  Did you have a

15    cell phone with a different telephone number prior to the fire?

16         A        We have cell phones for the inn and I had one of

17    those and I think the contract was terminated in December of

18    '08.

19         Q        What was the phone number for that phone?

20         A        I don't know.  It was the 4000 number.

21         Q        Is that the phone that was through Alltel?

22         A        No.  That's through Verizon.

23         Q        Had any guest in 2008 or 2009 complained as far as

24    you know that the quality of service and food at the Richmond

25    Hill Inn had decreased?

Dr. William Gray, Vol. 2

Page 67

1    A    Not that I'm aware of.

2    Q    Sir, could you go to your proof of loss?  And I'd

3    like you to go to whatever section it is that you think

4    accurately reflects the value of the antiques in the inn at the

5    time of the fire?

6    A    There isn't a section that just lists the antiques.

7    Q    Okay.  And I'd like you to tell me what pages the

8    antiques appear on your proof of loss?  And let's do this, Dr.

9    Gray, I'd like you to go through with a pink marker and

10    highlight every entry that relates to an antique of some kind?

11        MR. PAYNE:  Can I make a suggestion?

12        MR. NELSON:  Sure.

13        MR. PAYNE:  Why don't we take a break while he's

14    doing that?  It's several pages.

15        MR. NELSON:  Yeah.  It's going to take awhile.

16        MR. PAYNE:  It may save us some time.

17        MR. NELSON:  That's great.

18        (Thereupon, a recess is taken from 11:17 a.m. to

19    11:37 a.m.)

20    Q    Dr. Gray, you just estimated that it was going to

21    take you approximately another two hours to go through this

22    process identifying what's an antique on your claim.  We've

23    agreed that you're going to do that after today.  What I'll do

24    is -- what page did you run through?

25    A    I'm on 10024 and I just finished that one.

Dr. William Gray, Vol. 2

Page 68

1      Q      So you finished 24, okay.  So you'll look at

2    everything after 24 and you'll make marks with that pink marker,

3    okay?

4      A      Okay.

5      Q      Do you regret purchasing the Richmond Hill Inn?

6      A      Definitely.

7      Q      When did you realize that it was a mistake?

8      A      In October and November of '05.

9      Q      Have you had any discussions with your wife and

10   family about whether or not it was a mistake to purchase this

11   inn?

12           MR. PAYNE:  Well, let me advise him if you did that

13   would be under the spousal privilege and you're not obligated to

14   answer that question.

15           MR. NELSON:  That's a fair point, Counsel.

16           MR. PAYNE:  Cover yourself for malpractice.

17     Q      I've seen the name Hoods in some of the documents.

18   Hoods -- are they related in any way to this ownership or the

19   potential selling of The Hammocks?

20     A      I don't know who they are.

21     Q      Did anyone ever suggest to you or did you ever

22   suggest to anyone that some kids may be involved in setting the

23   fire?

24     A      No, I didn't.

25     Q      Did you ever suggest to anyone or did anyone ever

Page 69

1    suggest to you that someone may have been hired to set the fire?

2         A      You know, I told your investigators and, you know,

3    the detectives that, you know, none of the people I thought

4    might have been behind it would have done it themselves and if

5    they were behind it they would've had to hire somebody.

6         Q      So besides those comments, did you make any comments

7    to anyone else that -- Dr. Gray, let me finish the question.

8    Besides those comments you just alluded to, did you ever talk to

9    anyone else and suggest that someone else had been hired to set

10   the fire?

11        A      No.  Not that I'm aware of.

12        Q      After the fire on March 24th there was a press

13   release issued by the Richmond Hill Inn.  It's published in the

14   Citizen Times website.  Did you have a hand in drafting that

15   press release?

16        A      No.

17        Q      Who drafted it?

18        A      David Killoughby.

19        Q      And who is David Killoughby?

20        A      He is doing our marketing right now out of

21   Knoxville, Tennessee.

22        Q      He's a marketing person retained by The Hammocks?

23        A      Right.

24        Q      Okay.  How long had you used---

25        A      We had never used him before.

Page 70

1     Q     Let me finish my question, sir.  How long had you

2   used Mr. Willoughby [sic]?

3     A     We never used him before.

4     Q     Before the fire?

5     A     No.

6     Q     So you hired him at the time of the fire?

7     A     Right.

8     Q     Did you hire him specifically to issue this press

9   release?

10    A     No.

11    Q     Was that his first job?

12    A     Probably.

13    Q     Did he ask you any questions about what should be in

14  the press release?

15    A     He sent it to me before he released it.

16    Q     So you reviewed it before you released it?

17    A     Yes.

18    Q     There's a reference to executive officers, are those

19  the owners of The Hammocks?

20    A     Right.

21    Q     Which of the owners grew up in the Asheville area?

22    A     My sister and myself.  My sisters and myself.

23    Q     You grew up in Asheville?

24    A     Black Mountain.  For various periods of time we had

25  a home there.

Page 71

1      Q      How old were you when you lived there?  What years

2    of your childhood?

3      A      From -- I first went there when I was four and

4    maintained a home there until the 1970s, I guess.

5      Q      Did you make any changes to the press release before

6    it was released?

7      A      I left it to him and my sister.

8      Q      But you said you reviewed it?

9      A      I did.

10      Q      So did you make any changes to it?

11      A      No.

12      Q      So you approved it then?

13      A      Yes.

14      Q      When you say "your sister," are you talking about

15    Virginia?

16      A      Yes.

17      Q      Is she the one that hired Willoughby [sic]?

18      A      Right.

19      Q      Did you hire Willoughby [sic], I'm saying The

20    Hammocks now, at your sister's suggestion?

21      A      Yes.

22      Q      Why did your sister feel you needed to have a press

23    statement?

24      A      Dan Killoughby felt we needed one.  And I talked to

25    my sister and so I said fine anything.  I had asked Susie

Page 72

1    Zimmerman to release one and she'd never been able to pull one

2    together so.

3        Q    When's the last time you talked to Mr. Sloggart

4    prior to the fire?

5        A    When I took the quitclaim deeds down to him.

6        Q    How about before that?

7        A    I don't really remember.

8        Q    You said he started hanging up the phone as soon as

9    he heard your voice, when did that start?

10        A    Back in '07.

11        Q    Would he respond to anything that you sent to him in

12    writing?

13        A    Not normally.

14        Q    Did you ever send anything to him in writing?

15        A    I did.  I faxed him paperwork and stuff to get his

16    comments or contracts that we were trying to negotiate just to

17    get his input.  But again I had to go through the lawyers to get

18    him to respond to anything.

19        Q    Where are all the documents that you faxed to him?

20        A    I don't know.  I don't have them.

21        Q    You don't have them -- are you sure you looked

22    around?

23        A    Yeah.  I don't keep paperwork much.  I don't have a

24    secretary.

25        Q    Did you ever ask anybody employed by the Richmond

Not shown

Page 73

1    Hill Inn, The Hammocks, when you owned it to misstate anything

2    and mislead the Michels in any way, The Hammocks in any way?

3         A     No.  I've always been very upfront with the Michels.

4         Q     So as far as you're concerned all your dealings with

5    the Michels have been honest?

6         A     Right.  Very much so the way things are.

7         Q     You never misrepresented anything about gift

8    certificates and reports to the Michels about gift certificates?

9         A     No.  Money for gift certificates that were used back

10   in '07 from '06 through '08 and they refused to pay those.

11        Q     But you never told anybody working at the Richmond

12   Hill Inn to misstate anything about those gift certificates?

13        A     Absolutely not.

14        Q     Did you ever tell anybody that your wife did not

15   want you to buy the inn originally?

16        A     Probably.

17        Q     Where is Iredell County?

18        A     In North Carolina near Charlotte.

19        Q     Do you own any property there or any of the

20   companies you're involved in with have property there?

21        A     Yes.  I own a home there.  Two homes there and some

22   land.

23        Q     Did you ever have any problems with the state such

24   that you couldn't sell property in Iredell County?

25        A     No.

Page 74

1      Q      Did you ever tell anybody to stop sending Mr.

2   Sloggart reports relating to the performance of the Richmond

3   Hill Inn?

4      A      No, I did not.  I actually quit running the inn and

5   turned it over to him in February of '08.  And we sent him

6   everything for a while and he never responded so I just stepped

7   back in.

8             MR. NELSON:  Can you read back his last answer to

9   me, please?

10            THE COURT REPORTER:  I actually quit running it and

11  turned it over in February of '08.  And quit sending him

12  everything back then.

13     Q      When did you quit running the inn?

14     A      In February of '08 I turned it over to him and told

15  everybody to send everything to him instead of coming to me with

16  the problems.

17     Q      Did he agree to accept responsibility----

18     A      No.

19     Q      ----for running the inn?

20     A      He never responded so.

21     Q      Did you send him a note that he was now in charge of

22  running the inn?

23     A      The staff did.

24     Q      So you quit and he didn't accept responsibility for

25  running the inn, who then ran the inn?

Dr. William Gray, Vol. 2

Page 75

1    A    The staff did for a little while then I stepped back

2   in.

3    Q    When did you step back in?

4    A    I don't know.  April or May.  I continued to work on

5   the sales that we were working on and dealing with the lawyers

6   on various things but the running of the inn the staff took care

7   of and communicated directly to him on.

8    Q    Was he communicating with them?

9    A    No.  He wouldn't respond to their e-mails or calls.

10    Q    Why did you decide you were going to quit running

11   the inn in February of '08?

12    A    Because I couldn't get any response from him on

13   anything that I needed to clarify with him that if he agreed

14   with or didn't agree with.

15    Q    Did you ever ask any of your employees at the

16   Richmond Hill Inn to take pay cuts?

17    A    When we first found out about the pay raises I did.

18    Q    The only people that you asked to take pay cuts then

19   were related to the folks that got pay raises from Mr. Holland?

20    A    Yes.

21    Q    Did the attire rules change at the inn?  At one

22   point I think it was coat and tie?

23    A    For dining, yes, we did start allowing a little more

24   casual.

25    Q    Why was that done?

Dr. William Gray, Vol. 2

Page 76

1       A      Because most people who went out preferred casual

2    dining.

3       Q      Was that because business was dropping off and you

4    were trying to make more people---

5       A      Comfortable.

6       Q      ---comfortable and come to the inn?

7       A      Yes.

8       Q      Did you ever say to anybody at any point after you

9    took ownership of the Richmond Hill Inn that you would drive the

10    place into the ground before you would give it back to the

11    Michels?

12       A      No, I did not.

13       Q      Did you ever instruct anybody to cut back on the

14    quality of food at the inn?

15       A      With one of the chefs we discussed ways of cutting

16    the food cost and he said he could produce the same food with

17    less expensive cuts of meat.

18       Q      Beside cuts of meat was anything else in the quality

19    of the food downgraded?

20       A      No.  Not that I'm aware of.

21       Q      Who was the chef?

22       A      That was Perry.  That was his suggestion not mine.

23       Q      Did you ever tell anybody associated with the inn

24    that you were bipolar?

25       A      Absolutely not.

Post Office Box 2152
Advance, NC 27006

EMERT REPORTING SERVICE, INC.
CERTIFIED VERBATIM REPORTERS

TEL: (336) 998-9551
FAX: (336) 998-9568

Page 77

1        Q      Did you ever tell anybody associated with the inn

2    that you wanted to use the 30 or so children that you had some

3    relationship with to work at the inn?

4        A      No.

5        Q      At some point during your time at the Richmond Hill

6    Inn did you ever instruct the staff to stop using the guest

7    cards because they were coming back with negative comments?

8        A      No, I did not.

9        Q      Did you change the decor in the mansion?

10       A      Yes to some degree.

11       Q      You changed it to more of an oriental flair?

12       A      We put more oriental things in it.

13       Q      Were they high-quality oriental furnishings?

14       A      Yes.

15       Q      At any point did the Michels offer to take the inn

16   back from you?

17       A      One time in '05 Mrs. Michels said "We might buy the

18   inn back or take it back."  But she never presented a proposal

19   or anything.

20       Q      Did you ever refuse to give it back to her?

21       A      To give it back to her.

22       Q      Yeah.  When they made that proposal you said "No,

23   I'm not interested in that"?

24       A      No, I didn't say that.  I would've gladly sold it

25   back to them.

1       Q       Did you ever tell them that?

2       A       I told them that, you know, let's talk about it or

3   give me an offer.  Something along that line.  I don't remember.

4   That was a long time ago.

5       Q       Did there ever come a time when you had to pay cash

6   on delivery for the wine supplies?

7       A       You always have to pay cash on delivery for the wine

8   supplies.

9       Q       So at the time you took over the inn you had to pay

10  COD for the wine?

11      A       As far as I know.  It was a state law.

12      Q       Why did you terminate the security guards?

13      A       Security--- Say that again?

14      Q       At one point -- strike that.

15              At one point wasn't the Richmond Hill Inn using an

16  outside service to provide security?

17      A       Not that I'm aware of.  And never while I owned it.

18      Q       I think yesterday you testified that you were always

19  on time with your interest payments to the Michels.  Is that

20  correct?

21      A       We paid them within a week or two of when they were

22  due, yeah.

23      Q       You were never behind more than a month in paying

24  them?

25      A       Never behind that long.

Page 79

1     Q    We're talking about the debt service?

2     A    Right.

3     Q    Did you ever threaten to sue a financial institution

4  because they wouldn't give you construction funding for any of

5  your projects?

6     A    I went to a lawyer in Charlotte to talk to them

7  about----

8     MR. PAYNE:  Wait just a minute.  Now, you're getting

9  into the topic of law.  Now, I want you to answer his question.

10  His question was, did you ever threaten to sue a financial

11  institution?

12     A    No.  No.

13     Q    Did you ever consult with a lawyer about suing a

14  financial institution?

15     A    Yes.

16     Q    Who was the lawyer?

17     A    It was I think Woods Bassett.  I don't remember

18  their names.

19     Q    What financial institution?

20     A    It was a construction loan on the assisted living.

21     Q    Did the bank change its position with funding the

22  construction of the assisted living?

23     A    Right.

24     Q    Why did it do it?

25     A    Because they were cost overruns due to state

Page 80

1    regulations and they had indicated they would, you know,

2    continue to fund it and then they just quit.

3          Q    Did it have anything to do with your financial

4    standing?

5          A    I don't know.  They never said that.  They just said

6    they weren't going to do anymore.

7          Q    Had they already committed to funding the

8    construction?

9          A    They committed to a certain amount on it.

10         Q    And they backed away from that commitment?

11         A    No.  They fulfilled that part of it but then when we

12   needed more to finish the project they wouldn't do it.

13         Q    So why did you think it was inappropriate on their

14   part to not give you more funding?

15         A    Because their agents had told me they would.

16         Q    The agents for the bank?

17         A    Uh-huh.

18         Q    Is that a yes?

19         A    The loan officer said they would continue to give me

20   more money if we needed it.

21         Q    Was that a verbal commitment?

22         A    Yes.

23         Q    Who were the agents?

24         A    I don't remember their names.

25         Q    Dr. Gray, the personal financial statement you

Page 81

1    prepared in April of 2009 that was after the bankruptcy,

2    correct?

3        A    Yes.

4        Q    Why was that prepared?

5        A    Because you sent me a letter wanting something.  I

6    thought I was supposed to supply that.

7        Q    So you created a personal financial statement in

8    April of 2009?

9        A    Right.

10       Q    Solely for the insurance claim?

11       A    Right.

12       Q    It had nothing to do with requesting financing?

13       A    No.

14       Q    The personal financial statements you've provided,

15   the five that we looked at, did any of those -- were any of

16   those provided to banks supporting any request for personal

17   loans for you?

18       A    No.

19            MR. PAYNE:  Let him finish.

20       Q    Were any of those personal financial statements

21   prepared for support of any ongoing loans or new loans for you

22   and/or Mrs. Gray?

23            MR. PAYNE:  You're asking about individual or joint

24   loans?

25            MR. NELSON:  Yeah.  Personal in nature as opposed to

Page 82

1    business loans?

2        A    The house in Charleston.  The note needed to be

3    renewed so that was done last year so I would assume one of them

4    was prepared for that.

5        Q    Okay.  How much did you purchase the home in

6    Charleston for?

7        A    I don't remember.  It was 10 years ago or more.

8        Q    Do you still own the house in Charleston?

9        A    My sister and I do.

10       Q    Which sister?

11       A    Virginia.

12       Q    You and your sister own a house in Charleston?

13       A    (Witness nods head yes.)

14       Q    Is it for your benefit or her benefit?

15       A    Neither one.  We were using it as our business

16   headquarters when we were working down there.

17       Q    What do you use it for now?

18       A    We let people use it.  We don't have time to go down

19   there.

20       Q    So it's not used for business and you don't use it?

21       A    No.

22       Q    But you still own it?

23       A    I'm trying to sell it.

24       Q    How long have you been trying to sell it for?

25       A    Since we bought the inn up here so three and a half

Dr. William Gray, Vol. 2

Page 83

1    years.

2        Q        Okay.  In the last five years have you asked for any

3    -- have you supplied any loan applications or requests for

4    financing from any financial institution?

5        A        For business or?

6        Q        You personally or you and your wife or your wife?

7        A        We refinanced the house that we live in Mooresville

8    several years ago.

9        Q        Besides that loan?

10       A        No.

11       Q        Okay.  So have you in the last five years been

12   refused any financing by any mortgage institution, money

13   institution, credit card company?

14       A        Personally?

15       Q        Personally?

16       A        No.

17       Q        So Dr. Gray, the personal financial statements the

18   most recent one is 20d, Exhibit 20d.  Do you need to look at it?

19       A        Yes.

20       Q        So this personal financial statement was prepared

21   for the benefit of your insurance claim?

22       A        Yes.

23       Q        This was prepared in response to the documents

24   requested as part of the examination under oath process?

25       A        Yes.

Page 84

1          MR. NELSON:  Dr. Gray, there's a very likely chance

2    that we're going to have to continue your questioning onto

3    another day.  Harleysville's been provided with some recent

4    documents yesterday and we've learned about the existence of

5    other documents that might exist that might be germane to the

6    document request by Harleysville.  In addition, it doesn't

7    appear that the Harleysville document requests was presented to

8    other members of The Hammocks, LLC such as Mr. Sloggart or

9    either of your sisters or that your attorneys or accountants

10   were asked for certain of these documents.  So it's very likely

11   that additional documents will be provided to Harleysville.  So

12   Harleysville is going to at this point reserve the right to ask

13   you to submit to further examination under oath and also this is

14   something that Attorney Payne and I talked about before it may

15   be necessary for Harleysville to question other members of The

16   Hammocks, LLC such as your sisters or Mr. Sloggart.

17          At this point we're going to close the record and

18   ask Attorney Payne if he has any questions for you or if you

19   want to say anything.

20          MR. PAYNE:  I don't have any questions.  Just a

21   couple of things that I do want to and I don't know if we need

22   to put it on record or not.  In his going through Exhibit 2 the

23   proof of loss for the antiques in response to your question

24   regarding antiques, can we have an agreement that the marked

25   Exhibit 2 can remain here and what I was going to ask him to do

1    was that if he could grab a bite of lunch and just come back up

2    here and get that finished and then I could keep it here in the

3    office.

4                    MR. NELSON:  Yeah.  If you could send---

5                    MR. PAYNE:  Is that agreeable with you?

6                    MR. NELSON:  That's agreeable to me.  If you could

7    send me a color copy so I can see what's pink, okay?

8                    MR. PAYNE:  What I'll do is just send you the

9    original, if that's okay?  And I'll just retain a copy.

10                   MR. NELSON:  That's great.  Yeah.  I need an

11   original signature on the document.  Dr. Gray, there's also a

12   transcript that's going to be generated out of this examination

13   under oath process.  And I'm going to ask you to review the

14   transcript and then sign it.  Okay?

15                   THE WITNESS:  Okay.

16                   MR. NELSON:  It's very important that a timely --

17   you return it back to me in a timely fashion.  Seven days would

18   be appropriate.  Are you okay with that?

19                   THE WITNESS:  As far as I know.

20

21                   (Thereupon, the Examination Under Oath recessed at

22   12:10 p.m. to be completed at a later date and time.)

23

24

25

Page 86

1                              WITNESS CERTIFICATION

2                  I, DR. WILLIAM GRAY, hereby certify,

3                  That, I have read and examined the contents of the

4        foregoing 85 pages of record of testimony of Volume II as given

5        by me at the time and place herein aforementioned;

6                  And that to the best of my knowledge and belief, the

7        foregoing 85 pages are a complete and accurate record of all of

8        the testimony given by me at said time, except as to where noted

9        on the attached errata addenda.

10

11

12

13

14

15                              DR. WILLIAM GRAY

16

17       Sworn to and subscribed before me,

18       this the  22nd   day

19       of   July                      , 2009.

20

21

22

23       Notary Public

                                        Tara Smathers
                                        Notary Public
24                                      Madison County
                                        North Carolina
                                        My Commission Expires 11/11/2009

25       My Commission Expires:      11-11-09

Dr. William Gray, Vol. 2

Page 87

```
1   STATE OF NORTH CAROLINA                    CERTIFICATE
2   COUNTY OF DAVIE
3           I, DEBORAH O. EMERT, CVR, Verbatim Court Reporter
4   and a Notary Public in and for the County of Davie, State of
5   North Carolina, do hereby certify;
6           That there appeared before me the foregoing witness
7   at the time and place herein aforementioned; that the foregoing
8   pages 1 through 85, inclusive, constitute a true and correct
9   transcription of the proceedings.
10          I do further certify that the persons were present
11  as stated in the appearances.
12          I do further certify that I am not of counsel for,
13  or in the employment of, either of the parties in this action,
14  nor am I interested in the results of this action.
15          IN WITNESS WHEREOF, I have set my hand on this the
16  25 day of June 2009.
17
18
19
20
21          Deborah O. Emert, CVR
22          Deborah O. Emert, CVR
23          Davie County, North Carolina
24          Notary Number:  19950950039
25
```

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:    IN THE MATTER OF THE FIRE LOSS OF RICHMOND HILL INN
Case Number:    SO-840619
Dep. Date:    June 11, 2009
Deponent:    DR. WILLIAM GRAY

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|-----|-----|-----------|-------------|-------------------|
|     |     | None      |             |                   |

_____
Signature of Deponent