# EXHIBIT "H"

No. 1682    P. 44

Mar. 26. 2009    7:12AM

NORTH CAROLINA    FILED    IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
BUNCOMBE COUNTY 2008 OCT 28 PM 3:45    08 CV 5278

BUNCOMBE COUNTY, C.S.C.

WILLIAM G. GRAY, and THE
HAMMOCKS, LLC,    BY _____

Plaintiffs,

vs.    COMPLAINT
Fraud
RICHMOND HILL, INC., ALBERT J.    N.C.G.S. Chapter 75
MICHEL, MARGE MICHEL, and    Attorneys Fees
ROBERT BLAND HOLLAND,

Defendants

NOW COME the Plaintiffs, complaining of the Defendants, and allege and say as follows:

1.    Plaintiff William G. Gray (hereafter "Plaintiff Gray") is a citizen and resident of Iredell County, North Carolina.

2.    Plaintiff The Hammocks, LLC (hereafter "Plaintiff Hammocks LLC") is a limited liability company organized and existing under the laws of the state of South Carolina and doing business as Richmond Hill Inn.

3.    Defendant Richmond Hill, Inc. is a for-profit corporation organized and existing under the laws of the state of North Carolina.

4.    Defendant Albert J. Michel is a citizen and resident of Guilford County, North Carolina.  Upon information and belief, Defendant Albert Michel is President, a director, and shareholder of Defendant Richmond Hill, Inc.

5.    Defendant Marge Michel is a citizen and resident of Guilford County, North Carolina.  Upon information and belief, Defendant Marge Michel is director, officer and shareholder of Defendant Richmond Hill, Inc.

6.    Defendant Holland is a citizen and resident of Buncombe County, North Carolina. At all times herein complained of herein Defendant Holland was the agent, servant and employee of Defendant Richmond Hill Inc. acting within the scope of his agency and the course of his employment.  At all times complained of herein Defendant Holland was the agent of Defendants Albert Michel and Marge Michel, acting within the scope of this agency.

No. 1682   P. 45

Mar. 26. 2009   7:12AM

7.    This action involves real property and improvements thereon situated in Buncombe County, North Carolina.

8.    In July 2005, Plaintiff Gray and Defendant Richmond Hill, Inc. entered into a written Agreement of Purchase and Sale setting forth the terms of sale of "all real and personal property associated with and used in the operation of the Richmond Hill Inn situated at 87 Richmond Hill Drive, Asheville, North Carolina, 28806" (hereafter "the Richmond Hill Inn Property"). A copy of the Agreement is attached hereto as Exhibit A and incorporated herein by reference as if fully set forth. (hereafter "the Agreement").

9.    Pursuant to the terms of the Agreement, Plaintiff Gray assigned the Agreement to Plaintiff Hammocks LLC.

10.    In October 2005, Plaintiff Hammocks LLC closed on the purchase of the Richmond Hill Inn Property from Defendant Richmond Hill, Inc. As part of the purchase of the Property, the Plaintiff Hammocks LLC executed a promissory note in the principal amount of $8,800,000 in favor of Defendant Richmond Hill, Inc. and secured by a deed of trust on the real property conveyed in the transaction for the benefit of Defendant Richmond Hill, Inc.

11.    During the period between the execution of the Agreement in July 2005 and the closing in October 2005, Plaintiff Gray discussed the condition of the Richmond Hill Inn Property with Defendants Albert Michel, Marge Michel, and Holland (who was employed at the time as the General Manager of the Richmond Hill Inn).

12.    Plaintiff Gray specifically and directly asked Defendants Albert and Marge Michel about the condition of the Richmond Hill Inn Property and whether any problems existed. Defendants Albert and Marge Michel advised Plaintiff Gray that certain areas needed to be painted, and that they had experienced difficulty in managing the Richmond Hill Inn Property in a financially successfully manner. Defendants Albert and Marge Michel disclosed no further information related to the physical condition of the Richmond Hill Inn Property.

13.    Plaintiff Gray also specifically and directly asked Defendant Holland about the condition of the Richmond Hill Inn Property and whether any problems existed. Defendant Holland advised Plaintiff Gray that the Richmond Hill Inn was in great condition and that a previous prospective buyer of the inn had conducted a lengthy and comprehensive inspection of the various conditions and systems of the Richmond Hill Inn Property and had determined that no problems existed. When asked, Defendant Holland disclosed no further information related to the physical condition of the Richmond Hill Inn Property.

14.    Pursuant to the Agreement to purchase the Richmond Hill Inn Property, Defendant Holland remained employed as the General Manager of the Richmond Hill Inn after the closing on the transaction.

2

No. 1682   P. 46

15.   Undisclosed to Plaintiffs was the fact that the Richmond Hill Inn Property had been experiencing leaks in the polybutylene pipes that comprise the plumbing of the Richmond Hill Inn mansion and at least nine guest cottages on the Richmond Hill Inn Property.

16.   Polybutylene piping is a type of piping formed of plastic resin and used in construction from the late 1970s to the mid-1990s. It has been determined that polybutylene piping eventually degrades and leaks, and must be replaced. The presence of polybutylene piping has a substantial and negative effect on property as a result of the leaks and attendant damage, and also the necessity of replacing the piping.

17.   The leaks had been numerous and continuous for more than a decade before the Plaintiff closed the transaction to purchase the Richmond Hill Inn property. For at least ten years, the leaks and attendant water damage had been repaired by the maintenance staff of the Richmond Hill Inn on a piecemeal basis.

18.   Upon information and belief, the presence of leaking polybutylene plumbing pipes at the Richmond Hill Inn Property was well known to Defendants Albert Michel, Marge Michel, and Bland Holland at the time that Plaintiff Gray inquired about the condition of the Richmond Hill Inn Property.

19.   Upon information and belief, Defendants Albert Michel and Marge Michel, as the owners of the Richmond Hill Inn during the negotiations with Plaintiff Gray, instructed Defendant Holland to conceal any information about the leaking polybutylene plumbing pipes from Plaintiff Gray.

20.   In an effort to conceal the leaking pipes from Plaintiff Gray, Defendant Holland in his capacity as General Manager of the Richmond Hill Inn instructed employees of Richmond Hill Inn that he himself would "take care of" telling Plaintiff Gray about the leaks and polybutylene piping.

21.   Subsequent to the closing Plaintiff Gray, on behalf of Plaintiff Hammock LLC, visited the Richmond Hill Inn Property to review the financial condition of the business of Richmond Hill Inn and view the real property and improvements.

22.   During this period, Defendant Holland was serving as the General Manager and as the contact for Plaintiff Gray regarding the financial and physical condition of the Richmond Hill Inn Property.

23.   Upon information and belief, the Richmond Hill Inn Property had in excess of 250 leaks that had been discovered and repaired by employees of Richmond Hill Inn prior to Plaintiffs' negotiation and purchase of the property.

24.   Upon information and belief, Defendants Albert Michel, Marge Michel and Bland Holland were each aware of the occurrence and frequency of the leaking polybutylene

Mar. 26. 2009  7:12AM

3

No. 1682    P. 47

piping at the time each was representing to Plaintiff Gray that the property had no problems.

25.    Upon information and belief, Defendants Richmond Hill, Inc., Albert Michel, and Marge Michel had attempted to participate in class action litigation involving the defects in and failures of polybutylene piping years prior to representing the condition of the Richmond Hill Inn Property to the Plaintiffs.

26.    Plaintiffs discovered the presence of the polybutylene piping and the history of leaks in mid-2006 after the employment of Defendant Holland was terminated by Plaintiff Hammocks LLC.

27.    The presence of the polybutylene piping and the history and continuation of leaks in this piping has a significant and negative impact on the value of the Richmond Hill Inn Property.

28.    Completely replacing the polybutylene piping is the only satisfactory method of stopping the leaks. Such replacement is costly and is the only available remedy to restore the Richmond Hill Inn Property to the condition as represented by the Defendants to the Plaintiffs.

### First Claim for Relief
### (Fraud)

29.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if fully set forth.

30.    By their specific representations, Defendants induced Plaintiffs to forego inspections of the improvements on the Richmond Hill Inn Property.

31.    Defendant misrepresented and concealed material facts related to the physical condition of the improvements on the Richmond Hill Inn Property, including the existence of malfunctioning polybutylene piping and frequent and substantial leaks in the polybutylene piping.

32.    These misrepresentations and concealment of material facts were made and done with the intent to deceive Plaintiffs and to induce Plaintiffs to purchase the Richmond Hill Inn Property.

33.    Plaintiffs' reliance on the misrepresentations was reasonable.

34.    Plaintiffs were deceived by Defendants' misrepresentations and concealment of material facts regarding the Richmond Hill Inn Property, and as a result, purchased the Property.

Mar. 26. 2009  7:12AM

4

35.    As a result of Defendants' misrepresentations and concealment of material facts, Plaintiffs have sustained damages in an amount in excess of $10,000.00.

## Second Claim for Relief
### (N.C.G.S. Chapter 75-1.1 *et seq.*)

36.    The allegations set forth in the previous paragraphs are incorporated herein by reference as if fully set forth.

37.    The sale of the Richmond Hill Inn Property to Plaintiffs represents a commercial real estate and business transaction.

38.    The conduct of Defendants constitutes an unfair or deceptive act or practice in or affecting commerce which has proximately caused actual injury to the Plaintiffs in an amount in excess of $10,000.00.

39.    Plaintiffs are entitled to compensatory damages and that said damages be trebled.

WHEREFORE, Plaintiffs respectfully pray the Court:

1.    For a judgment against Defendants pursuant to Plaintiffs claim of fraud;

2.    For a judgment against Defendants pursuant to Plaintiff's claim under N.C.G.S Chapter 75-1.1 *et seq.*, including treble damages and attorneys fees.

3.    That all costs be taxed against the Defendants;

4.    For such other and further relief as the Court may deem just and proper.

ADAMS HENDON CARSON CROW & SAENGER, P.A.

By: _____

George Ward Hendon          N.C. Bar No 2026
Joy McIver                          N.C. Bar No. 23134
72 Patton Avenue
Asheville, N.C. 28801
Tel. (828) 252-7381
Fax (828) 252-5018

ATTORNEYS FOR PLAINTIFFS.

5

THIS AGREEMENT OF PURCHASE AND SALE is entered into as of July ____, 2005, by and between RICHMOND HILL, INC., a North Carolina corporation, ("Seller"), and DR. WILLIAM G. GRAY, a resident of Iredell County, North Carolina, ("Purchaser").

ARTICLE I

Sale of Assets and Assumption of Liabilities

Section 1.1    Sale of Assets.

(a)    Purchased Assets. At the Closing (as defined below), Seller shall sell, assign, transfer, convey and deliver to Purchaser and Purchaser shall accept and purchase all of Seller's right, title and interest in and to all real and personal property associated with and used in the operation of the Richmond Hill Inn situated at 87 Richmond Hill Drive, Asheville, North Carolina, 28806, including all furniture, fixtures, equipment, inventories and intangible assets (the "Property"). Such real property shall include those tracts or parcels listed and more thoroughly described on Exhibit "A" attached hereto and incorporated herein by reference.

(b)    Excluded Assets. The foregoing notwithstanding, Purchaser shall not purchase, and Seller shall not be deemed to sell, those assets which are listed in the Schedule of Excluded Assets listed on Exhibit "B" attached hereto and incorporated herein by reference.

Section 1.2    Assumption of Liabilities. As of the Closing, Purchaser shall undertake, assume and agree to perform, and otherwise pay, satisfy and discharge the liability upon those contracts or agreements listed on Exhibit "C" attached hereto and incorporated herein by reference (the "Assumed Liabilities"). Seller shall remain liable for any and all agreements, contracts and liabilities not specifically assumed by Purchaser.

Section 1.3    Closing.

(a)    Closing Date. The closing of the purchase and sale of the Purchased Assets (the "Closing") will take place on or before thirty (30) days after the end of the Due Diligence Period (the "Closing Date").

(b)    Closing Adjustments and Costs. Purchaser and Seller agree that all operating income comprised of rents and other income of whatever nature, accrued or prepaid expenses, utilities or other assumed liabilities, if any, shall be pro rated as of the date of Closing. Seller shall pay for the preparation of the deed and the North Carolina excise tax on the transfer. Purchaser shall pay recording fees, cost of any due diligence activities and financing costs. Purchaser and Seller shall each bear the costs of their respective attorneys and financial advisors.



EXHIBIT

A

1

No. 1682    P.  50

Section 1.4    Purchase Price.

(a)    Purchase Price.  The price at which the Seller shall convey the Property to the Purchaser shall be Ten Million Eight Hundred Thousand and No/100 Dollars ($10,800,000.00) and shall be payable as follows:

(i)    Earnest Money.  Upon the execution of this Agreement of Purchase and Sale, Purchaser shall deliver to North Carolina Inn Brokers, Inc., as Escrow Agent, in the form of an official bank check or wire transfer of funds, at Seller's option, the amount of One Hundred Thousand and No/100 Dollars ($100,000.00) (the "Earnest Money") which shall be immediately nonrefundable to Purchaser, except in the event of Seller's default, or proper termination by Purchaser pursuant to any provision hereunder, in which event it shall be returned to Purchaser.

(ii)    Cash:  Purchaser shall pay to Seller at the Closing the sum of Ten Million Seven Hundred Thousand and No/100 Dollars ($10,700,000.00) in the form of an official bank check or wire transfer of funds, at Seller's option, as the balance of the Purchase Price.

(b)    Allocation.  The Purchase Price shall be allocated as set forth on Exhibit "D" attached hereto and incorporated herein by reference.

ARTICLE II

Representations and Warranties

Section 2.1    Condition of Property.  Seller represents and warrants that, at the Closing, the Property will be in as good condition as of the date of this Agreement, reasonable wear and tear and damage by fire and other casualty excepted, as provided under Section 4.7 hereinafter. Seller also represents and warrants that, to the best of its knowledge, there are no pending or confirmed governmental special assessments for improvements on the real property described herein.

Section 2.2    Environmental Matters.  Seller represents and warrants that, to the best of Seller's knowledge, without investigation, there are no hazardous or toxic waste or substances located on or underneath the Property, except substances used in a lawful way for cleaning, painting and other routine matters.  Hazardous or toxic waste or substances are defined as those substances, materials and wastes, including but not limited to, those substances, materials and wastes listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR 302) and amendments thereto, or such substances, materials and wastes, which are or become regulated under any applicable local, state or federal law, including, without limitation, any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) designated as a Hazardous Substance pursuant to Section 331 of the Clean Water Act, 33 U.S.C. Sec. 1251 et. seq. (33 U.S.C. 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Sec. 1371) (v) defined as a hazardous waste pursuant to Section 1004 of the

Mar. 26. 2009  7:13AM

2

No. 1682    P. 51

Resource conservation and Recovery Act, 42 U.S.C. Sec. 6901 et seq. (42 U.S.C. Sec. 6903) or (vi) defined as a hazardous substance pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sec. 9601 et. seq. (42 U.S.C. 9601). Seller further states that it has no actual knowledge of any contamination of the Property from such substances as may have been disposed of or stored on neighboring tracts.

Section 2.3    Authority.

(a)    Purchaser's Representations and Warranties.  Purchaser represents and warrants that:

(i)    he is a citizen and resident of Mecklenburg County, North Carolina and has the power and authority to enter into and perform his obligations under this Agreement and to carry out the transactions contemplated herein;

(ii)    the execution, delivery and performance by Purchaser of this Agreement does not and will not conflict with, or result in any violation of or default under, any provision of any ordinance, rule, regulation, judgment, order, decree, agreement, instrument or license applicable to Purchaser; and

(iii)    no consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, is required by or with respect to Purchaser in connection with his execution, delivery or performance of this Agreement.

(b)    Seller's Representations and Warranties.  Seller represents and warrants that:

(i)    it is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation and that it has all requisite corporate power and authority to enter into and perform its obligations under this Agreement and to carry out the transactions contemplated herein;

(ii)    its Board of Directors and Shareholders have duly authorized the execution and delivery of this Agreement and the other transactions contemplated herein, and no other corporate proceedings on the part of Seller are necessary to authorize this Agreement and the transactions contemplated herein;

(iii)    the execution, delivery and performance by Seller of this Agreement does not and will not conflict with, or result in any violation of or default under, any provision of the Articles of Incorporation or Bylaws of Seller or ordinance, rule, regulation, judgment, order, decree, agreement, instrument or license applicable to Seller or to any of its respective properties or assets; and

(iv)    no consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or

Mar. 26. 2009  7:13AM

3

other governmental authority or instrumentality, domestic or foreign, is required by or with respect to Seller in connection with its execution, delivery or performance of this Agreement.

Section 2.4    Brokerage.  Purchaser and Seller each represent to the other that Connie S. Munden and Christopher W. Ortwein of North Carolina Inn Brokers, Inc., Asheville, North Carolina, ("Broker") are the only brokers involved in this transaction and that no other brokers are entitled to any fee, charge or commission in connection with or related to this transaction. Each party agrees to indemnify and hold the other harmless should its representations and warranties set forth in this Section 2.4 prove to be untrue.  Seller shall compensate Broker in accordance with a separate written agreement between Seller and Broker dated June 29, 2005. Any other compensation owed Broker shall be the responsibility of Purchaser.

ARTICLE III

Covenant Relating to Conduct of Business

Section 3.1    Continuous Operation.  During the period from the date of this Agreement and continuing until the Closing, Seller agrees (except as expressly contemplated by this Agreement or to the extent that Purchaser shall otherwise consent in writing) that it shall continue operating its business on the Property in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted until the Closing.

ARTICLE IV

Additional Provisions

Section 4.1    Confidentiality.  Purchaser and Seller agree to maintain as confidential and proprietary all information relative to the anticipated sale and purchase described in this Agreement ("Confidential Materials").

Section 4.2    Terms and Conditions.  Seller shall convey marketable fee simple title to the real property to Purchaser at Closing by General Warranty Deed subject only to the exceptions described on Exhibit "E" hereto.  Seller shall convey title to the personal property and transfer and assign all of the Assumed Liabilities by Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as Exhibit "F."  The Seller shall convey the Property described in "As-Is, Where-Is" condition without any warranties or representations as to physical condition or any other matter other than warranties of title in the Deed and Bill of Sale and those relating to the Seller's existence and authority to convey the Property as described.

Section 4.3    Sale of Assets.  Seller agrees that, from the date of this Agreement, no portion of the Property (not including inventory) will be sold without the prior written consent of the Purchaser.

Section 4.4    Training/Consulting.  Seller agrees to make its personnel reasonably available for training and consultation after the end of the Due Diligence Period and prior to Closing.  Otherwise, Seller shall not be obligated to provide any training, consulting or other

4

No. 1682   P. 53

Mar. 26. 2009  7:13AM

related services to the Purchaser in connection with its purchase of the Property; provided, however, Seller agrees that Albert J. Michel and Margaret Michel shall be reasonably available by e-mail and telephone for consultations for a period of thirty (30) days following Closing.

Section 4.5    Noncompetition Agreement.  Seller, Albert J. Michel and Margaret Michel agree to enter a binding agreement at Closing in which they agree that they shall not be involved directly or indirectly, as employees, consultants, owners, representatives, agents or in any other capacity, in any business or business activity which is engaged wholly or partially in a similar business or any business substantially competitive with the business identified herein for a period of five (5) years within a fifty (50) mile radius of the Richmond Hill Inn.  Seller acknowledges that the agreement under this Section 4.5 is an inducement to the Purchaser concerning the purchase of the Property.

Section 4.6    Employee Matters.  As additional consideration for the transaction contemplated herein, Purchaser agrees that, either before or within a reasonable time after Closing, it shall offer employment to all those persons who are employed by Seller in the operation of the Richmond Hill Inn on the date of Closing, ("Existing Employees"), except any persons who are shareholders or relatives of shareholders of Seller.  For each Existing Employee who accepts Purchaser's offer of employment, Purchaser shall receive a credit for one hundred percent (100%) of each such Existing Employee's accrued vacation as of Closing and seventy-five percent (75%) of each such Existing Employee's accrued sick leave as of the Closing (as evidenced by a schedule which Seller shall prepare and submit to Purchaser as part of the Closing.  After the Closing, Purchaser shall be responsible for providing one hundred percent (100%) of the accrued vacation and one hundred percent (100%) of the accrued sick leave to the Existing Employees in accordance with Seller's schedule and Seller's vacation and sick leave policies.

Section 4.7    Casualty.

(a)    If, prior to Closing, any of the Property shall be destroyed or damaged by fire or other casualty to the extent that the cost to repair such damage is less than Two Hundred Fifty Thousand and No/00 Dollars ($250,000.00), as determined by agreement of the parties, or substantiated by three independent cost estimates obtained from contractors selected by Seller to perform such repairs, then Seller shall (a) repair such damage if the repairs can be completed by the date of Closing, or (b) escrow funds at Closing in the amount of 1.10 times the estimated cost to repair such damages if the repairs cannot be completed by the date of Closing.  Should Seller elect to escrow funds as provided in (b) above, the repairs will be made as soon as possible after Closing, and any excess in the escrowed funds shall be refunded to Seller, and any shortfall between the escrowed funds and the cost of repairs shall be promptly paid by Seller.

(b)    If, prior to Closing, any of the Property shall be destroyed or damaged by fire or other casualty to the extent that the cost to repair such damage is Two Hundred Fifty Thousand and No/00 Dollars ($250,000.00) or greater, as determined by agreement of the parties, or substantiated by three independent cost estimates obtained from contractors selected by Seller to perform such repairs, then this Agreement shall, at the option of Purchaser, be terminated.  If, after the occurrence of any such casualty, the

5

No. 1682    P. 54

Agreement is not so terminated, Purchaser may elect to purchase the Property "as is" and Seller shall, at Closing, pay to Purchaser any sums collected under any policies of insurance because of damage due to casualty (and pay to Purchaser all deductibles, if any) and otherwise assign to Purchaser all rights to collect such sums as may then be uncollected.

(c)    Purchaser shall reasonably approve any contractor and materials used for any repairs under subsections (a) and (b) above prior to the commencement thereof. In the event that Purchaser's approval is not obtained, then Purchaser shall have the option of terminating this Agreement, or electing to accept such repairs upon completion.

(d)    In the event of any casualty hereunder, Seller shall provide Purchaser with: (a) a cost estimate, (b) name of contractor(s) to be employed, and (c) a copy of plans or invoices showing the materials to be used in such repairs. Any such notice shall be tendered for Purchaser's approval a minimum of ten (10) days prior to the commencement of any repairs hereunder.

Section 4.8    Purchaser's Insurance. Purchaser shall secure its own insurance on the Property as of the date of Closing, and Seller shall cancel all existing insurance policies as of the date of Closing. Purchaser and Seller shall, before and after Closing, reasonably cooperate with each other in connection with these provisions.

Section 4.9    Due Diligence. Purchaser shall have a period of sixty (60) days from the date of the execution of this Agreement by the Purchaser and Seller to complete its due diligence inspections ("Due Diligence Period"). During the Due Diligence Period, Seller shall provide Purchaser, its agents and employees, with reasonable access to the Property and all records, agreements, contracts, financial documents and operating agreements as requested by Purchaser, all of which are Confidential Materials. In the event that Purchaser determines that the Property is unacceptable to Purchaser for any reason, Purchaser shall notify Seller in writing prior to the end of the Due Diligence Period that Purchaser elects to terminate this Agreement. In the event Purchaser gives such notice, the Earnest Money shall be returned to Purchaser. If Purchaser fails to so notify Seller prior to the end of the Due Diligence Period that it elects to terminate this Agreement, then Seller shall have no further right to terminate this Agreement and the Earnest Money shall become non-refundable except for Seller's default in the performance of its obligations under this Agreement. If Purchaser elects to terminate this Agreement, all Confidential Materials shall be returned to Seller.

Section 4.10    Default; Remedies. In the event any of the conditions hereto for the benefit of Purchaser are not satisfied, then the Earnest Money shall be returned to Purchaser. In the event of breach of this Agreement by Seller, Purchaser shall have the right either to (a) receive a return of the Earnest Money; or (b) seek specific performance of this Agreement, as Purchaser's sole remedy.

In the event Purchaser breaches this Agreement, then the Earnest Money shall be forfeited to Seller as Seller's sole remedy. Upon written notice from Purchaser or Seller to the Escrow Agent as provided herein, the Earnest Money shall be delivered by the Escrow Agent to the party entitled thereto.

Mar. 26. 2009  7:14AM

No. 1682    P. 55

Section 4.11    <u>Licenses, Permits and Memberships.</u>  While it shall be Purchaser's obligation to obtain any appropriate and necessary state and local licenses and permits necessary to continue operation of the Property, Seller agrees to provide reasonable cooperation with Purchaser in that regard.  Seller shall also reasonably assist Purchaser in securing membership in the Select Registry and Classic Inns of the South.

Section 4.12    <u>Liquor.</u>  Seller's obligation to transfer any liquor inventory to Purchaser at Closing shall be expressly conditioned upon Purchaser having obtained the appropriate state liquor licenses to possess such liquor inventory.

Section 4.13    <u>Labor and Material.</u>  Seller shall furnish to Purchaser at Closing an affidavit and indemnification agreement in form reasonably satisfactory to Purchaser stating that all labor and materials, if any, furnished to the Property within one hundred twenty (120) days prior to the date of Closing have been paid for, and agreeing to indemnify Purchaser, Purchaser's title insurance company and Purchaser's lender, if any, against all loss from any cause or claim arising if such affidavit should prove to be untrue.

Section 4.14    <u>Assignment.</u>  This Agreement may be assigned by Purchaser to any entity in which Purchaser is the majority owner.

ARTICLE V

<u>General Provisions</u>

Section 5.1    <u>Notices.</u>  Any notices permitted or required by the terms of this Agreement shall be deemed given when mailed by registered or certified mail or recognized overnight courier:

| | |
|---|---|
| To Seller: | Richmond Hill, Inc.<br>87 Richmond Hill Drive<br>Asheville, North Carolina 28806 |
| With a copy to: | William P. Aycock, II, Esquire<br>Schell Bray Aycock Abel & Livingston P.L.L.C.<br>P. O. Box 21847 (27420)<br>230 North Elm Street, Suite 1500<br>Greensboro, North Carolina 27401 |
| To Purchaser: | Dr. William G. Gray<br>P. O. Box 1496<br>Cornelius, North Carolina 28031 |
| With a copy to: | Scott C. Best, Esquire<br>Best & Best PLLC<br>138 Charlotte Street, Suite 200<br>Asheville, North Carolina 28801 |

Mar. 26. 2009   7:14AM

7

Section 5.2.    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.

Section 5.3    Governing Law.  This Agreement shall be governed in all respects, including validity, interpretation and effect, by the internal laws of the State of North Carolina.

Section 5.4    Entire Agreement/Modification.  This Agreement represents the entire understanding of the parties with respect to the transaction contemplated herein and no modifications hereof shall be permitted or enforceable unless reduced to writing and signed by Purchaser and Seller.

Section 5.5    1031 Exchange.  Either party may subject this transaction to an exchange pursuant to Section 1031 of the Internal Revenue Code.  The parties agree to cooperate with the exchanging party provided no additional liability or cost is assumed by the cooperating party.

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement as of the date first written above.

SELLER:

RICHMOND HILL, INC.

By: _____
Name: Dr. Albert J. Michel
Title:  President


PURCHASER:

_____
Dr. William G. Gray


North Carolina Inn Brokers, Inc., as Escrow Agent, joins in the execution of this Agreement to acknowledge receipt of the Earnest Money.

NORTH CAROLINA INN BROKERS, INC.,
as Escrow Agent

By: _____
Name: CONNIE MUNDEN
Title:  PRESIDENT

8

No. 1682  P. 57

## EXHIBIT "A"

### DESCRIPTION OF PROPERTY

TRACT I: Being all of that 7.48-acre tract conveyed from The Preservation Society of Asheville and Buncombe County, Inc., a North Carolina corporation, to the Education Center, Inc., a North Carolina corporation, by Deed dated January 21, 1987 and recorded in Deed Book 1462, Page 307, Buncombe County Registry.

TRACT II: Being all of Lot 23, Section 1, of Richmond Hill Park as shown on Plat Book 28, at Page 92, Buncombe County Registry; as conveyed from Thurman W. Cecil, Jr. and wife, Virginia S. Cecil, to The Education Center, a North Carolina corporation, by Deed dated April, 1987 and recorded in Deed Book 1470, at Page 447, Buncombe County Registry.

TRACT III: Being all of that 41.51-acre tract conveyed from Ernest L. McCombs and wife, Phyllis F. McCombs to The Education Center, Inc., a North Carolina corporation, by Deed dated April 21, 1988 and recorded in Deed Book 1517, at Page 581, Buncombe County Registry.

TRACT IV: Being all of that 1.37-acre tract conveyed from Baptist Retirement Homes of North Carolina, Inc. to The Education Center, Inc., a North Carolina corporation, by Deed dated March 1, 1990, and recorded in Deed Book 1597, at Page 207, Buncombe County Registry.

TRACT V: Being all of that 3.31-acre tract conveyed from Metropolitan Sewerage District of Buncombe County, North Carolina, a Public Body and Body Politic and Corporate, to The Education Center, Inc., a North Carolina corporation, by Deed dated March 20, 1990 and recorded in Deed Book 1602, at Page 508, Buncombe County Registry.

TRACT VI: Being Parcel No. 1 containing 1.586 acres, more or less, and Parcel No. 2 containing 0.541 acres, more or less, conveyed from Southern Region Industrial Realty, Inc., a Georgia corporation, to The Education Center, Inc., a North Carolina corporation, by Deed dated November 13, 1992 and recorded in Deed Book 1721, at Page 452, Buncombe County Registry.

TRACT VII: Being all of that 0.575-acre tract conveyed from Baptist Retirement Homes of North Carolina, Inc. to The Education Center, Inc., a North Carolina corporation, by Deed dated February 9, 1993, and recorded in Deed Book 1732, Page 486, Buncombe County Registry.

TRACT VIII: Being all of Lot 16, Section 1, of Richmond Hill Park, as shown on that plat recorded in Plat Book 28, Page 92 of the Buncombe County, NC Registry, reference to said plat being made for a more particular description of said lot, and being all of that property conveyed to Richmond Hill, Inc. by Deed recorded in Book 2330, Page 88, Buncombe County Registry.

TRACT IX: Being all of Lot 17, in Section One as shown on a plat of Richmond Hill Park recorded in the Office of the Register of Deeds for Buncombe County, North Carolina in Plat Book 28 at Page 92, reference to which is hereby made for a more particular description, and being all of that property conveyed to Richmond Hill, Inc. by Deed recorded in Book 2268, Page 798, Buncombe County Registry.

Mar. 26. 2009  7:14AM

9

## EXHIBIT "B"

## EXCLUDED ASSETS

Cash and cash equivalents
Checking, money market and other deposit accounts
Deposits
Accounts and notes receivable
Birdseye maple desk and chair
Painting in the Richard Pearson Room
Personal property owned by any shareholder of Seller (such
   as personal items located in the Apartment, dolls, Burke
   & James camera and other items on display in the
   display cabinet and library)
Condominium at Pine Knoll Shores and other property not
   used in the operation of the Richmond Hill Inn

**EXHIBIT "C"**

<u>ASSUMED LIABILITIES</u>

All liabilities and obligations of Seller arising on or after the Closing Date for or under:

Guest reservations and reservation packages (Purchaser will receive credit at Closing for 100% of the reservation deposits on the Closing Date);

Guest gift certificates (Purchaser will receive credit at Closing for 80% of the aggregate amount of gift certificates outstanding on the Closing Date);

Leases covering the premises located at 86 Richmond Hill Drive and the premises located at 88 Richmond Hill Drive;

Postage meter lease with Pitney Bowes;

Contracts with Arch wireless (pager rental); Avaya (phone maintenance); Charter Communication (cable TV); Charter Communication (cable modem); Christopher Leonard (CD/tape/book royalty); GDS (garbage service); Orkin (pest control); Orkin (termite control); Peachtree software (software support); Plus Linen (linen/mat rental); Ramesys (software support); Retail Systems (software support); Spectrum Office Products (copier maintenance), Thyssen Krupp (elevator maintenance); ASCAP (license); BMI (license); SESAC (license); Southern Living (advertising);

All open purchase orders as of the Closing Date for food, beverages, supplies, equipment, and gift shop inventory and other goods for sale to guests;

Accrued vacation and sick leave as provided in Section 4.6.

Richmond Hill/Gray – Exhibit C (Assumed Liabilities).DOC                                    11

EXHIBIT "D"
PURCHASE PRICE ALLOCATION

| Asset Category | Allocation |
|---|---|
| 86 RB House | 105,000 |
| Land for 86 | 20,000 |
| 88-RH House | 110,000 |
| Land for 88 | 40,000 |
| Paving | 25,000 |
| RH-.575 acres | 45,000 |
| RH-1.37 acres | 75,000 |
| RH-40 acres | 1,600,000 |
| RH-Carriage House Units | 350,000 |
| RH-Croquet Cottages | 1,000,000 |
| RH-Garden Cottages | 3,000,000 |
| RH-Garden Room Units | 1,000,000 |
| RH Inn-Building | 40,000 |
| RH Inn-Rehab | 1,200,000 |
| RH Inn-Land | 150,000 |
| RH-M&O Property | 25,000 |
| RH-Railroad Land | 100,000 |
| Landscaping-Gardens, etc. | 670,000 |
| Land-Westport | 30,000 |
| Kitchen Renovations | 300,000 |
| Parterre Garden | 130,000 |
| RH-Bldg. Improvements | 150,000 |
| Dev. Cost-12 acres | 25,000 |
| 1245 tangible personal property | 300,000 |
| Inventory | 50,000 |
| Goodwill | 250,000 |
| | 10,800,000 |

No. 1682    P. 60

Mar. 26. 2009  7:15AM

161704v1

No. 1682    P. 61

EXHIBIT "E"

EXCEPTIONS TO GENERAL WARRANTY DEED

1.   Taxes for the year 2005 and subsequent years.

2.   Restrictive covenant document(s) recorded in Book 1280, Page 442; Book 780, Page 175;
     and Book 1597, Page 207.

3.   Easements and any other facts as shown on recorded map in Plat Book 9, Page 148; Book
     28, Page 92; and Book 40, Page 25.

4.   Right(s) of way of Richmond Hill Road (Drive), Pearson Bridge Road, Pearson Drive
     and Rolling Oaks Drive to their full legal widths.

5.   Easement(s) to Carolina Power and Light Company recorded in Book 1547, page 705;
     Book 1222, Page 373; Book 760, Page 128; Book 1204, page 519; Book 1556, Page 468;
     Book 497, Page 358 (Tracts I, IV, V, VI, VII).

6.   Easement(s) to State Highway Commission recorded in Book 1014, Page 617; Book
     1014, Page 619; Book 1017, Page 411; and Book 1017, Page 413 (Tract I, II, V).

7.   Waterline easement(s) to the City of Asheville recorded in Book 1563, page 716.

8.   Public Service Company Easement(s) recorded in Book 1750, Page 668, and Book 783,
     Page 221 (Tracts I and V).

9.   Easement(s) recorded in Book 1189, Page 460, and Book 1602, page 508.

10.  Joint Buffer Agreement and easement with Baptist Retirement Home recorded in Book
     1732, Page 479.

11.  Right of way to Western North Carolina Baptist Retirement Home recorded in Book
     1183, page 423 (Tract II).

12.  Right(s) of way of Riverside Drive as recorded in Book 1098, Pages 417 and 419.

13.  Right of way for public utilities (Tract II).

14.  Right(s) of way of Southern Railway to its full legal width.

15.  Rights of others in and to the continued and uninterrupted flow of a small branch and the
     French Broad River affecting the land.

Mar. 26. 2009  7:15AM

13

No. 1682  P.  62

Mar. 26. 2009  7:15AM

## AS TO TRACTS I, II, III, IV, V, AND VII:

16.   Power pole(s) located on insured land and power line(s) crossing said land as shown on survey by J. Glenn Haynes, Registered Land Surveyor, dated October 20, 1994.

17.   Manholes and trailer located on the insured land as shown on survey by J. Glenn Haynes, Registered Land Surveyor, dated October 20, 1994.

## AS TO TRACT VI:

18.   Power pole(s) located on insured land and power line(s) crossing said land as shown on survey by J. Glenn Haynes, Registered Land Surveyor, dated October 21, 1994.

19.   Encroachment of frame building and asphalt situate on property adjoining to the Northwest onto insured land as shown on survey by Registered Land Surveyor, dated October 21, 1994.

20.   Lease with Baptist Retirement Home recorded in Book 1732, Page 474.

21.   Reservation of all easements necessary for the reasonable use, maintenance, repair and construction or reconstruction of all existing utility lines (including gas, sanitary sewer, water, electrical and storm sewer lines) in, upon, over or under the insured land as described in Book 1189, page 460 (Tract IV).

22.   Reservation of all additional easements in, upon, over and across the insured land for any utility lines which may reasonably be required in the future to serve the retained property of the Baptist Retirement Homes of North Carolina, Inc. (formerly North Carolina Baptist Homes, Inc.) as set forth in Deed recorded in Book 1597, Page 207, subject to the approval of the Education Center, Inc., which approval shall not be unreasonably withheld (Tract IV).

23.   Covenant and Agreement that no improvements (including parking areas and roadways) shall be constructed within ten (10) feet of the northwestern boundary line of the insured land, which line shall be the common new boundary between the property of the Education Center, Inc. and the adjoining real property retained by the Baptist Retirement Homes of North Carolina, Inc. (formerly North Carolina Baptist Homes, Inc.) as set forth in Deed recorded in Book 1597, Page 207 (Tract IV).

24.   Reservation of easements for any and all presently existing utility and sewer lines and necessary appurtenances thereto over and under the insured land as set forth in Deed recorded in Book 1602, Page 508 (Tract V).

## AS TO TRACT VIII:

25.   Restrictions appearing of record in Book 780, Page 175, and Book 780, Page 429.

14

No. 1682    P. 63

26. Building setback line of thirty-five (35) feet from the front, as shown on the recorded plat of subdivision.

27. Title to that portion of insured premises within the right-of-way of Richmond Hill Drive.

28. Easement(s) to State Highway Commission recorded in Book 1014 at Page 617, and Book 1014, Page 619.

AS TO TRACT IX:

29. Rights of way for public utilities.

30. Restrictive covenant document(s) recorded in Book 780, Pages 175 and 429. Note: There is a violation of the restrictive covenants in that the thirty-five (35) foot building setback line has been violated.

31. Easements and any other facts as shown in Plat Book 28, Page 92.

32. Easement(s) to Carolina Power and Light Company recorded in Book 1533, page 411.

Mar. 26. 2009  7:15AM

15

No. 1682    P. 64

EXHIBIT "F"

BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is made and entered into as of August ___, 2005, by and between Richmond Hill, Inc., a North Carolina corporation ("Seller"), and Dr. William G. Gray, a resident of Iredell County, North Carolina ("Purchaser").

WITNESSETH:

WHEREAS, Seller and Purchaser have entered into an Agreement of Purchase and Sale dated as of July __, 2005 (the "Purchase Agreement") providing for, among other things, (i) the transfer by Seller to Purchaser of all of Seller's right, title and interest in and to substantially all of the tangible and intangible personal property owned by Seller and used in the operation of the Richmond Hill Inn (excluding, however, those assets (the "Excluded Assets") listed on Exhibit A attached hereto and incorporated herein by reference); (ii) the assignment by Seller to Purchaser of Seller's rights under the contracts and agreements listed on Exhibit B attached hereto and incorporated herein by reference (the "Assigned Agreements"); and (iii) the assumption by Purchaser of those liabilities listed and described on Exhibit C attached hereto and incorporated herein by reference (the "Assumed Liabilities"); and

WHEREAS, the Purchase Agreement contemplates the execution and delivery of this Agreement prior to or at the closing of the transactions provided for therein;

NOW, THEREFORE, in consideration of the premises, the agreements and covenants set forth herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser, intending to be legally bound, hereby agree as follows:

1.    Transfer of Personal Property.  Seller does hereby sell, transfer, convey and assign to Purchaser and his successors and assigns, and Purchaser does hereby accept, all of Seller's right, title and interest in and to the Personal Property, together with possession thereof, free and clear of all liens, taxes, liabilities and adverse claims of any kind whatsoever, except liens for current year taxes not yet due and payable and except the Assumed Liabilities. The Personal Property transferred hereby does not include the Excluded Assets.

2.    Assignment of Agreements.  Seller does hereby assign to Purchaser and his successors and assigns, and Purchaser does hereby accept and assume, all of Seller's right, title and interest in, to and under the Assigned Agreements, free and clear of all liens, liabilities and adverse claims of any kind whatsoever, except the Assumed Liabilities.  Notwithstanding the foregoing if the assignment attempted to be made hereby of any Assigned Agreement would be ineffective as between Seller and Purchaser without the consent of a third party or would

161685_1.DOC

16

Mar. 26. 2009  7:15AM

constitute a cause for terminating or invalidating the Assigned Agreement, then the Assigned Agreement is excluded from this Agreement and Seller will cooperate with Purchaser to obtain all required consents. Upon obtaining such required consents, no further assignment or conveyance shall be required, but rather full and complete title to the Assigned Agreement shall automatically become vested in Purchaser by virtue of this Agreement. If all required consents are not obtained with respect to any Assigned Agreement, Seller will cooperate with Purchaser in any reasonable arrangement designed to provide the Purchaser the benefits of the Assigned Agreement.

3.      Assumption of Liabilities.  Purchaser does hereby assume and agree to pay and perform, when due and payable in accordance with their respective terms, the Assumed Liabilities.

4.      Further Assurances.  Seller will do, execute, acknowledge and deliver all such further acts, deeds, instruments, transfers, powers of attorney or assurances as may be reasonably requested by Purchaser from time to time for the purpose of confirming the sale of the Personal Property and the assignment of the Assigned Agreements, and Purchaser will do, execute, acknowledge and deliver all such further acts deeds, instruments, transfers, powers of attorney or assurances as may be reasonably requested by Seller from time to time for the purpose of confirming the assumption by Purchaser of the Assigned Agreements and the Assumed Liabilities.

5.      Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, and be enforceable by, the parties hereto and their respective heirs, personal representatives, successors and assigns, except neither of the parties shall have the right to assign any of its obligations hereunder without the prior written consent of the other party.

6.      Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of North Carolina.

7.      Counterparts.  This Agreement may be executed in counterparts each of which is an original and all of which taken together shall constitute a single instrument.

IN WITNESS WHEREOF, Seller and Buyer have executed this Bill of Sale, Assignment and Assumption Agreement as of the date first above written.

RICHMOND HILL, INC.

By: _____
Dr. Albert J. Michel, President


_____
Dr. William G. Gray

17